**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| Ocean Semiconductor LLC, <br><br> Plaintiff <br><br> v. <br><br> Silicon Laboratories Inc., <br><br> Defendant. | Civil Action No.: 6:20-cv-1214 <br><br> JURY TRIAL DEMANDED <br><br> PATENT CASE |

**PLAINTIFF OCEAN SEMICONDUCTOR LLC'S OPPOSITION**
**TO DEFENDANT SILICON LABORATORIES INC.'S MOTION**
**TO DISMISS FOR FAILURE TO STATE A CLAIM**

/s/ *Alex Chan*_____

Timothy Devlin
tdevlin@devlinlawfirm.com
Henrik D. Parker
hparker@devlinlawfirm.com
Alex Chan (State Bar No. 24108051)
achan@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

DATED:        March 25, 2021

1

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   LEGAL STANDARD ......................................................................................... 2

    A.    The High Bar for a Motion to Dismiss ...................................................... 2

    B.    The Broad Reach of Infringement Under 35 U.S.C. § 271(g) .................... 3

III.  ARGUMENT ...................................................................................................... 4

    A.    Ocean's Complaint Asserts Plausible Acts of Infringement ....................... 4

        1.    The Complaint Provides Plausible Details Linking TSMC's Manufacturing Tools Directly to the Accused Products ...................................................... 5

        2.    Ocean Provides Plausible Details Beyond What Section 271(g) Requires ............... 6

    B.    The *Iqbal/Twombly* Standard Does Not Require Ocean to Identify *All* Third-Party Foundries and Manufacturing Tools at the Pleading Stage ........................................... 8

        1.    Silicon Labs Has Sufficient Notice as to What It Must Defend Because Ocean Has Identified at Least One Foundry and Five Manufacturing Tools Used to Manufacture the Accused Products .................................................... 8

        2.    Silicon Labs' Cases Are Inapposite ................................................ 9

    C.    Ocean's Complaint Sufficiently Asserts Claims for Induced Infringement as Silicon Labs Gained Knowledge of the Processes and Tools Used to Manufacture Its Products Through Its Contractual Relationships with the Foundries ......................................... 10

    D.    The Complaint Sufficiently Asserts Claims for Willful Infringement ........................ 13

        1.    Ocean's Complaint Sufficiently Pleads Willful Infringement Because Silicon Labs Had Notice of the Asserted Patents ............................................. 13

        2.    This Court Has Previously Ruled that Egregious Conduct Is Not Required to be Pled at the Pleading Stage .................................................. 14

    E.    The 402, 538, 305, and 248 Patents Are All Directed to the Manufacture of Products and Are Subject to Section 271(g) ............................................... 14

        1.    The '402 Patent Involves the Making of Physical Products Such as Silicon Wafers, and Ocean's Pleadings Reflect that Fact ...................................... 14

        2.    The '538 Patent Involves the Making of Physical Products Such as Silicon Wafers, and Ocean's Pleadings Reflect that Fact ...................................... 16

        3.    The '305 and '248 Patents Involve the Making of Physical Products Such as Silicon Wafers, and Ocean's Pleadings Reflect that Fact .................................... 18

    F.    No System Claims of the '651 Patent Were Asserted Under Section 271(g) .............. 19

    G.    In All Events, Fact Issues Preclude Dismissal ........................................ 20

    H.    At Worst, Rather Than Dismissing the Complaint, Leave to Amend Should Be Granted

IV.   CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Artrip v. Ball Corp.*, 735 Fed. Appx. 708 (Fed. Cir. 2018) .......................................... 10

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)........................................................................................................ 2

*Bayer AG v. Housey Pharm., Inc.*
340 F.3d 1367 (Fed. Cir. 2003) ................................................................. 3, 4, 16, 17

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007).............................................................................................. 2, 3, 7

*Bio-Rad Labs Inc. v. Thermo Fisher Scientific Inc.*, 267 F. Supp. 3d 499 (D. Del. 2017).......... 14

*Bio-Technology General Corp. v. Genentech, Inc.*
80 F.3d 1553, 38 USPQ2d 1321 (Fed. Cir. 1996) ................................................... 3, 4

*Causey v. Sewell Cadillac-Chevrolet, Inc.*
394 F.3d 285 (5th Cir. 2004) ......................................................................................... 3

*DermaFocus LLC v. Ulthera, Inc.*, 201 F. Supp. 3d 465 (D. Del. 2016) .................................... 14

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*
888 F.3 1256 (Fed. Cir. 2018) ....................................................................................... 3

*Eli Lilly & Co. v. Am. Cyanamid Co.*
82 F.3d 1568 (Fed. Cir. 1996....................................................................................... 3, 4

*Encoditech, LLC v. Citizen Watch Co. of Am.*
C.A. No. 18-1335-XR, 2019 U.S. Dist. LEXIS 105833 (W.D. Tex. June 25, 2019)................ 3

*Estech Sys. v. Regions Fin. Corp.*, No. 6:20-cv-00322-ADA,  2020 U.S. Dist. LEXIS 200484
(W.D. Tex. Oct. 28, 2020) ........................................................................................... 10

*Frye v. Anadarko Petro. Corp.*, 953 F.3d 285 (5th Cir. 2019) ..................................................... 2

*Griggs v. Hinds Junior Coll.*, 563 F.2d 179 (5th Cir. 1977)........................................................ 20

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed. Cir.
2012) ............................................................................................................................... 9

*James v. J2 Cloud Servs., LLC*, 887 F.3d 1368 (Fed. Cir. 2018) ................................................ 12

*Janssen Pharma., N.V. v. Mylan Pharms. Inc.*, No. 15-760-SLR-SRF, 2016 U.S. Dist. LEXIS
192881 (D. Del. Oct. 18, 2016) ..................................................................................... 7

*Kyowa Hakka Bio, Co. Ltd. v. Ajinomoto Co.*, No. 17-313, 2018-MSG, U.S. Dist. LEXIS 22392
(D. Del. Feb. 12, 2018) ........................................................................................ 6

*Lone Star Motor Imp., Inc. v. Citroen Cars Corp.*, 288 F.2d 69, 75 (5th Cir. 1961) ................ 20

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ....................................................... 2

*McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354 (Fed. Cir. 2007) ............................................ 8, 10

*Motiva Patents, LLC v. Sony Corp.*, 408 F. Supp. 3d 819 (E.D. Tex. 2019)........................... 9, 12

*Parity Networks, LLC v. Cisco Sys.*, No. 6:19-cv-00207-ADA, 2019 U.S. Dist. LEXIS 144094
(W.D. Tex. Jul. 26, 2019) ................................................................................. 13

*Plano Encryption Techs. v. Alkami Tech.*, No. 2:16-cv-1032-JRG, 2017 U.S. Dist. LEXIS
221765 (E.D. Tex. Sept. 22, 2017) ....................................................................... 14

*Skinner v. Switzer*
562 U.S. 521 (2011).......................................................................................... 3

*Univ. of Mass. Med. Sch. v. L'Oréal S.A.*, No. 17-868-CFC-SRF, 2018 U.S. Dist. LEXIS 192832
(D. Del. Nov. 13, 2018) ....................................................................................... 8

**Rules**

Fed. R. Civ. P. 15(a) ........................................................................................... 20

**Statutes**

35 U.S.C. § 271.......................................................................................... 2, 3, 15

**Other Authorities**

5 Chisum on Patents § 16.02............................................................................. 4

## I.        INTRODUCTION

Defendant Silicon Laboratories Inc.'s ("Silicon Labs") Motion to Dismiss (Dkt. 14) is a hodgepodge of conclusory assertions about the adequacy of Ocean Semiconductor LLC's ("Ocean") Complaint (Dkt. 1) that both: (a) confuse the pleading standards and Rule 12(b)(6) law while citing to non-precedential and inapplicable case law; and (b) ignore the extensive evidentiary presentation (including citation to Silicon Labs' website, presentations at trade shows, and Silicon Labs' online Discussion Forum and Expert's Corner) in that Complaint. While purporting to apply a "plausibility" standard, Silicon Labs actually argues for a much higher, and legally improper, pleading standard that would require Ocean to know, and lay out in the Complaint, substantially more than is required under the *Iqbal*/*Twombly* Supreme Court standard.  This misapplication of legal standards runs throughout Silicon Labs' Motion.

Indeed, despite having specified in the Complaint at least one foundry, identified five manufacturing tools, and described more than 165 accused products manufactured by the foundry using the tools, Silicon Labs wants more—it seeks to require Ocean to identify ***every*** foundry and ***every*** tool that might be found to infringe.  That is not the law.  Ocean need only plead facts sufficient to place Silicon Labs on notice as to what it must defend—and Ocean did.

Similarly, in support of its inducement claims, Ocean has provided evidence and factual allegations—allegations that the Court must accept as true—that would allow an inference that Silicon Labs knew about the manufacturing processes and equipment used to manufacture its own products by virtue of its contractual relationships with its foundries.  Already exceeding what is typically required under the *Iqbal*/*Twombly* pleading standard, Ocean's Complaint also offered three specific classes of information that Ocean expects discovery will reveal and that would lend credence to Ocean's inducement allegations.  If this information is insufficient to meet the *Iqbal*/*Twombly* pleading standard, it is difficult to imagine what would.

On willfulness, Silicon Labs argues for an "egregiousness" requirement that is not the law, while ignoring this Court's case precedent establishing that notice letters are sufficient to show knowledge and also to plausibly show that Silicon Labs should have known that its conduct amounted to infringement.

Finally, Silicon Labs wrongly argues that four of the asserted patents cannot be asserted under 35 U.S.C. § 271(g) because they allegedly are not drawn to the manufacture of a product. Silicon Labs mischaracterizes what the patents cover, however, and ignores that each patent teaches and claims manufacturing activities and physical products that place them well within the ambit of § 271(g).

Because this Court must accept all well-pleaded facts as true while drawing all reasonable inferences in Ocean's favor and should *not* be resolving at this stage whether Ocean will ultimately prevail, and because Silicon Labs fails properly to consider the pleaded facts or to apply the various legal standards, Silicon Labs' Motion should be denied in its entirety.

## II.     LEGAL STANDARD

### A.     The High Bar for a Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint or cause of action is appropriate if it fails to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss under Rule 12(b)(6), "[t]he court *must* accept all well-pleaded facts as true and *must* draw all reasonable inferences in favor of the plaintiff." *Frye v. Anadarko Petro. Corp.*, 953 F.3d 285, 290-91 (5th Cir. 2019) (citing *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009));[1] *see also Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461

---

[1] Unless otherwise indicated, all emphasis in this brief has been added.

(5th Cir. 2010) (internal quotations omitted); *see also Bell Atl. Corp.*, 550 U.S. at 570.  The question resolved is "whether [the] complaint was sufficient to cross the federal court's threshold"—*not* whether the plaintiff will ultimately prevail.  *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).  Pleadings should be construed broadly in light of the allegations as a whole, and the facts pled should be viewed expansively in light of the liberal pleading standards.  *See, e.g., Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288-90 (5th Cir. 2004).

This Court has held, based on Federal Circuit precedent, that identification of specific products, when coupled with allegations that defendants make, sell, offer to sell, import or use the accused products in the United States and that each accused product satisfies each and every limitation of at least one patent claim, is enough to meet "the relatively low threshold for stating a claim for patent infringement."  *Encoditech, LLC v. Citizen Watch Co. of Am.*, C.A. No. 18-1335-XR, 2019 U.S. Dist. LEXIS 105833, at *10 (W.D. Tex. June 25, 2019) (citing *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3 1256 (Fed. Cir. 2018)).

B.     **The Broad Reach of Infringement Under 35 U.S.C. § 271(g)**

Section 271(g) attaches liability to the import or sale of products made by a patented process.  "By enacting the Process Patent Amendments Act, the principal portion of which is codified as 35 U.S.C. § 271(g), Congress changed the law by making it an act of infringement to import into the United States, or to sell or use within the United States 'a product which is made by a process patented in the United States[.]'"  *Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1572 (Fed. Cir. 1996).

Congress created liability under § 271(g) to ensure that holders of process patents and domestic manufacturers were not disadvantaged relative to holders of device and system claims or foreign manufacturers, and the courts interpret "made by" in view of these policy goals.  *Bayer AG v. Housey Pharm., Inc.*, 340 F.3d 1367, 1368, 1373 (Fed. Cir. 2003); *Bio-Technology*

*General Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1561 (Fed. Cir. 1996), *cert. denied*, 519 U.S. 911 (1996); *Eli Lilly & Co.* 82 F.3d at 1578; 5 Chisum on Patents § 16.02[6][d][iv] (2019).  The Federal Circuit has interpreted the term "made" as used in § 271(g) to mean "manufactured" and the term "product" to mean a "physical article."  *Bayer AG*, 340 F.3d at 1377.

　　　*Section 271(g) is applied broadly.*  When enacting the Process Patent Amendments Act ("PPAA"), Congress specifically *declined* to require that a product be made "directly" from a patented process in order to infringe under § 271(g).  *Eli Lilly & Co.*, 82 F.3d at 1576.  "In enacting the PPAA, Congress did not include a positive definition of 'made by.'  The court must interpret 'made by' in light of the PPAA's policy to afford meaningful protection for owners of patents claiming processes."  5 Chisum on Patents § 16.02[6][d][iv] (2019) (citing *Bayer*, 340 F.3d at 1368; *Bio-Technology General Corp.*, 80 F.3d at 1561).  "The connection between a patented process and a product can vary from immediate . . . to remote[.]"  5 Chisum on Patents § 16.02[6][d][iv] (2019).  Consequently, whether a product is "made by" a patent should be interpreted expansively to include products made through the "agency," "efficacy," "work," "participation," "means or instrumentality," "medium," or "operation" of a process.  *Bayer* at 1378, n.12 (citing Webster's and Random House dictionaries).

## III.   ARGUMENT

### A.   Ocean's Complaint Asserts Plausible Acts of Infringement

　　　Silicon Labs argument that the Complaint's infringement contentions are "conclusory" and only raise a "possibility of infringement" (Dkt. 14 at 8) fails to address the abundance of detail contained in the Complaint.  What Silicon Labs attacks is a straw man, just the introductory or summary sentences of the complaint divorced from the other pleadings that establish pleaded allegation in detail.  Each statement that Silicon Labs argues is conclusory—

that Taiwan Semiconductor Manufacturing Company Ltd. ("TSMC") manufactures products for Silicon Labs; that TSMC has access to the asserted manufacturing tools; and that the accused products are manufactured according to the patented processes—is more than sufficiently supported by citations throughout the Complaint so as to survive a motion to dismiss.

### 1. The Complaint Provides Plausible Details Linking TSMC's Manufacturing Tools Directly to the Accused Products

Silicon Labs' suggestion that the Complaint identifies only a "possibility of infringement" falls flat in view of the voluminous evidence identified.  As an initial matter, the Complaint describes in ample detail how Silicon Labs engaged, and still engages, TSMC to manufacture accused products for Silicon Labs.  For example, the Complaint identifies Silicon Labs' microcontrollers (or "MCUs") as accused products (Dkt. 1 at ¶¶ 11, 15, 17, 19), and describes one of Silicon Labs' "Process Change Notice #1011021" as publicly announcing that a TSMC fabrication facility (called "Fab10") has been contracted as a "Fabrication site for Silicon Labs MCU products," which, according to that same notice, is "an additional Fabrication site for Silicon Labs MCU products currently being fabricated in TSMC's Fab3 site."  (Dkt. 1 at ¶ 8; *see* Chan Decl. Ex. 1 at ¶ 1.)[2]

To tie Silicon Labs' accused products directly to the offending tools, the Complaint also describes how TSMC purchased such tools for the manufacture of accused products.  For example, the Complaint identifies ASML's TWINSCAN semiconductor manufacturing equipment (one of several extreme ultraviolet ("EUV") lithography systems offered by ASML) as one of the infringing tools used to manufacture accused products for Silicon Labs, and includes a link to a news report affirming that TSMC had placed a "large order" in November

---

[2]  Citations to Exhibits in this brief refer to the Exhibits attached to the co-filed Declaration of Alex Chan in Support of Ocean Semiconductor LLC.'s Opposition to Defendant Silicon Laboratories Inc.'s Motion to Dismiss for Failure to State a Claim.

2020 for such EUV systems (an order that boosted ASML's stock value).  (Dkt. 1 at ¶ 17.)  The Complaint also offers evidence indicating that ASML had launched a training facility for TSMC (for "teach[ing] [TSMC's] engineers how to use its extreme ultraviolet (EUV) lithography systems") as well as LinkedIn profiles of ASML engineers who support this training endeavor.

Thus, contrary to Silicon Labs' contention of a "bare conclusion" that all of Silicon Labs' products are manufactured using the infringing tools, Ocean provided ample evidence linking the tools directly to accused products.  This more than meets the *Iqbal*/*Twombly* pleading standard.

## 2. Ocean Provides Plausible Details Beyond What Section 271(g) Requires

Silicon Labs erroneously contends that Ocean has not pled plausible facts supporting that the accused products are "manufactured according to any asserted method, much less all Silicon Labs' products and all asserted methods," such as detailing "characteristics" or providing a "teardown" of the accused products.  (Dkt. 14 at 8.)  As a preliminary matter, Silicon Labs overlooks that Ocean's infringement allegations are directed to Section 271(g), which focuses on unauthorized importation into the United States, or sale or use within the United States, of a "product which is made by a *process* patented in the United States."  Thus, this is not a case where teardown of a product would be required to demonstrate infringement.

Moreover, nothing in Section 271(g) requires Ocean to provide the granular level of specificity sought by Silicon Labs, which courts in other districts have recognized as unnecessary.  All that is required is that any party utilizes the patented process to manufacture products and eventually imported such products into the United States.  *See, e.g.*, *Kyowa Hakka Bio, Co. Ltd. v. Ajinomoto Co.*, No. 17-313, 2018-MSG, U.S. Dist. LEXIS 22392, at *24 (D. Del. Feb. 12, 2018) ("Under [the second clause of § 271(g)], the [] Complaint **need not allege facts that the offending process was practiced for a product manufactured outside the United States**

. . . ."); *Janssen Pharma., N.V. v. Mylan Pharms. Inc*., No. 15-760-SLR-SRF, 2016 U.S. Dist. LEXIS 192881, at *40 (D. Del. Oct. 18, 2016) ("The statutory language supports plaintiffs' assertion that ***it is defendants' act of importing which is relevant to the § 271(g) analysis, and the fact that a third party engages in the infringing process is irrelevant under § 271(g)*** . . . ."). Indeed, the specificity proposed by Silicon Labs is inconsistent with Supreme Court precedent, which cautions courts not to transform the plausibility standard into a probability standard. *Twombly*, 550 U.S. at 556. *Twombly* simply requires enough facts at the pleading stage to rise above the level of sheer speculation, such that there is "a reasonable expectation that discovery will reveal evidence" supporting a claim for relief. (*Id.*) Ocean has clearly done this and more.

Silicon Labs also ignores the voluminous claim charts accompanying the Complaint that demonstrate use of the patented processes by its contracted supplier TSMC. As one example, the '402 patent is directed to "a fault detection system in a semiconductor manufacturing process to detect the presence of a manufacturing fault and perform corrective measures in expedient manner." (*See* Dkt. 1 at ¶ 45.) In two separate claim charts provided for that patent, Ocean demonstrates, in great detail, how the manufacturing tools (e.g., Applied Materials' E3 system and PDF Solutions' Exensio system) determine if a fault condition exists during manufacturing (e.g., based on failed patterns on a semiconductor wafer), and if such a condition exists, perform corrective actions such as updating recipe tables or scraping the die or package that contains the fault condition. (*See* Dkt. 1-9 at 10-11; Dkt. 1-10 at 19-21.) The result is a defect-free product. This defect-free "characteristic" is undoubtedly in all of Silicon Labs' accused products. Thus, Ocean's allegation that Silicon Labs' accused products are manufactured by an infringing process is not only plausible; it is already established.

**B.      The *Iqbal/Twombly* Standard Does Not Require Ocean to Identify *All* Third-Party Foundries and Manufacturing Tools at the Pleading Stage**

Silicon Labs does not claim that it cannot understand Ocean's infringement theories based on Ocean's explicit identification of third-party foundries and manufacturing tools. Instead, it complains that Ocean has not identified ***all*** such foundries and tools.  (Dkt. 14 at 9.) Silicon Labs, however, fails to cite a single case requiring a plaintiff to identify this level of specificity for pleading purposes under Section 271(g).  It cannot for good reason—under the *Iqbal/Twombly* standard, a plaintiff need only "plead facts sufficient to place [an alleged infringer] on notice as to what [the alleged infringer] must defend."  *Univ. of Mass. Med. Sch. v. L'Oréal S.A.*, No. 17-868-CFC-SRF, 2018 U.S. Dist. LEXIS 192832, at *13 (D. Del. Nov. 13, 2018) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)).

**1.      Silicon Labs Has Sufficient Notice as to What It Must Defend Because Ocean Has Identified at Least One Foundry and Five Manufacturing Tools Used to Manufacture the Accused Products**

Silicon Labs does not, and indeed cannot, dispute that it is on notice as to: (a) which accused products infringe (e.g., with more than 165+ products and models listed by Ocean); (b) which foundries are implicated (e.g., TSMC); and (c) what manufacturing tools are used to manufacture the accused products (e.g., Applied Materials' E3 system, PDF Solutions' Exensio system, camLine's LineWorks system, and ASML's TWINSCAN and YIELDSTAR systems)—all of which are specified for each asserted patent in the Complaint.  Instead, Silicon Labs seeks Ocean to identify, at the pleading stage, all unknown foundries and unnamed tools, the absence of which allegedly would somehow open the door for a "fishing expedition."  (Dkt. 14 at 10.)

But Silicon Labs misses the mark.  The *Iqbal/Twombly* standard does ***not*** require Ocean to "prove its case at the pleading stage" by identifying all foundries that Silicon Labs contracted to manufacture its accused products and naming all such tools at the outset.  *In re Bill of Lading*

*Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012).  To the extent other such foundries exist but are not publicly known, Silicon Labs itself obviously knows about them.  To require *all* such information would "effectively require[] [Ocean] to prove, pre-discovery, the facts necessary to win at trial" and "[t]hat is not the law."  *Motiva Patents, LLC v. Sony Corp.*, 408 F. Supp. 3d 819, 831 (E.D. Tex. 2019).  Instead, Ocean "need only identify the class of information which it reasonably expects will be revealed through discovery in support of its claims."  (*Id.*)

Nevertheless, Ocean has pled with "enough facts to raise a reasonable expectation"—through its 71-page Complaint and eight accompanying claim charts, that the accused products are and were imported, sold, or used by Silicon Labs and made by an infringing patented process.  Thus, neither Silicon Labs nor this Court need speculate about what evidence discovery may reveal or be concerned that discovery would be so broad that it would become a "fishing expedition," because Ocean has identified precisely what it expects discovery will reveal: Silicon Labs' importation of the accused products that infringe each of the asserted patents.

### 2.    Silicon Labs' Cases Are Inapposite

Silicon Labs misleadingly cites to *Artrip, Estech,* and *McZeal* for the proposition that the pleading standard requires Ocean to identify *all* unnamed "machines."  (Dkt. 14 at 11.)  These cases provide no such support.  First, all three are inapposite because they are not directed to Section 271(g).  Second, they are irrelevant because Ocean has not accused *the manufacturing tools* of infringement; instead, Ocean's Complaint accuses Silicon Labs' own *products* that are and were imported, sold, and/or used in the U.S. as infringing Section 271(g).

Each is distinguishable on further grounds as well.  In *Artrip*, the Federal Circuit affirmed the district court's motion to dismiss because the "complaint does not identify, for example, by photograph or name, *any* of the particular machines that allegedly infringe other than by broad

functional language." *Artrip v. Ball Corp.*, 735 Fed. Appx. 708, 715 (Fed. Cir. 2018). Here, however, Ocean has identified by name at least *five* such "machines" used to manufacture the accused products. (*See, e.g.*, Dkt. 1 at ¶¶ 9, 13, 17, 19.) Ocean has also provided "photograph[s]" of such tools. (*See, e.g.*, Dkt. 1-8 (claim chart for the '651 patent), which identifies the name and provides a photo of the manufacturing tool called "TWINSCAN.")

Similarly, *Estech* is inapplicable because the plaintiff there failed to identify even a single product, which is not the case here. *Estech Sys. v. Regions Fin. Corp.*, No. 6:20-cv-00322-ADA, 2020 U.S. Dist. LEXIS 200484, at *5-6 (W.D. Tex. Oct. 28, 2020) ("The statement claiming infringement fails to reasonably inform Defendant as to what devices or practices, if any, are accused of infringement").

Finally, *McZeal* actually supports Ocean's position. There, the Federal Circuit found that the plaintiff's "complaint contain[ed] enough detail to allow the defendants to answer and thus meets the notice pleading required to survive a Rule 12(b)(6) motion" because the plaintiff "described the means by which [Defendant] allegedly infringes ('[t]he defendant's [] machine physically have [sic] or perform all of the basic elements contained in the patent claims . . . and pointed to the specific parts of the patent law invoked." *McZeal*, 501 F.3d at 1357. The Complaint here goes far beyond the standard of *McZeal*.

**C.    Ocean's Complaint Sufficiently Asserts Claims for Induced Infringement as Silicon Labs Gained Knowledge of the Processes and Tools Used to Manufacture Its Products Through Its Contractual Relationships with the Foundries**

While Silicon Labs does not dispute that it has knowledge of the Asserted Patents, it misleadingly avers that it "could not have possibly known the alleged induced acts would constitute infringement" because it "does not know the processes and tools used to manufacture its products." (Dkt. 14 at 13.) This argument fails for two reasons.

First, as specified in the Complaint, Silicon Labs has contractual relationships with its foundries, which use third-party manufacturing tools to manufacture the accused products. (Dkt. 1 at ¶¶ 8, 9, 17, 19.) As the customer, and as the designer and developer of its accused products, Silicon Labs surely has knowledge of the processes and equipment used to manufacture them. Indeed, this knowledge can be gleaned from Silicon Labs' own "Process Change Notice" identified in the Complaint, which specifies that the second TSMC facility being used as an additional manufacturing site fabricates products that "comply with Silicon Labs relevant datasheets and quality levels," and which have "no impact on form, fit, function, quality or reliability." (Dkt. 1 at ¶ 8; *see* Chan Decl. Ex. 1 at ¶ 1.) This notice thus suggests that Silicon Labs communicated with TSMC, tested the accused products, and along the way, gained knowledge about the fabrication processes adopted and tools used by TSMC to make the products in announcing the "successful qualification" of TSMC. Hence, Ocean has, at a minimum, provided factual allegations—allegations that the Court must take as true—that would allow an inference to be drawn that Silicon Labs knew about the fab processes and equipment used to manufacture its own products by virtue of its contractual relationships with its foundries.

Second, the Complaint alleges that Silicon Labs is liable for induced infringement by **third-party importers** because Silicon Labs has encouraged them to infringe the Asserted Patents ***via importation under § 271(g)***, including "ordering or instructing" them to import the accused products, "providing directions and other materials" to them to enable such importation, and "conditioning the receipt of benefits (included but not limited to payment)" to them on such importation. (Dkt. 1 at ¶¶ 85, 105, 125, 145, 166, 186, 206.) The same allegations were made with respect to **third-party manufacturers** because Silicon Labs has encouraged them to do so by ordering the accused products from them. (Dkt. 1 at ¶¶ 86, 106, 126, 146, 167, 187, 207.)

Ocean has identified at least three specific classes of information relevant to induced infringement: (1) "ordering or instructing" third-party importers and manufacturers to import the accused products; (2) communications "providing directions and other materials" to enable such parties to import the accused products in an infringing manner; and (3) conditioning payments to such parties on importation.  As such, the *Twombly* standard is more than met because Ocean has identified "a specific class of information that it expects discovery will reveal."  *Motiva*, 408 F. Supp. 3d at 831 (citing *James v. J2 Cloud Servs., LLC*, 887 F.3d 1368, 1372 (Fed. Cir. 2018) ("[O]n a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim")).  "By identifying specific classes of information, [Ocean] makes a ***plausible*** showing that discovery will reveal evidence—specifically, those three classes of evidence—in support of [Ocean's] inducement claims."  *Id.* (emphasis in original).

Silicon Labs falsely asserts that Ocean's inducement allegations rely on "boilerplate accusations," but the Complaint reveals that Silicon Labs is wrong.  (Dkt. 1 at ¶¶ 80, 100, 120, 140, 161, 181, and 201.)  For example, in paragraph 80, Ocean's Complaint describes how Silicon Labs induced infringement, including "promot[ing] the sale, use, and importation" of the accused products by pointing to Silicon Labs' website (e.g., www.Silicon Labs.com), Silicon Labs' presentations at trade shows (e.g., the Consumer Technology Association's Consumer Electronics Show ("CES")) and Silicon Labs' online Discussion Forum and Expert's Corner.  Even after the litigation commenced, there is no public information indicating that Silicon Labs has asked TSMC to stop manufacturing the Accused Products or to prevent importers from shipping the Accused Products into the United States.  Instead, Silicon Labs continues to promote the sale, use, and importation of the accused products through its distribution and sales channels.  This fact alone, when viewed in the light most favorable to the non-movant, supports

Ocean's inducement allegations.

### D.   The Complaint Sufficiently Asserts Claims for Willful Infringement

#### 1.   Ocean's Complaint Sufficiently Pleads Willful Infringement Because Silicon Labs Had Notice of the Asserted Patents

As with the inducement allegations, Silicon Labs erroneously complains that the Complaint's willfulness allegations amount to "legal conclusions." (Dkt. 14 at 15.) To be sure, Silicon Labs does not dispute that it had the relevant knowledge; instead, it only disputes whether Ocean has pled such an allegation. As discussed in Section III.C. above, however, Silicon Labs' studious avoidance of evidence cited in the Complaint does not make that evidence disappear. This evidence includes Silicon Labs' Process Change Notice, suggesting that Silicon Labs knew about the fab processes and tools used to manufacture the accused products.

Silicon Labs doubles down on its argument that Ocean has not adequately pled willfulness by pointing to Ocean's failure to attach a copy of its notice letters to Silicon Labs (dated October 16 and November 25, 2020) to the Complaint. (Dkt. 1 at 15.) This is a red herring because Silicon Labs does not dispute that it received Ocean's notice letters. The fact that these letters were not attached to the Complaint does not make Ocean's willfulness allegations less credible or plausible. As this Court has held, such letters are sufficient to show knowledge, and "to plausibly show that, after acquiring that knowledge, Defendant infringed the patent and knew, or should have known, that its conduct amounted to infringement of the patent." *Parity Networks, LLC v. Cisco Sys.*, No. 6:19-cv-00207-ADA, 2019 U.S. Dist. LEXIS 144094, at *9 (W.D. Tex. Jul. 26, 2019).

Moreover, the Complaint notes that Silicon Labs "has continued to infringe" since the dates on which Silicon Labs received the notice letters. (Dkt. 1 at ¶¶ 89, 109, 129, 149, 170, 190, 210.) This is sufficient to survive a Rule 12 motion. *Plano Encryption Techs. v. Alkami Tech.*,

No. 2:16-cv-1032-JRG, 2017 U.S. Dist. LEXIS 221765, at *19 (E.D. Tex. Sept. 22, 2017) ("[A]n allegation that a defendant continues its allegedly infringing conduct even after receiving notice of a complaint is sufficient to at least state a claim for willful infringement").[3]

### 2. This Court Has Previously Ruled that Egregious Conduct Is Not Required to be Pled at the Pleading Stage

Silicon Labs' second argument—that the Complaint does not plead "egregious conduct" (Dkt. 14 at 16)—completely misstates the standard for willful infringement.  Even in the standard quoted in Silicon Labs' Motion two pages earlier, the so-called "requisite" element of "egregiousness" is conspicuously absent.  (Dkt. 14 at 14.)  As this Court has held, a pleading of egregiousness is ***not*** required at this stage of the proceedings.  *Frac Shack, Inc. v. Afd Petroleum Tex. Inc.*, No. 7:19-cv-00026-ADA, 2019 U.S. Dist. LEXIS 141114, at *at *2, 5 (W.D. Tex. Jun. 13, 2019) (holding that willfulness was sufficiently plead, even when defendant argued that egregiousness was not articulated in the complaint); *Bio-Rad Labs Inc. v. Thermo Fisher Scientific Inc.*, 267 F. Supp. 3d 499, 501 (D. Del. 2017) ("At the pleading stage, it is not necessary to show that the case is egregious."); *DermaFocus LLC v. Ulthera, Inc.*, 201 F. Supp. 3d 465, 473 (D. Del. 2016) (holding that general allegations of willful infringement are sufficient under *Halo* to withstand a motion to dismiss).

### E. The 402, 538, 305, and 248 Patents Are All Directed to the Manufacture of Products and Are Subject to Section 271(g)

### 1. The '402 Patent Involves the Making of Physical Products Such as Silicon Wafers, and Ocean's Pleadings Reflect that Fact

As a preliminary matter, at least one defendant in a parallel litigation (namely NVIDIA) does not challenge the applicability of Section 271(g) to the '402 patent, implicitly recognizing

---

[3] While Silicon Labs cites to *Inhale* and *Meetrix* for the proposition that Ocean provided only a threadbare recital of elements of willful infringement (Dkt. 14 at 16), both cases are distinguishable because the plaintiffs there never sent notice letters.

that Silicon Labs' argument here has no merit.  Indeed, the '402 patent itself confirms that the invention relates to: (1) the making of ***physical products*** such as silicon wafers; and (2) the actual manufacture of such products.  For example, the exemplary system and its manufacturing tools as described in the '402 patent are "semiconductor fabrication equipment used to produce a processing piece, such as a silicon wafer," and the exemplary tool is a "Rapid Thermal Processing (RTP) tool" or "a tool for processing silicon wafers."  (Dkt. 1-3 ('402 patent) at 2:42-48.)  The  independent method claim recites "the manufacture of a processing piece"; and the independent system claim recites a tool adapted to "manufacture a processing piece" (claim 8).  One dependent claim recites that "the processing piece is a silicon wafer" (claim 14).

Ocean's pleading allegations are consistent with the '402 patent's focus on physical articles, in particular semiconductor products made by Silicon Labs.  The Complaint limits its accusations under § 271(g) to products made using the claimed method—that "SILICON LABS has directly infringed and continues to infringe . . . by importing into the United States, and/or using, and/or selling, and/or offering for sale in the United States, without authority or license, the '402 Accused Products, in violation of 35 U.S.C. § 271(g)."  (Dkt. 1 at ¶ 95.)

Apparently recognizing that Ocean clearly accuses eligible products, Silicon Labs contends that "[t]he only thing produced via the execution of Claim 1 is information, namely that a 'fault condition exists' in a processing tool."  (Dkt. 14 at 18.)  But Silicon Labs' argument is premised on a deliberate misreading of what the '402 patent actually describes and claims, ***which is a process for manufacturing physical products ("processing pieces") such as silicon wafers***. The claims themselves demonstrate this fact.

Specifically, the patented system receives "operational state data of a processing tool" (e.g., recited as "receiving . . .operational state data of a processing tool ***related to the***

*manufacture of a processing piece*" in claim 1) "when the tool 105 is operating and processing a given wafer," and sends data to a fault detection unit (e.g., recited as "sending the translated state data from the data collection unit to the fault detection unit in claim 1) "while the particular wafer is being processed" to ensure that the tool is operating "within acceptable operational limits."  (Dkt. 1-3 ('402 patent) at 3:27-31; 4:3-7.)  If the processing tool is operating within appropriate parameters, manufacturing proceeds (e.g., recited as "determining if a fault condition exists with the processing tool" in claim 1).  If a "fault condition" is detected, the system can act to adjust the manufacturing process in a variety of ways, including: "manipulate the tool," (*id.* at 5:18-20); "shut down the tool," (*id.* at 5:65-6:4); or "apprise a technician of any potential solutions to rectify the fault condition" (*id.* at 6:4-9) (e.g., recited as "performing a predetermined action on the processing tool in response to the presence of a fault condition" in claim 1).  Where the system is monitoring tools but detects no fault, manufacturing can continue as normal.  All of these activities, as well as each of the recited limitations, relate directly to the *manufacture of the physical products,* and the language of claim 1 readily reflects them.

> **2.     The '538 Patent Involves the Making of Physical Products Such as Silicon Wafers, and Ocean's Pleadings Reflect that Fact**

The '538 patent covers similar subject matter to the '402 patent—fault detection.  As such, the discussion just above as to the '402 patent applies equally to the '538 patent.  Like the '402 patent, claim 1 of the '538 patent recites "[a] method, comprising: performing in a computer a fault detection analysis relating *to processing of a workpiece*."  (Dkt. 1-7 ('538 patent) at 13:28-30.)  This "workpiece comprises a semiconductor wafer."  (Claim 2.)  The fault detection analysis includes determining "a relationship of a parameter relating to said fault detection analysis to a detected fault," including a relationship between at least one of "pressure," "temperature," "data," "humidity," or "gas flow."  (*See* claim 9.)  The performance

of the fault detection method is not undertaken for mere testing or data collection, but rather "relat[es] to ***processing of a subsequent workpiece*** . . . ." (*Id*. at 13:38.) Thus, on its face, the method recited in claim 1 directly affects the manufacture of semiconductor wafers.

This is confirmed by the specification, which further delineate the ways in which the patented method involves not only collection and analysis of information from the manufacturing process, but also control of manufacturing tools used for manufacturing semiconductor wafers. For example, as part of the weighting process, "the processing system ***may perform subsequent processes upon the semiconductor wafers*** based upon the newly adjusted parameter-weighting . . . ." (*Id*. at 11:7-9.) Fig. 7 similarly indicates that the "perform subsequent process step" follows the "perform dynamic PCA weighting process" step. (*Id*. at Fig. 7.)

Relying on *Bayer*, Silicon Labs again contends that "the only thing produced via the execution of Claim 1 is information . . . ." (Dkt. 14 at 18.) In doing so, Silicon Labs misconstrues *Bayer*, arguing that § 271(g) liability only attaches where the patented method directly claims the physical manufacture of that product. *Bayer* holds no such thing. The language from *Bayer* cited by Silicon Labs relates to the question of whether information developed using a patented process is a "product" within the scope of § 271(g), such that ***importation of that information*** is an infringement. *Bayer AG*, 340 F.3d at 1370-71. The court in *Bayer* held that the importation of information was not importation of a "product," because information is not "manufactured" at all. *Id.* 340 F.3d at 1377. Here, what is imported is not information, but the physical products that are manufactured using these patented processes.

Notably, *Bayer* itself articulates this distinction, demonstrating why the asserted patents here are all within the scope of § 271(g). The *Bayer* court separately analyzed claims involving a physical drug, holding that it "is beyond dispute that a drug is a physical product that has been

17

manufactured."  *Id*.  As with the drug in *Bayer*, it is beyond dispute that the semiconductor

wafers described in the '538 patent, and the products alleged to infringe, are physical products,

and that the '538 patent relates directly to the ***manufacture*** of such products.

> **3.      The '305 and '248 Patents Involve the Making of Physical Products
> Such as Silicon Wafers, and Ocean's Pleadings Reflect that Fact**

Silicon Labs construes the claimed invention of the '305 and '248 patents as "a schedule

for some future unspecified action" (Dkt. 14 at 19) but ignores the fact that scheduling

semiconductor fabrication processes is an indispensable part of semiconductor manufacturing.

As discussed in the specification, the semiconductor fabrication process "involves processing a

number of wafers through a series of fabrication tools" in which "[l]ayers of materials are added

to, removed from, and/or treated on a semiconducting substrate during fabrication to create the

integrated circuits."  (Dkt. 1-2 ('305 patent) at 1:38-42; Dkt. 1-4 ('248 patent) at 1:41-45.)

"Efficient management of a facility for manufacturing products such as semiconductor chips

requires monitoring various aspects of the manufacturing process" and "track[ing] the amount of

raw materials on hand, the status of work-in-process and the status and availability of machines

and tools at every step in the process."  (Dkt. 1-2 at 2:10-16; Dkt. 1-4 at 2:12-18.)

The '305 and '248 patents both describe ways "for efficiently scheduling and controlling

the lots [] of wafers [] through the fabrication process," such as "schedul[ing] ahead for each lot

[] one or more operations on a specified qualified process tool 115, including. . . making

optimizing decisions such as running an incomplete batch as opposed to waiting for an

approaching lot," and "schedul[ing] and initiat[ing] activities such as lot transport and

processing." (Dkt. 1-2 at 6:45-48 and 6:65-7:11; Dkt. 1-4 at 6:47-50 and 6:67-7:13.)  As is

evident, each of these processes is more than just "a schedule for some future unspecified

action."  Indeed, without a means of scheduling semiconductor lots and individual wafers during

production, successful semiconductor manufacturing would be impossible.

This teaching is also manifested in the claims.  For example, claim 1 of each patent recites "a method for scheduling ***in an automated manufacturing environment***," including "automatically detecting an occurrence of a predetermined event in an integrated, automated process flow," which is a "process flow [for] fabricat[ing] ***semiconductor devices***."  (Dkt. 1-2 at 5:3-4; Dkt. 1-4 at 5:5-6.)  This "process flow comprises a portion of a semiconductor manufacturing facility."  (*See* Claim 43 of the '305 patent.)  Several dependent claims also elaborate on the types of events detected during manufacturing at the "manufacturing facility."

For example, claim 7 of the '305 patent and claim 5 of the '248 patent specify the "predetermined event" to include "a machine becoming available, . . . a chamber going down, a chamber becoming available, a change in machine capabilities, a lot arriving at a machine, . . . a lot wafer count changed, a lot process operation changed, and a lot departing a machine."  Other dependent claims (e.g., claim 9 of the '305 patent and claim 7 of the '248 patent) also focus on possible actions taken in view of a detected event that directly impacts manufacturing, including "adding new processing capabilities" and "deleting old processing capabilities" "of a machine." (Dkt. 1-2 at Table 1; Dkt. 1-4 at Table1.)

Thus, the "scheduling" method as described in both the '305 and '248 patents ***governs not only when to take certain manufacturing actions but also what manufacturing actions to take in making the physical products***.  (Dkt. 15 at 6.)  It dictates when and how, for example, the wafers, lots, and tools interact to ensure successful manufacturing of semiconductor wafers.

### F.    No System Claims of the '651 Patent Were Asserted Under Section 271(g)

Silicon Labs' final argument—that claim 1 of the '651 Patent cannot support a cause of action under § 271(g)—once again misstates the facts of the Complaint when it suits Silicon Labs to do so.  The Complaint plainly asserts infringement of ***claim 19*** of the '651 patent under §

271(g).  (Dkt. 1 at ¶ 75.)  Claim 19, however, is a method claim, **not** a system claim, and is

therefore validly asserted.  Nowhere in the paragraph of the Complaint cited by Silicon Labs (¶

73) is § 271(g) mentioned.  If there is any doubt whether claim 1 or claim 19 is being asserted

under § 271(g), the '651 claim chart (Dkt. 1-8) summarily resolves the issue in Ocean's favor.

It is also disingenuous for Silicon Labs to make such a frivolous contention despite the

parties' meet and confer during which Ocean explained how Silicon Labs had misread the

Complaint while confirming in writing that claim 19 is the claim being asserted under Section

271(g).  (*See* Chan Decl. Ex. 2.)

### G.    In All Events, Fact Issues Preclude Dismissal

While, as discussed above, the claims of the '402, '538, '305, and '248 patents fall within

the scope of § 271(g) as a matter of law, at least one fact issue exists regarding the commercial

viability of producing the accused products without use of the patented methods.  This fact issue

also precludes dismissal of the challenged causes of action.  Ocean should be entitled to

discovery on these issues before any further consideration is undertaken.

### H.    At Worst, Rather Than Dismissing the Complaint, Leave to Amend Should Be Granted

Should the Court be inclined to rule in Silicon Labs' favor, Ocean should be granted

leave to amend the Complaint rather than having it dismissed outright.  Indeed, this Court has the

power to *sua sponte* grant leave to amend the Complaint as justice requires.  Fed. R. Civ. P.

15(a);  *Lone Star Motor Imp., Inc. v. Citroen Cars Corp.*, 288 F.2d 69, 75 (5th Cir. 1961).

Granting leave to amend is especially appropriate in the context of dismissing for failure to state

a claim.  *Griggs v. Hinds Junior Coll.*, 563 F.2d 179, 180 (5th Cir. 1977).

## IV.    CONCLUSION

For all of the reasons stated above, Silicon Labs' Motion to Dismiss should be denied.

Dated:  March 25, 2021

<div style="margin-left:45%">

/s/ Alex Chan
Timothy Devlin
tdevlin@devlinlawfirm.com
Henrik D. Parker
hparker@devlinlawfirm.com
Alex Chan (State Bar No. 24108051)
achan@devlinlawfirm.com
**DEVLIN LAW FIRM LLC**
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone:  (302) 449-9010
Facsimile:  (302) 353-4251

*Attorneys for Plaintiff*
OCEAN SEMICONDUCTOR LLC

</div>

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system on March 25, 2021.

<div align="right">

*/s/ Alex Chan*
Alex Chan

</div>