**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **OCEAN SEMICONDUCTOR LLC,**<br> *Plaintiff,*<br>**vs.**<br>**MEDIATEK INC., ET AL.,**<br> *Defendant.* | **NO. 6:20-cv-01210-ADA** |
| **OCEAN SEMICONDUCTOR LLC,**<br> *Plaintiff,*<br>**vs.**<br>**NVIDIA CORPORATION**,<br> *Defendant.* | **NO. 6:20-cv-01211-ADA** |
| **OCEAN SEMICONDUCTOR LLC,**<br> *Plaintiff,*<br>**vs.**<br>**NXP SEMICONDUCTORS NV, ET AL.,**<br> *Defendant.* | **NO. 6:20-cv-01212-ADA** |
| **OCEAN SEMICONDUCTOR LLC,**<br> *Plaintiff,*<br>**vs.**<br>**RENESAS ELECTRONICS CORPORATION, ET AL.,**<br> *Defendant.* | **NO. 6:20-cv-01213-ADA** |
| **OCEAN SEMICONDUCTOR LLC,**<br> *Plaintiff,*<br>**vs.**<br>**SILICON LABORATORIES INC.,**<br> *Defendant.* | **NO. 6:20-cv-01214-ADA** |
| **OCEAN SEMICONDUCTOR LLC,**<br> *Plaintiff,*<br>**vs.**<br>**STMICROELECTRONICS INC.,**<br> *Defendant.* | **NO. 6:20-cv-01215-ADA** |
| **OCEAN SEMICONDUCTOR LLC,**<br> *Plaintiff,*<br>**vs.**<br>**WESTERN DIGITAL TECHNOLOGIES, INC.,**<br> *Defendant.* | **NO. 6:20-cv-01216-ADA** |

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARDS .................................................................................... 2

III.   TECHNOLOGY BACKGROUND .................................................................. 3

     A.    Technology Background and Asserted Patents ........................................ 3

     B.    Level of Ordinary Skill in the Art .......................................................... 5

IV.   DISPUTED TERMS .......................................................................................... 5

     A.    '097 PATENT ....................................................................................... 5

          1.    The scope of "ultra-thin resist layer" in claims 1–3 and 10–17 of the '097 patent is not reasonably certain, rendering the term indefinite ..................... 5

     B.    '651 PATENT ..................................................................................... 11

          1.    Overview .................................................................................. 11

          2.    Ocean's proposed construction of "pneumatic cylinder" defies the intrinsic and extrinsic record (asserted claims 19–24, 75, 81) .................................. 13

          3.    The term "said process chamber" lacks antecedent basis and cannot be corrected by the Court (asserted claims 31, 32, 34–37) .............................. 16

     C.    '305 AND '248 PATENTS .................................................................. 19

          1.    Intrinsic evidence limits the scope of the "software scheduling agent" claimed in the '305 and '248 patents .......................................................... 19

     D.    '330 PATENT ..................................................................................... 25

          1.    Intrinsic evidence, including Ocean's own statements to the PTAB, supports Defendants' construction of "concurrently measuring" .............................. 25

     E.    '538 PATENT ..................................................................................... 30

          1.    The limitations "[a] significant fault" (claim 5) and "determining in said computer whether said parameter is a significant factor" (claim 7) are indefinite terms of degree ....................................................................... 30

V.    CONCLUSION ................................................................................................ 33

# TABLE OF AUTHORITIES

**CASES**

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
   618 F.3d 1354 (Fed. Cir. 2010)........................................................................................8

*Amgen, Inc. v. Chugai Pharm. Co.*,
   927 F.2d 1200 (Fed. Cir. 1991)........................................................................................7

*Aylus Networks, Inc. v. Apple Inc.*,
   856 F. 3d 1353 (Fed. Cir. 2017).......................................................................................29

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018).......................................................................................32

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002).............................................................................22, 23, 24

*Cellular Commc'ns Equip. LLC v. AT&T, Inc.*,
   No. 2:15-CV-576-RWS-RSP, 2016 WL 7364266 (E.D. Tex. Dec. 18, 2016) ........................17

*Eagle Pharms. Inc. v. Slayback Pharma LLC*,
   958 F.3d 1171 (Fed. Cir. 2020).......................................................................................15

*Forest Labs., LLC v. Sigmapharm Labs., LLC*,
   918 F.3d 928 (Fed. Cir. 2019).........................................................................................24

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
   750 F.3d 1304 (Fed. Cir. 2014).......................................................................................13

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)......................................................................................7, 8

*IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*,
   966 F.3d 1374 (Fed. Cir. 2020).......................................................................................11

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014)............................................................................... passim

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*,
   285 F.3d 1046 (Fed. Cir. 2002).......................................................................................15

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)............................................................................................2, 7, 30

CASES (CONT.)

*Novo Indus., L.P. v. Micro Molds Corp.*,
    350 F.3d 1348 (Fed. Cir. 2003) ........................................................................17

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ........................................................................21

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................2, 7, 8, 13

*PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*,
    355 F.3d 1353 (Fed. Cir. 2004) ........................................................................15

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ........................................................................23

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ..........................................................................22

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ..................................................................13, 24

*Trusted Knight Corp. v. Int'l Bus. Machines Corp.*,
    681 F. App'x 898 (Fed. Cir. 2017) ...................................................................17

*Unwired Planet L.L.C. v. Google, Inc.*,
    660 F. App'x 974 (Fed. Cir. 2016) ...................................................................32

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
    392 F.3d 1325 (Fed. Cir. 2004) ........................................................................15

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..........................................................................24

## I.      INTRODUCTION

While Defendants' claim construction arguments remain true to the intrinsic and extrinsic evidence, Ocean turns a blind eye to that evidence.  In doing so, Ocean manufactures an overbroad and infringement-driven construction for one term, eschews specific definitions from the intrinsic record for others, and denies the indefiniteness of several ambiguous limitations.  Defendants' constructions and indefiniteness arguments should be adopted and Ocean's faulty arguments rejected.

First, despite arguing that "no construction is necessary" for the term "pneumatic cylinder," Ocean provides an "alternative" definition that broadens the term beyond its plain meaning evident from the intrinsic record.  That is not by accident.  Ocean's construction is designed to salvage its infringement theory.  Because the accused tools do not include a "pneumatic cylinder" as a skilled person would understand that term, Ocean conjures up an unduly broad definition that would eviscerate the difference between a "pneumatic cylinder" and other devices that induce movement without relying on compressed gas.  But Ocean's construction contradicts the plain and ordinary meaning of "pneumatic cylinder," and should be rejected.

Second, in some instances Ocean asserts "no construction is necessary" when the intrinsic evidence shows that the patentee defined terms in a very specific way.  One of the patents at issue makes clear that "concurrently measuring" two different semiconductor wafer features refers not only to taking those measurements simultaneously but also to measuring with the same measuring tool.  In addition, Ocean advises the Court not to address the term "software scheduling agent" even though the patentee expressly defined the term to include only certain "software" and relied on that definition to distinguish conventional, prior art "software" during prosecution.  The patentee adopted a particular meaning for the term and disclaimed anything broader.

Third, Ocean refuses to come to terms with several limitations that are indefinite because their scope is not reasonably certain to skilled artisans.  The defective limitations fall into two categories.  In the first category, the term "said process chamber" implicates an antecedent basis defect where a claim refers back to a feature that was never initially recited, creating irresolvable confusion.  While Ocean suggests a fix for this limitation, nothing in the intrinsic record suggests that the patentee intended what Ocean belatedly advances in these litigations.  The limitation is laden with uncertainty and thus indefinite.  A second category of limitations, including "significant fault," "determining in said computer whether said parameter is a significant factor," and "ultra-thin resist layer[s]," involves terms of degree for which the record provides insufficient guidance to allow a skilled person to decipher the claims' boundaries with reasonable certainty.  The resulting ambiguity makes the claims indefinite.

## II.    LEGAL STANDARDS

Defendants appreciate that the Court is very familiar with the law of claim construction. Claim terms are given the meaning understood by a person of ordinary skill in the art at the time of the alleged invention ("POSITA" or "skilled person" or the like).  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005).  To determine that meaning, the court should look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  A patent claim is indefinite and invalid if the claim, read in light of the specification and prosecution history, fails to inform a skilled person "about the scope of the invention" "with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

## III.     TECHNOLOGY BACKGROUND

### A.     Technology Background and Asserted Patents

Plaintiff Ocean Semiconductor LLC ("Ocean") asserts a total of eight patents ("Asserted Patents") against seven different defendants (collectively, "Defendants") in the above-captioned cases in the Western District of Texas.  The chart below shows which patents Ocean has asserted against each defendant.  Seven patents are asserted against all Defendants, but the '097 patent is asserted only against STMicroelectronics, Inc. and NXP USA Inc.

| Asserted Patents | MediaTek | NVIDIA | NXP | Renesas | Silicon Labs | ST | Western Digital |
|---|---|---|---|---|---|---|---|
| 6,420,097 ('097 patent) | | | X | | | X | |
| 6,660,651 ('651 patent) | X | X | X | X | X | X | X |
| 6,725,402 ('402 patent) | X | X | X | X | X | X | X |
| 6,836,691 ('691 patent) | X | X | X | X | X | X | X |
| 6,907,305 ('305 patent) | X | X | X | X | X | X | X |
| 6,968,248 ('248 patent) | X | X | X | X | X | X | X |
| 7,080,330 ('330 patent) | X | X | X | X | X | X | X |
| 8,676,538 ('538 patent) | X | X | X | X | X | X | X |

In general, the Asserted Patents relate to different facets of semiconductor manufacturing. This Brief addresses claim terms from six of the Asserted Patents.  The subject matter of those

patents is described briefly below.  Additional details appear throughout this Brief as part of Defendants' claim construction and indefiniteness arguments.

The '097 patent relates to methods for manufacturing a semiconductor device to purportedly achieve smaller features than those allowed by conventional photolithography tools at the time of the alleged invention.  Ex. 1[1] ('097 patent), 1:4–9.  In particular, the '097 patent describes and claims methods for "trimming" or narrowing the linewidth of a hardmask layer that is part of the stack of films processed during manufacturing and then using the trimmed hardmask to etch an underlying film at reduced dimensions.  *Id.*, 1:57–63.

The '651 and '330 patents relate to characteristics of tools that are used in semiconductor manufacturing.  The '651 patent describes and claims methods for using a stage inside a process chamber of a semiconductor processing tool where the wafer sits on the stage and the stage can be raised, lowered, or tilted.  Ex. 2 ('651 patent), 2:26–57, 3:9–14, 5:3–29, 7:28–34.  The '330 patent describes and claims methods of using a tool to measure, at the same time, two characteristics of a semiconductor wafer known as "critical dimension" and "overlay."  Ex. 3 ('330 patent), 1:7–11, 1:29–30, 1:41–51, 1:63–2:5.

The '538, '305, and '248 patents relate to efforts to control semiconductor manufacturing processes.  The '538 patent describes and claims methods for using a feedback mechanism to detect undesired "faults" that arise during manufacturing by weighting different parameters based on their relationships to detected faults.  Ex. 4 ('538 patent), 1:9–12, 5:28–59.  The '305 and '248 patent are related and include claims that are nearly identical.[2]  They also share the same

---

[1] References to exhibits in this Opening Claim Construction Brief refer to exhibits to the Declaration of Stephanie Sivinski filed concurrently with this Brief.

[2] The '248 patent is based on an application that was a continuation of the application for the '305 patent.  Ex. 6 ('248 patent), 1:5–7.

specification.  The '305 and '248 patents describe and claim methods for scheduling activities in an automated semiconductor manufacturing environment where a "software scheduling agent" is notified of an event and reactively schedules an action as a result.  Ex. 5 ('305 patent), 3:63–4:3; Ex. 6 ('248 patent), 3:64–4:4.

### B.    Level of Ordinary Skill in the Art

A POSITA would have had at least a B.S. in mechanical engineering, electrical engineering, materials science engineering, or a related field, and (i) four years of experience designing and developing semiconductor fabrication processes and tooling (for the '651 patent) or (ii) four years of experience working with semiconductor fabrication processes, including computer programming and data analysis (for the '538 patent).  Declaration of Costas Spanos, Ph.D. ("Spanos Decl.") ¶¶ 11–12.  For the '097 patent, a skilled person would have had a B.S. in chemical engineering, materials science, electrical engineering, physics, chemistry, or a similar field, and three or four years of work experience in integrated circuit fabrication or related fields. *Id.* ¶¶ 13–14.  For any of these patents, advanced education may substitute for experience.  *Id.* ¶¶ 12, 14.

## IV.    DISPUTED TERMS

### A.    '097 PATENT

#### 1.    The scope of "ultra-thin resist layer" in claims 1–3 and 10–17 of the '097 patent is not reasonably certain, rendering the term indefinite

| ST and NXP's Construction[3] | Ocean's Construction |
|---|---|
| Indefinite | No construction is necessary |

---

[3] Ocean asserts the '097 patent only against STMicroelectronics, Inc. and NXP USA, Inc.  The term "Defendants" for this section refers to those entities only.

The parties dispute whether claims 1–3 and 10–17 of the '097 patent are indefinite because of the term "ultra-thin resist layer." ST and NXP contend that "ultra-thin" is a term of degree and the intrinsic and extrinsic evidence provide insufficient disclosure of an upper limit for the thickness of such a layer, leaving a skilled person uncertain about the scope of the claims. *E.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014) (holding term of degree ("unobtrusive manner") indefinite; terms of degree are definite only when claim language provides "enough certainty to one of skill in the art when read in the context of the invention"). Ocean argues the term requires no construction, and it offers none. Based on the unresolvable ambiguity reflected in the intrinsic and extrinsic records, ST and NXP have the better argument.

The '097 patent describes a method for forming circuit structures having linewidths smaller than conventional lithography techniques allowed. Ex. 1 ('097 patent), 1:4–9. Lithography uses light of specific wavelengths to expose and generate linewidth patterns in a layer of photoresist material. *Id.*, 1:16–20. The patterned photoresist is used to create circuit structures, such as gates, from underlying layers. *Id.*, 1:60–63, 4:14–42. In the '097 patent, the stack of layers includes substrate 114, device layer 116, hardmask layer 118, and ultra-thin resist (UTR) layer 120, as shown in Figure 4(b) below left. *Id.*, 3:63–4:2. UTR layer 120 is annotated in blue. UTR layer 120 is patterned to form resist mask 122, as shown in Figure 4(c) below, and used to create transistor gates with small linewidths. *Id.*, 4:14–42. Resist mask 122 is also annotated in blue.



The claims of the '097 patent indicate that a UTR layer corresponds to a range of resist thicknesses.  Claim 4 recites "[a] method of forming circuit structures as claimed in claim 1, wherein the *ultra-thin resist layer has a thickness of less than 2500 Å*" (emphasis added).  That claim makes clear that, for its purposes (and for its dependent claims 5–9), the recited "ultra-thin resist layer" must have a thickness of less than 2500 Å.  Claim 1 similarly recites an "ultra-thin resist layer," but unlike claim 4, does not specify any resist thicknesses.  As with claim 4, the "ultra-thin resist layer" of claim 1 and its dependent claims 2–3 and 10–17 (which are unrelated to claim 4) must correspond to a particular range.  The resist layer's thickness is the characteristic that qualifies it as "ultra-thin," which is a term of degree for thickness.  But the intrinsic and extrinsic evidence relating to the UTR layer of claims 1-3 and 10-17 offers only ambiguity about the upper limit for the thickness of that layer rather than the "reasonable certainty" required to satisfy the definiteness requirement of 35 U.S.C. § 112.  *Nautilus*, 572 U.S. at 901.  Therefore, claims 1–3 and 10–17 are indefinite.  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008) (holding claim indefinite when the intrinsic record and the knowledge of a person of ordinary skill in the art failed to resolve ambiguity as to the scope of the term "fragile gel"); *see also Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991) (finding claims indefinite because of uncertainty over the scope of the "range of specific activity" covered by the claim language).

To begin, the intrinsic evidence does not identify or suggest any upper boundary for thickness of the UTR layer recited in claims 1–3 and 10–17.  In determining the meaning of a claim, courts look to the language of the claim and that of surrounding claims.  *See, e.g.*, *Phillips*, 415 F.3d at 1314–15 ("[T]he context in which a term is used in the asserted claim can be highly instructive. . . .  Other claims . . . can also be valuable sources of enlightenment as to the meaning

of a claim term."). Claim 1 does not provide a thickness range for the recited "ultra-thin resist layer." By contrast, claim 4, which depends from claim 1, specifies a thickness range with an upper limit of "less than 2500 Å." Under the principle of claim differentiation, the upper limit of the thickness range encompassed by "ultra-thin resist layer" in claim 1 must be higher than the upper limit provided in claim 4 of "less than 2500 Å." *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1359–60 (Fed. Cir. 2010) ("Under the doctrine of claim differentiation, those dependent claims [reciting a range] give rise to a presumption that the broader independent claims are not confined to that range.); *see also Halliburton*, 514 F.3d at 1251 n.3 ("'the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim'") (quoting *Phillips*, 415 F.3d at 1315). But claim 1 and its dependent claims 2–3 and 10–17 do not provide any indication of an upper limit for the thickness of "ultra-thin resist layer." Spanos Decl. ¶¶ 49-50.

The specification likewise fails to define the upper thickness limit for an UTR layer. While the specification states that "a resist coating having an UTR thickness is considered to be resist films of less than 0.25 µm (2500 Å) in thickness" (Ex. 1 ('097 patent), 1:43–45) and describes embodiments having a "[ultra-thin resist] thickness of less than 2500 Å" (*id.*, 3:34–35), that merely establishes that resist films with thicknesses under 2500 Å qualify as UTR layers. Noticeably absent from the patent is any specific upper limit for a UTR layer thickness. In fact, the specification breeds uncertainty on the point. The patent describes a "standard" resist thickness of 5000 Å for 248 nm lithography and of 4000 Å for 193 nm lithography.[4] *Id.*, 1:39–43, 2:29–31, 2:51–58, 3:2–3, Fig. 1a. But the specification does not address whether a resist thickness between 2500 Å and 5000 Å for 248 nm lithography or between 2500 Å and 4000 Å for 193 nm lithography

---

[4] The distances of 248 nm and 193 nm refer to the wavelengths of light used for patterning photoresist.

qualifies as "ultra-thin."  One is left to wonder:  are resists with thicknesses within those ranges "ultra-thin" for purposes of claim 1?  Or do they fall into some other non-ultra-thin category?  The specification offers no answers.  Thus, like the claims, the specification does not provide enough information for persons of ordinary skill in the art at the time of the alleged invention to understand the upper limit for thickness of the UTR layer recited in claims 1–3 and 10–17.  Spanos Decl. ¶¶ 51-53.

Adding to the uncertainty, the disclosed "standard" resist thickness varies according to the wavelength of light used during a lithography process.  According to the patent, the standard resist thickness is larger for 248 nm lithography (more than 5000 Å) than it is for 193 nm lithography (more than 4000 Å).  Ex. 1 ('097 patent), 1:39–43, 2:29–31, 2:51–58, 3:2–3, Fig. 1a.  This suggests to persons of ordinary skill in the art at the time of the alleged invention that the thickness range for a UTR layer also varies based on the wavelength of light used for lithography.  Spanos Decl. ¶ 52.  Despite that complication, the claims and the specification of the '097 patent provide no guidance to skilled artisans as to what qualifies as a UTR layer for different lithography techniques. The potential variation deepens the ambiguity reflected in the claims and the specification.  *Id.* ¶ 53.

For its part, the prosecution history provides no evidence at all regarding any upper limit of thickness for a UTR layer.  Spanos Decl. ¶ 54.  Neither the patentee nor the examiner ever confronted the issue during prosecution.

Turning to extrinsic evidence, other patents assigned to the same original assignee as for the '097 patent, some of which list the same co-inventors as the '097 patent, describe that the upper limit for UTR layer thickness could be anywhere from 2500 Å to about 5000 Å.

For example, several patents disclosed an "ultra-thin photoresist layer" with "a thickness of about 500 Å–5000 Å." Ex. 7 (U.S. Patent No. 6,127,070), 7:19–20; Ex. 8 (U.S. Patent No. 6,140,023), 6:15–16; Ex. 9 (U.S. Patent No. 6,309,926), 8:34–35; Ex. 10 (U.S. Patent No. 6,162,587), 7:22–23; Ex. 11 (U.S. Patent No. 6,165,695), 7:31–32. Scott A. Bell, one of the co-inventors listed in the '097 patent, is also a co-inventor listed in these five patents. Other patents explain that "[u]ltra-thin resists . . . have a thickness of about 5,000 Å or less." Ex. 12 (U.S. Patent No. 6,762,133), 4:4–5; Ex. 13 (U.S. Patent No. 6,645,702), 3:62–64. An additional patent describes an "ultra thin photoresist layer having a thickness from about 2,000 angstroms to about 5,000 angstroms." Ex. 14 (U.S. Patent No. 6,746,973), 12:55–59. These eight patents were filed between December 1998 and August 2002 at around the time of the May 2, 2000 filing of the '097 patent. Spanos Decl. ¶¶ 55-56.

But other patents assigned to the same original assignee as for the '097 patent identify an upper limit for UTR layer thickness that corresponds to different values. One patent filed a day before the '097 patent describes that "[u]ltra-thin photoresists . . . have a thickness of about 3,000 Å or less." Ex. 15 (U.S. Patent No. 6,451,512), 3:49–50. Other patents include 2500 Å in the range of thicknesses for an "ultra-thin" resist layer, although the '097 confirmed only that thicknesses of "less than" 2500 Å qualify. Two patents describe an upper limit for UTR layer thickness at 2500 Å. Ex. 16 (U.S. Patent No. 6,156,480), 3:44–46 ("about 2,500 Å"); Ex. 17 (U.S. Patent No. 6,566,214), 3:49–52 ("2500 Angstroms or less"). Scott A. Bell is listed as a co-inventor for one of these patents. Ex. 17 (U.S. Patent No. 6,566,214). Another patent similarly discloses "UTR coatings having thicknesses of 2,500 Å or less." Ex. 18 (U.S. Patent No. 6,326,319), 1:47–50. Christopher L. Pike, a second co-inventor listed in the '097 patent, is a listed co-inventor on this patent. Spanos Decl. ¶¶ 55, 57.

This extrinsic evidence confirms that the upper limit on the thickness of an "ultra-thin resist layer" could correspond to one of several different values. Based on the evidence cited above, the upper limit could be 5000 Å, 3000 Å, or 2500 Å. Spanos Decl. ¶ 58. Nothing in the '097 patent or claims 1–3 and 10–17 settles whether any of these potential upper limits, or some other upper limit, applies to the "ultra-thin resist layer" recited in those claims. The resulting uncertainty confirms the term is indefinite. *IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*, 966 F.3d 1374, 1380–81 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2470 (2021) (finding "half-liquid" indefinite where the intrinsic and extrinsic evidence did not supply a definite meaning for the term).

For the reasons described above, based on the intrinsic and extrinsic evidence a skilled person simply cannot determine the upper limit for the thickness of the claimed "ultra-thin resist layer" recited in claim 1–3 and 10–17. Spanos Decl. ¶ 58. As a result, those claims are indefinite.

**B.    '651 PATENT**

**1.    Overview**

In an attempt to minimize problematic "across-wafer variations" that occur during semiconductor wafer fabrication processes (such as deposition and etching) in some process tools, the '651 patent discloses a wafer stage that is "adjustable" (*i.e.*, the wafer stage can be raised, lowered, or tilted). Ex. 2 ('651 patent), 2:25–57, 5:3–29; *see also id.*, 7:28–34. The '651 patent discloses that such processing tools can include a process chamber—where process operations are performed—with a wafer stage located in the process chamber. *Id.*, 3:9–14. To adjust the wafer-stage, the '651 patent discloses using "a variety of devices, such as pneumatic, hydraulic, electromagnetic or mechanical systems." *Id.*, 5:65–6:1; *see also id.*, 6:66–7:16.

In the '651 patent, some claims leave open which type of device is used to make the wafer-stage adjustments, and other claims require a specific type of device.  In particular, the claims in dispute here expressly require "a plurality of pneumatic cylinders."  Although the claimed "pneumatic cylinders" "may be any type of pneumatic cylinders useful for performing the function of adjusting the surface . . . of the wafer stage," may have various "stroke, size and supply pressure . . . depending upon the particular application," and may rely on "air or inert gas . . . supplied to the cylinders [] at the required pressure," they actually have to be "pneumatic cylinders."  *Id.*, 6:13–21; *see also id.*, 5:46–6:27, Figs. 2–3.  They cannot be a different type of device.  Figure 2, reproduced below, illustrates an adjustable wafer stage 40 with a pneumatic cylinder 46.



**FIG. 2**

For context, pneumatic devices are powered by compressed air or other gas.  Spanos Decl. ¶¶ 40–43.  Pneumatic cylinders are a subset of pneumatic devices in which the compressed air or other gas acts on a piston inside a cylinder, causing the piston to move along a linear path within the cylinder.  *Id.* ¶¶ 41–42.  Hydraulic devices are powered by liquid.  *Id.* ¶ 44.  Electromagnetic devices are powered by an electric current and a magnetic field.  *Id.*  Mechanical devices are generic, in that they employ interacting mechanical structures to generate forces.  *Id.*

12

### 2.  Ocean's proposed construction of "pneumatic cylinder" defies the intrinsic and extrinsic record (asserted claims 19–24, 75, 81)

| Defendants' Construction | Ocean's Construction |
|---|---|
| Plain and ordinary meaning | No construction is necessary, or in the alternative, "a pneumatic, hydraulic, electromagnetic or mechanical device" |

The dispute is simple but critical given Ocean's infringement allegations: should "pneumatic cylinder" be given its plain and ordinary meaning (as Defendants propose) or should the term be expanded beyond any possible plain meaning to include not just "cylinders" but any "device" that is "pneumatic" *or* "hydraulic, electromagnetic, or mechanical" (as Ocean proposes, in an attempt to capture non-pneumatic devices within the scope of infringement)?  Because there is no evidentiary support for Ocean's proposal, plain and ordinary meaning should be adopted (*i.e.*, a cylindrical device that uses pressurized air or other gas to move a shaft of the device in a straight line).  *See also Phillips*, 415 F.3d at 1313–14.

There are only two exceptions to depart from the "general rule" that the plain and ordinary meaning governs—either the patentee acted as its own lexicographer or it disavowed the full claim scope in the specification or during prosecution.  *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  Neither exception is applicable here.  First, the '651 patent repeatedly describes using conventional pneumatic cylinders in the disclosed embodiments that are consistent with the term's plain meaning. Ex. 2 ('651 patent), 6:1–5, Figs. 2–3.  For example, as noted above, the patent discloses that "[t]he pneumatic cylinders 46 may be any type of pneumatic cylinders useful for performing the function of adjusting the surface 42 of the wafer stage 40," (*id.*, 6:14–16); "may be dual-acting pneumatic cylinders" with various "stroke, size and supply pressures," (*id.*, 6:16–19); and rely on "[a]ir or an inert gas . . . supplied to the cylinders 46 at the required

13

pressure," (*id.*, 6:19–21).  The patent also discloses that, in operation, a shaft (also referred to as a rod) of each pneumatic cylinder moves linearly to adjust the stage up, down, or at a tilt.  *Id.*, 6:22–40.  Second, Ocean has offered no evidence of any prosecution history disclaimer because there is none.

Moreover, the pneumatic cylinders disclosed in the '651 patent are entirely consistent with the extrinsic evidence.  Contemporaneous dictionary definitions and literature disclose that (i) the term "pneumatic" dictates the use of air or other gas pressure (as compared to electromagnetic forces, etc.) and (ii) in a "pneumatic cylinder" this pressure is used to move a shaft (or rod) in a straight line.  Ex. 19 (American Heritage Dictionary) (defining "pneumatic" as "Of or relating to air or other gases" or "Filled or operated by air"); Ex. 20 (Dictionary of Engineering) (defining "pneumatic" as "Pertaining to or operated by air or other gas"); Ex. 21 (Merriam-Webster Dictionary) (defining "pneumatic" as "of, relating to or using gas (as air or wind)" and "moved or worked by air pressure"); Ex. 22 (Pneumatic Systems) at 85 ("Pneumatic cylinders offer a straight rectilinear motion to mechanical elements. . . .  The pneumatic power is converted to straight line reciprocation motions by pneumatic cylinders"), 86–89 (describing conventional single- and dual-acting pneumatic cylinders with a shaft (rod) that moves linearly); Spanos Decl. ¶¶ 40–43.

In contrast, Ocean's proposed construction abandons the plain meaning by impermissibly seeking to broaden the scope of "pneumatic cylinder" to encompass devices that are (i) not pneumatic, such as hydraulic, electromagnetic, or mechanical devices, and (ii) not even "cylinders."  Indeed, Ocean's proposed construction is both unsupported by the intrinsic evidence and inconsistent with it.  The patent identifies four distinct types of known devices for wafer-stage adjustment—*i.e.*, "pneumatic, hydraulic, electromagnetic or mechanical."  Ex. 2 ('651 patent), 5:65–6:1; *see also id.*, 6:66–7:16 (disclosing that alternative "structures other than pneumatic

14

cylinders . . . may be used" for the stage adjustment, such as a rack and pinion assembly arrangement).  The claims-at-issue, however, recite only one specific type of device—a "pneumatic cylinder."  Because the patentee disclosed but did not claim those other devices—such as hydraulic, electromagnetic, and mechanical—the unclaimed devices cannot now be recaptured by Ocean through litigation as they have been dedicated to the public.  *See, e.g.*, *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1050, 1054–55 (Fed. Cir. 2002) (en banc) (while specification allowed for "other metals, such as stainless steel or nickel alloys [to] be used," the claimed "sheet of aluminum" was properly held not to cover "stainless steel or nickel alloys" and holding that where "patent drafter discloses but declines to claim subject matter, . . . this action dedicates that unclaimed subject matter to the public."); *see also, e.g.*, *Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1175–76 (Fed. Cir. 2020) (finding that the "disclosure-dedication doctrine" barred infringement by disclosed but unclaimed embodiments); *PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004) (same).

Further, Ocean's proposed expansive construction makes no sense.  Ocean's construction would illogically render a "pneumatic cylinder" equivalent to any one of a pneumatic, hydraulic, electromagnetic, or mechanical device.  But if "pneumatic" could be pneumatic, hydraulic, electromagnetic, or mechanical, the claims would not specify only "pneumatic."  Similarly, if "cylinder" could be any type of device, the claims would not specify "cylinder."

The claims themselves further confirm that a pneumatic cylinder cannot be construed to encompass non-pneumatic devices, as Ocean proposes.  Certain claims specifically require a pneumatic cylinder (*e.g.*, claims 1, 17, 19, 64, *etc.*), while other claims require another type of device, further confirming that the claimed "pneumatic cylinder" is a particular type of actuator that is different from other types of unclaimed actuators.  *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392

F.3d 1325, 1329–30 (Fed. Cir. 2004) ("The doctrine of claim differentiation 'create[s] a presumption that each claim in a patent has a different scope.'").  For example, independent claim 1 specifically requires "at least three pneumatic cylinders . . . that when actuated, may be used in raising, lowering or tilting said surface of said wafer stage."  Ex. 2 ('651 patent), 11:47–49.  By contrast, otherwise identical independent claim 7 replaced the pneumatic cylinders of claim 1 with "at least three rack and pinion combinations. . . ."  *Id.*, 12:6–9.  Dependent claim 11 requires the rack and pinion combinations of claim 11 to be coupled to an electric motor.  *Id.* at 12:22–24; *compare also, e.g.*, asserted dependent claim 75 ("adjusting . . . by actuating at least one of a plurality of pneumatic cylinders. . . .") *with* non-asserted dependent claim 76 ("adjusting . . . by actuating at least one of a plurality of rack and opinion combinations. . .").

Lastly, Ocean's infringement case rests on Lorentz actuators—*i.e.*, electromagnetic actuators—not pneumatic cylinders.  *See, e.g.*, Ex. 23 (Dkt. 1-8) at 5; Ex. 24 (Infringement Contentions) at 9.  Accordingly, this issue is ripe for resolution now.  Ocean wrongfully attempts to avoid the issue by taking the position that "no construction is necessary" or by proposing in the alternative a litigation-driven construction to read out both "pneumatic" and "cylinder" from the claim.  Those attempts should be rejected.  The claim simply does not say what Ocean wants it to say.

### 3. The term "said process chamber" lacks antecedent basis and cannot be corrected by the Court (asserted claims 31, 32, 34–37)

| Defendants' Construction | Ocean's Construction |
|---|---|
| Indefinite | "said process tool" |

There is no dispute that there is no antecedent basis for the term "said process chamber" in claim 31, which recites:

> 31. A method, comprising:
>
> > performing a process operation in a process tool on each of a plurality of wafers;
> >
> > measuring a plurality of said processed wafers to determine across-wafer variations produced by said process operation performed in said process tool;
> >
> > adjusting, based upon said measured across-wafer variations, a plane of a surface of an adjustable wafer stage; and
> >
> > performing said process operation on at least one subsequently processed wafer positioned on said wafer stage in **said process chamber** after said plane of said wafer stage has been adjusted.

There clearly is no previously recited "process chamber" in the claim for "said process chamber" to refer back to. The parties dispute, however, whether "said process chamber" is indefinite because it lacks an antecedent basis (Defendants' contention), or whether the term can be "corrected" to mean something entirely different—*i.e.*, "said process **tool**" (Ocean's contention).

A district court can only correct an error in a claim if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003). Neither condition is met here.

The claims and intrinsic record demonstrate that Ocean's proposed correction of "said process ***chamber***" to "said process ***tool***" is subject to reasonable debate and, therefore, impermissible. *Trusted Knight Corp. v. Int'l Bus. Machines Corp.*, 681 F. App'x 898, 903–04 (Fed. Cir. 2017) (non-precedential) (affirming district court's finding of indefiniteness where the claim "was not amenable to correction"; finding that where a party's attempt to correct error through claim construction is "subject to reasonable debate based on consideration of the claim language and the specification," the proposed correction is impermissible); *Cellular Commc'ns Equip. LLC v. AT&T, Inc.*, No. 2:15-CV-576-RWS-RSP, 2016 WL 7364266, at *9–11 (E.D. Tex.

17

Dec. 18, 2016) (finding claim term indefinite because it lacked antecedent basis). A "process tool" and "process chamber" are not the same. In fact, the '651 patent specification repeatedly describes the process chamber and process tool as different components. For example, the patent discloses that "many, if not all, [process] tools have a process chamber, where processing operations will be performed, and a wafer stage or chuck in the process chamber that is adapted to hold a wafer in position during processing[.]" Ex. 2 ('651 patent), 5:15–19; *see also id.*, 3:9–14, 3:37–47, 6:45–57, 10:39–49.

Moreover, there is nothing in the intrinsic record that confirms Ocean's proposal (*i.e.*, "*said* process ***tool***") as opposed to a different interpretation of the claims (*e.g.*, "*a* process ***chamber***"). The specification confirms that not all "process tools" have a "process chamber," so there is no certainty that "said process chamber" must mean "said process tool" here—it could just as easily mean "*a* process chamber" (which is where the wafer stage can reside). *Id.*; *see also id.*, 3:44–47, 4:59–5:29, 6:45–57, 8:28–30, 10:10–13, 10:26–27, 10:46–49. The claims similarly differentiate between "process tools" and "process chambers," further confirming that they are not interchangeable. *Id.*, 11:41–49 (claim 1 reciting "[a] process tool, comprising: a process chamber. . . ."); *see also id.*, 12:1–9, 16:38–46, 16:53–61, 17:1–10. If anything, Ocean's proposal—which intentionally[5] selects one option and ignores another—confirms that there is a reasonable debate over the meaning of "said process chamber."

Accordingly, the Court should reject Ocean's proposed "correction" and find this claim term indefinite.

---

[5] It appears that, like its alternative "pneumatic cylinder" construction, Ocean's proposed re-write here is intended to improperly broaden the claim scope for the purpose of asserting infringement.

### C.     '305 AND '248 PATENTS

#### 1.     Intrinsic evidence limits the scope of the "software scheduling agent" claimed in the '305 and '248 patents

| Defendants' Construction | Ocean's Construction |
|---|---|
| "a software agent that schedules, initiates, and executes activities on behalf of a single manufacturing domain entity" | No construction is necessary |

Ocean's proposal that "no construction is necessary" for the term "software scheduling agent" ignores the repeated definition ascribed to that term in the intrinsic evidence—a definition used to distinguish the claims over the prior art.  Defendants' proposal is true to that definition and should be adopted.

The '305 patent alleges inefficiencies in the controlling of a semiconductor factory fabricating integrated circuits.  Ex. 5 ('305 patent), 1:63–2:9.  The '248 patent is based on a continuation of the application for the '305 patent.[6]  Ex. 6 ('248 patent), 1:5-7.  The conventional "automated 'Manufacturing Execution System' ('MES')" is described as "largely depend[ing] on manufacturing personnel for monitoring factory state and initiating activities at the correct time."  Ex. 5 ('305 patent), 2:43–49.  Figure 3 of the '305 patent illustrates "many different types of scheduling agents."  *Id.*, 7:17–18.  The '305 patent describes "scheduling in an automated manufacturing environment" using "a software scheduling agent" to improve upon the admitted prior art MES systems.  *Id.*, 3:64–65.  These "software scheduling agents" "are intelligent, state aware, and are imbued with specific goals for which they autonomously initiate behaviors to achieve" and "each represent some 'manufacturing domain entity.'"  *Id.*, 37:66-38:2; 6:38–39.

---

[6] Although this section primarily cites disclosures from the '305 patent, the '248 patent shares the same specification and includes the same disclosures.

Examples of these "software scheduling agents" and their respective "manufacturing domain entit[ies]" are shown in Figure 3 below:



Figure 3 illustrates "a Lot Scheduling Agent ('LSA') 305 that schedules activities on behalf of lots 130 of wafers 135; a Machine Scheduling Agent ('MSA') 310 that schedules activities on behalf of process tools 115; a PM Scheduling Agent ('PMSA') 315 that schedules activities on behalf of PMs and Quals (not shown); and a Resource Scheduling Agent ('RSA') 320 that schedules activities on behalf of resources (not shown)."  Ex. 5 ('305 patent), 7:21–29.  Each of these agents is defined based on its corresponding manufacturing domain entity.

The parties effectively dispute whether a "software scheduling agent" requires no construction and therefore could cover any software agent used for scheduling, or whether the term should be understood more narrowly—as reflected in the patent and argued by the applicants to successfully distinguish prior art during prosecution.  As detailed below, during prosecution, the applicants made clear that a software scheduling agent is more than simply a generic software agent used for scheduling by arguing the examiner's contention that "***any software*** entity that schedules" is a "a software scheduling agent is ***clearly wrong***."  Ex. 27 (Response dated 2004-08-

06) at 4 (some emphasis in original).  The applicants' remarks clearly and unmistakably disavowed claim scope relating to "software scheduling agent," in favor of a narrower understanding consistent with the language of the specification.

Ocean should not now be allowed to reclaim scope that was disclaimed, as it will surely seek to do if this claim term remains unconstrued.  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324–25 (Fed. Cir. 2003) (holding that "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, . . . prosecution disclaimer attaches and narrows the ordinary meaning of the claim").  Defendants' proposed construction reflects the meaning of "software scheduling agent" in view of the applicants' disclaimers.

### a. Applicants specifically defined the term during prosecution to overcome prior art.

During prosecution, the applicants relied on an understanding of a "software scheduling agent" as operating on behalf of a single manufacturing domain entity.  For example, when appealing the examiner's rejection based on prior art, the applicants presented a "Summary of the Invention" describing that "[t]he software agents 265 each represent some 'manufacturing domain entity,' e.g., a lot 130, a process tool 115, a resource, a PM, or a Qual." Ex. 25 (Appeal Brief dated 2004–11–24) at 3.  These "manufacturing domain entities" are sub-parts of the semiconductor factory or the semiconductor factory fabricating process.  *See, e.g.,* Ex. 5 ('305 patent), 7:15–33, 9:48–49, Table 1.

The applicants made similar arguments before the patent examiner to overcome prior art. In one response, the applicants remarked that "'software scheduling agents' possess three characteristics," including that "they represent some respective manufacturing domain entity." Ex. 26 (Response dated 2003-09-08) at 4–5.  Indeed, the applicants went further and argued, multiple times, that the specification could not support any relationship that includes more than one

manufacturing domain entity.  The applicants argued that "there is **_no support_** in applicants' specification for the proposition that a scheduling agent represent **_more than one_** manufacturing domain entity at any given time."  Ex. 27 (Response dated 2004-08-06) at 1–2 (emphases added). The applicants repeated this assertion on appeal, stating "there is no support in Applicants' specification for the proposition that a scheduling agent represents more than one manufacturing domain entity at any given time," and "there is **_no support_** for any definition of the term 'software scheduling agent' in which an entity represents, for instance, a whole subsystem comprising **_large numbers_** of manufacturing domain entities."  Ex. 25 (Appeal Brief dated 2004-11-24) at 9 (emphases added).  This single manufacturing domain entity representation is applicants' explanation for why representing that "**_any software_** entity that schedules" is "a software scheduling agent is **_clearly wrong_**."  Ex. 27 (Response dated 2004-08-06) at 4 (some emphases added).  The applicants distinguished "software scheduling agent" from "any software entity that schedules," as was purportedly disclosed in the prior art relied upon by the examiner to reject the applicants' claims, based on the representation of a single manufacturing domain entity.

Accordingly, as clearly and unmistakably argued by the applicants and advanced by Defendants' claim construction, a "software scheduling agent" "schedules activities on behalf of a **_single_** manufacturing domain entity."  Thus, even if the term "software scheduling agent" could have a broader meaning in some other context, "it is well-established that '[t]he prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.'"  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366–67 (Fed. Cir. 2002) ("[A] claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly

disclaimed subject matter, or described a particular embodiment as important to the invention."). The applicants' arguments during prosecution evinced a clear narrowing of scope by surrendering any potentially broader interpretation, and should be adopted as part of the construction of this term. *Id.*

> **b.  The applicants' prior art differentiation was rooted in the specification's definition of the term "software scheduling agent."**

That singular relationship emphasized during prosecution to distinguish prior art is consistent with the scope of the "present invention" of the '305 patent.  The '305 patent supports Defendants' construction by repeatedly and unequivocally identifying software agents as associated with a single manufacturing domain entity.  *See, e.g.,* Ex. 5 ('305 patent), 6:38–41, 6:61–64, 7:15–17, 10:62–11:3, 12:36–39, 13:16–19; Ex. 6 ('248 patent), 6:40–42, 6:63–67, 7:17–19, 10:64–11:5, 12:38–41, 13:18–21.  Defendants' proposed construction for the term is identical to the definition given in the '305 patent, which is to restrict the "software scheduling agent" to a single manufacturing domain entity.  "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."  *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (citing *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000)); *see also CCS Fitness*, 288 F.3d at 1366–67 ("a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment").

The '305 patent states that "[o]f particular interest to the ***present invention***, the software agents 265 reactively schedule, initiate, and execute activities on behalf of their respective manufacturing domain entities."  Ex. 5 ('305 patent), 6:61–64 (emphasis added).    The Federal

Circuit has repeatedly explained that where, as here, "a patent . . . describes the features of the '***present invention***' as a whole, this description limits the scope of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC,* 918 F.3d 928, 933 (Fed. Cir. 2019) (emphasis added) (citing *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)); *see also CCS Fitness*, 288 F.3d at 1366–67 ("a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee ... described a particular embodiment as important to the invention"). Moreover, the "present invention" language also shows the applicants acting as lexicographers to define "software scheduling agent" by "'clearly set[ting] forth a definition of the disputed claim term'." *Thorner*, 669 F.3d at 1365 (citing *CCS Fitness*, 288 F.3d at 1366); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history").

Not only does the '305 patent describe the "present invention" as involving "agents [that] execute activities on behalf of their respective manufacturing domain entities," but the '305 patent adds that the agent configuration of the "present invention" is "of particular interest." Ex. 5 ('305 patent), 6:61–64. In the '305 patent, the "present invention" involving a "software scheduling agent" was limited to an agent that schedules, initiates, and executes "activities on behalf of a ***single*** manufacturing domain entity." *Id* (emphasis added). That "single manufacturing domain entity" is a key aspect of the invention in view of the specification and the prosecution history, and is appropriately addressed via claim construction. *See Forest Labs.,* 918 F.3d at 933. Such a relationship is supported by the embodiments of the '305 patent. For example, the '305 patent describes that "some computing devices 110 may have multiple software agents 265 residing thereon while other computing devices 110 may not have any. Thus, there need not be a one-to-

one correspondence between the computing devices 100 and the process tools 115." Ex. 5 ('305 patent), 6:28–32. If "software scheduling agents" could represent multiple manufacturing domains, there would be no need for multiple agents on one computing device.

### c. Ocean seeks to ignore the admissions and disclaimers from the intrinsic evidence to reclaim that which was already disclaimed.

Ocean urges that no construction is necessary for "software scheduling agent," however the applicants clearly expressed a specific meaning for the term throughout the intrinsic record, including in the specification and in the arguments made before the U.S. Patent and Trademark Office. Ocean now seeks to run from the applicants' statements that were necessary to differentiate the '305 patent's claims from the generic "any software that schedules" of the prior art. A construction is appropriate and necessary to prevent Ocean from seeking to broaden the scope of the '305 patent beyond that originally conceived by the patentee, and to prevent Ocean from recapturing disavowed claim scope. As the applicants argued in prosecution, "***any software*** entity that schedules" is "clearly" not a "software scheduling agent." Defendant's proposed construction for "software scheduling agent" as "a software agent that schedules, initiates, and executes activities on behalf of a single manufacturing domain entity" is taken from the definition of the "present intention" of the '305 patent and captures the scope of the invention in a manner that is consistent with the specification and prosecution history.

### D. '330 PATENT

#### 1. Intrinsic evidence, including Ocean's own statements to the PTAB, supports Defendants' construction of "concurrently measuring"

| Defendants' Construction | Ocean's Construction |
|---|---|
| "simultaneously measuring with a single measuring tool" | No construction is necessary |

The '330 patent describes a method for "monitoring and/or controlling a semiconductor fabrication process," including by "*concurrently measuring* critical dimensions and overlay in a wafer undergoing the fabrication process." Ex. 3 ('330 patent), 1:7–12; 21:13-15 (Claim 19(c)).[7] "Critical dimensions" or "CD" are the "dimensions of and between features" on the semiconductor wafer. *Id.*, 1:29–30. Overlay is the alignment—or misalignment—of layers on the wafer. *Id.*, 1:41–51. The '330 patent explains that CD and overlay are important to chip reliability and performance. *Id.*, 1:48–51. By concurrently measuring CD and overlay, the '330 patent "mitigate[s] fabrication inefficiencies" because "two operations are combined into one" thereby reducing "the time and real estate required for the fabrication process." *Id.*, 1:63–2:5.

Here, the parties dispute whether the term needs no construction (Ocean) or whether, as Defendants contend, it should be construed to mean "simultaneously measuring with a single measuring tool." Defendants' proposed construction of "concurrently measuring" stays true to the specification and the patentee's purported invention because it encompasses two related concepts: (1) a temporal limitation of measuring CD and overlay at the same time and (2) measuring CD and overlay with a single measuring tool. Defendants' construction should therefore be adopted.

a.   **"Concurrently measuring" includes a temporal component.**

The temporal limitation, which is indisputably part of the meaning of "concurrent," is captured by the word "simultaneously" in Defendants' proposed construction." *See* Ex. 28 (Chambers Dictionary) (defining "concurrent" as "running, coming, acting, or existing together or s*imultaneously*"); Ex. 29 (Webster's Dictionary) (defining "concurrent" as "occurring or existing *simultaneously*"). The specification applies this indisputable temporal limitation, describing CD and overlay measurements "taken at a first point in time" together. Ex. 3 ('330 patent), 7:19–28.

---

[7] Unless otherwise noted, emphasis is added throughout.

And measuring CD and overlay at the same time helps achieve a stated benefit of the '330 patent: to reduce the time required to fabricate a semiconductor device.  *Id.*, Abstract; 1:63–2:5; 4:18–21; 7:48–50; 9:9–13; 11:46–50.

> **b.     The claim language and specification require that "concurrently measuring" means measuring with a single measuring tool.**

Not only must the measurements be made at the same time, but they must also be taken with the same tool—the patentee was clear on this.  The specification states multiple times that the two concurrent measurements are taken "with a single measuring tool." Ex. 3 ('330 patent), 9:9–13; 11:46–50 (describing measuring CD and overlay "with a single measuring tool"); *see also id.*, 7:48–50 (describing measuring CD and overlay "with a single tool").  Moreover, absent the requirement for a single measuring tool, the invention would not be able to achieve the stated benefits of the invention:  combining two operations into one and "mitigating the amount of test equipment, real estate and time required for the fabrication process." *Id.*, 4:18–21; *see also id.*, Abstract; 1:63–2:5; 7:48–50; 9:9–13; 11:46–50.  If two machines are used to perform the two measurements, the "amount of test equipment" and "real estate" would both be increased, contrary to the invention's purpose.

Measuring at the same time with the "same tool" is commanded by the claim language itself, which requires forming "a grating structure for use in concurrent measurements." *Id.*, 21:9–12 (Claim 19(b)).  The grating structure "allows these measurements to be taken concurrently with a single measuring tool, thus mitigating fabrication equipment, time and spacing requirements while improving feature accuracy and chip quality control." *Id.*, 9:9–13.  In other words, the claimed structure requires that the same tool—scatterometry or scanning electron microscope— measures the two different properties at the same time. *Id.*, 4:14-18.

All disclosed embodiments concurrently measure CD and overlay with the same tool.  For example, Figure 2 below illustrates "underlying gratings 202 that facilitate overlay 204 measurements" and "overlying gratings 206 that facilitate critical dimension 208 measurements." *Id.*, 7:32–42.  The combination of the overlying and underlying gratings is necessary to measure both CD and overlay with a single scatterometry measuring tool simultaneously.  *Id.*  Likewise, Figure 9 below illustrates using gratings 906 and features 910 that can be "interrogated" concurrently by a single scanning electron microscope measuring tool.  *Id.*, 11:39–50.



Fig. 2     Fig. 9

The entire purpose of the claimed grating structure is to permit the same tool to measure two different wafer attributes at the same time.

> **c.    Ocean recognized in its statements to the PTAB that the measurements be made with a single measuring tool.**

In fact, Ocean itself recently conceded to the Patent Office that "concurrently measuring" is simultaneously measuring with a single measuring tool.  In its Patent Owner's Preliminary Response ("POPR") in the co-pending *inter partes* review ("IPR") relating the '330 patent before the Patent Trial and Appeal Board ("PTAB"), Ocean acknowledged that the "focus of the '330 patent . . . is to ***concurrently*** measure" CD and overlay, even calling it "the most fundamental

element" of the asserted clams.[8]   Ex. 30 (POPR) at 42, 55 (emphasis in original).   Ocean acknowledges that a POSITA would understand how to measure CD and how to measure overlay but argues that "[a]n engineer who was working with a CD-SEM or scatterometry tool in 2003 would simply not have contemplated *using such a typical CD tool to also get overlay measurements* that were three orders of magnitude larger." *Id.* at 56–57.

In fact, Ocean sought to distinguish the Levy prior art reference by asserting that it allegedly failed to teach a POSITA how to combine multiple embodiments for measuring CD or overlay into "*one of* the Levy tools:"

> Analyzing for CDs and overlays use very different features.  How would a POSITA know to combine the different features and use *one of the Levy tools* to do so?  If a POSITA does not have to combine the features and is looking at individual features, how does the Levy tool work to perform this measurement/analysis *simultaneously*?

*Id.* at 51–52 (emphasis added); *see also id.* at 49 (arguing that a POSITA would not be motivated to take separate embodiments for measuring CD and overlay and perform them on a "combination tool").   In other words, Ocean is asking how CD and overlay measurements could be taken simultaneously if they are not taken with the same measuring tool.  The answer is that they cannot; "concurrently measuring" requires "simultaneously measuring with the same measuring tool."

---

[8] Ocean's statements in the IPR are part of the intrinsic record.  *See Aylus Networks, Inc. v. Apple Inc.*, 856 F. 3d 1353, 1359, 1364 (Fed. Cir. 2017) ("[W]e hold that statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be relied upon to support a finding of prosecution disclaimer" which "promotes the public notice function of the intrinsic evidence.").

E.      '538 PATENT

1.      The limitations "[a] significant fault" (claim 5) and "determining in said computer whether said parameter is a significant factor" (claim 7) are indefinite terms of degree

| Term | Defendants' Construction | Ocean's Construction |
|------|--------------------------|----------------------|
| "a significant fault" | Indefinite | No construction is necessary, or in the alternative, "abnormality or fault that relates to an actual fault" |
| "determining in said computer whether said parameter is a significant factor" | Indefinite | No construction is necessary, or in the alternative, "a parameter that provides a significant contribution to the fault" |

Both of these claim limitations render the claims in which they appear indefinite because a POSITA would not be able to understand the scope of either claim.  For both claims, a POSITA would not understand the bounds of the claims because the word "significant" is a subjective term of degree, and the patent provides no guidance to a POSITA as to how "significant" is determined or defined.  Spanos Decl. ¶¶ 26–30, 32–35.

An indefiniteness problem arises if claim language "might mean several different things and no informed and confident choice is available among the contending definitions."  *Nautilus*, 572 U.S. at 911 & n.8.  The Federal Circuit has explained that "[t]he claims, when read in light of the specification and the prosecution history, *must provide objective boundaries* for those of skill in the art."  *Interval Licensing*, 766 F.3d at 1371 (emphasis added).  This is especially relevant when a subjective term of degree—like "significant" here—is used.  "[A] term of degree fails to provide sufficient notice of its scope if it depends on the unpredictable vagaries of any one person's opinion."  *Id.* (citations omitted).  The term "significant" in the '538 patent claims is an archetypical example of such an unpredictable," and therefore indefinite, term.

In claim 5, the use of "significant" to describe the "detected fault" renders it impossible for a POSITA to know the bounds of the claim.  Spanos Decl. ¶¶ 27-30.  Specifically, a POSITA would not have any idea how far a fault must deviate from expected values/faults to be "significant," or how out of specification a workpiece must be before experiencing a "significant" fault.  *Id.* ¶¶ 27, 30.  Another important consideration beyond the magnitude of any fault is the nature of a fault.  *Id.*  The patent does not explain whether certain types of faults are more important than others or whether there is a greater degree of variance that renders certain types of faults "significant."  *Id.* ¶¶ 28–29.

When "faced with a 'purely subjective' claim phrase, [courts] must look to the written description for guidance" but the patent fails to provide any guidance here.  *Interval Licensing*, 766 F.3d at 1371.  There is nothing in the specification that provides any information or guidance as to what a "significant" fault is, or how it differs from a regular fault.  The specification merely explains that "[t]he system 300 analyzes the fault data resulting from the fault data analysis and/or the PCA, in order to determine whether any particular parameters associated with any faults or abnormalities detected that are associated with the processing of semiconductor wafers 105 is actually a significant fault."  Ex. 6 ('538 patent), 11:12–19.  Furthermore, the example provided in the specification at 11:29–67 does not actually provide a way to determine what is "significant"; it merely states as a given that a certain fault may be significant.  *See also id.*, Fig. 8 (see below).



**FIGURE 8**

Nothing in these disclosures from the specification provides any guidance to a POSITA as to what a "significant" fault is.  Spanos Decl. ¶¶ 28–29.  Therefore, claim 5 is indefinite.  *Interval Licensing*, 766 F.3d 1364 (finding a term of degree indefinite when it was purely subjective and failed to provide any notice of its scope in the claims or written description); *Unwired Planet L.L.C. v. Google, Inc.*, 660 F. App'x 974 (Fed. Cir. 2016) (claim term with phrase "much larger" indefinite because patent failed to define standard for determining "much larger"); *Berkheimer v. HP Inc*., 881 F.3d 1360, 1363–64 (Fed. Cir. 2018) ("minimal redundancy" found indefinite).

Ocean's proposed alternative construction does not remedy this issue.  Instead, that construction reads new uncertainty into the claim by introducing unclear concepts such as "abnormality" and undefined terms like "relates to an actual fault."  There is also no support in the specification for this construction.  If Ocean's alternative construction were to be adopted, it too would fail to inform a POSITA of the bounds of the claim because a POSITA would not understand what is meant by "relat[ing] to an actual fault."  Spanos Decl. ¶ 31.  The construction preserves

the ambiguity reflected in the term "significant" rather than resolving it.  Therefore, Ocean's alternative construction should be rejected.

For claim 7, based on all the reasons discussed above, the use of "significant" to describe whether the "parameter" "provides a significant contribution" renders it impossible for a POSITA to know the bounds of the claim.  Spanos Decl. ¶¶ 32–35.  Specifically, a POSITA would not have any idea what the parameter provides to the fault for it to be a "significant contribution" in the fault.  *Id.* ¶¶ 34-35.  Again, the specification provides no guidance.  The only occurrence of "significant factor" in the specification does not provide any objective boundaries as to the meaning of the term.  Ex. 6 ('538 patent), 7:36–40 ("The system 300 may also comprise a dynamic PCA weighting module 370, which is capable of receiving data automatically and/or manually relating to information indicating whether a particular parameter that was considered abnormal is indeed a significant factor in any detected faults."); *Interval Licensing*, 766 F.3d at 1371.  Nothing in the disclosures from the specification provides any guidance to a POSITA as to what a "significant factor" is.  Spanos Decl. ¶ 34.  Therefore, claim 7 is also indefinite.

Lastly, Ocean's proposed alternative construction again fares no better.  This time Ocean merely proposed replacing the indefinite "a significant factor" with the equally indefinite "a significant contribution."  The alternative construction still renders it impossible for a POSITA to know the bounds of the claim because it again uses the subjective term "significant."  Spanos Decl. ¶ 36.  Even under Ocean's proposed alternative construction, the same unresolvable ambiguity remains.  Ocean's alternative construction should be rejected.

## V.   CONCLUSION

For the foregoing reasons, Defendants request an order consistent with the following chart.

| Asserted Patent | Term | Construction |
|---|---|---|
| '097 | "ultra thin resist layer[s]" | Indefinite |
| '651 | "pneumatic cylinder" | Plain and ordinary meaning |
| '651 | "said process chamber" | Indefinite |
| '305/'248 | "software scheduling agent" | "a software agent that schedules, initiates, and executes activities on behalf of a single manufacturing domain entity" |
| '330 | "concurrently measuring" | "simultaneously measuring with a single measuring tool" |
| '538 | "significant fault" | Indefinite |
| '538 | "determining in said computer whether said parameter is a significant factor" | Indefinite |

Dated: October 6, 2021                         Respectfully submitted,

|  | /s/ Tyler R. Bowen<br>Janice L. Ta, Texas 24075138<br>JTa@perkinscoie.com<br>Perkins Coie LLP<br>500 West Second St., Suite 1900<br>Austin, TX 78701<br><br>Chad S. Campbell (*admitted pro hac vice*)<br>CSCampbell@perkinscoie.com<br>Tyler R. Bowen (*admitted pro hac vice*)<br>TBowen@perkinscoie.com<br>Perkins Coie LLP<br>2901 North Central Avenue, Suite 2000<br>Phoenix, AZ  85012<br><br>Philip A. Morin (*admitted pro hac vice*)<br>PMorin@perkinscoie.com<br>Yudong Kim (*admitted pro hac vice*)<br>YKim@perkinscoie.com<br>Perkins Coie LLP<br>11452 El Camino Real, Suite 300<br>San Diego, CA  92130-2020 |

|  | *Counsel for Defendant STMicroelectronics, Inc.* |
|---|---|
|  | /s/ L. Kieran Kieckhefer<br>L. Kieran Kieckhefer (*pro hac vice*)<br>Shearman & Sterling LLP<br>535 Mission Street, 25th Floor<br>San Francisco, CA 94105<br>Telephone: 415.616.1124<br>Facsimile: 415.616.1199<br>Kieran.Kieckhefer@Shearman.com<br><br>David P. Whittlesey<br>Shearman & Sterling LLP<br>300 West 6th Street, 22nd Floor<br>Austin, TX 78701<br>Telephone: 512.647.1907<br>Facsimile: 512.857.6602<br>David.Whittlesey@Shearman.com<br><br>Matthew G. Berkowitz (*pro hac vice*)<br>Patrick Colsher (*pro hac vice*)<br>Yue (Joy) Wang (*pro hac vice*)<br>Shearman & Sterling LLP<br>1460 El Camino Real, 2nd Floor<br>Menlo Park, CA 94025<br>Telephone: 650.838.3737<br>Facsimile: 650.838.5141<br>Matt.Berkowitz@Shearman.com<br>Patrick.Colsher@Shearman.com<br>Joy.Wang@Shearman.com<br><br>Ahmed ElDessouki (*pro hac vice*)<br>Shearman & Sterling LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>Telephone: 212.848.4908<br>Ahmed.ElDessouki@Shearman.com<br><br>*Counsel for Defendant Western Digital Techs., Inc.* |
|  | /s/ Stephanie N. Sivinski<br>David H. Harper<br>Texas Bar No. 09025540 |

|   | david.harper@haynesboone.com |
|---|---|
|   | David L. McCombs |
|   | Texas Bar No. 13438700 |
|   | david.mccombs@haynesboone.com |
|   | Stephanie N. Sivinski |
|   | Texas Bar No. 24075080 |
|   | stephanie.sivinski@haynesboone.com |
|   | HAYNES AND BOONE, LLP |
|   | 2323 Victory Avenue, Suite 700 |
|   | Dallas, Texas 75219 |
|   | (214) 651-5000 (telephone) |
|   | (214) 200-0615 (fax) |
|   | |
|   | *Counsel for Defendants MediaTek Inc. and MediaTek USA Inc.* |
|   | */s/ Marc B. Collier* |
|   | Marc B. Collier (SBN 00792418) |
|   | marc.collier@nortonrosefulbright.com |
|   | Eric C. Green (SBN 24069824) |
|   | eric.green@nortonrosefulbright.com |
|   | Catherine Garza (SBN 24073318) |
|   | cat.garza@nortonrosefulbright.com |
|   | NORTON ROSE FULBRIGHT US LLP |
|   | 98 San Jacinto Boulevard, Suite 1100 |
|   | Austin, Texas 78701 |
|   | Tel:   (512) 474-5201 |
|   | Fax:   (512) 536-4598 |
|   | |
|   | Richard S. Zembek (SBN 00797726) |
|   | richard.zembek@nortonrosefulbright.com |
|   | Darren Smith (SBN 24088433) |
|   | darren.smith@nortonrosefulbright.com |
|   | NORTON ROSE FULBRIGHT US LLP |
|   | 1301 McKinney, Suite 5100 |
|   | Houston, Texas 77010-3095 |
|   | Tel: (713) 651-5151 |
|   | Fax: (713) 651-5246 |
|   | |
|   | *Counsel for Defendant Silicon Laboratories Inc.* |
|   | */s/ Andrew M. Holmes* |
|   | Sean S. Pak |
|   | seanpak@quinnemanuel.com |
|   | *admitted pro hac vice* |

| | |
|---|---|
| | California Bar No. 219032<br>Andrew M. Holmes<br>drewholmes@quinnemanuel.com<br>*admitted pro hac vice*<br>California Bar No. 260475<br>QUINN EMANUEL URQUHART &<br>SULLIVAN LLP<br>50 California Street<br>22nd Floor<br>San Francisco, CA 94111<br>Phone: (415) 875-6600<br>Fax: (415) 875-6700<br><br>Scott L. Cole<br>scottcole@quinnemanuel.com<br>Texas Bar No. 00790481<br>QUINN EMANUEL URQUHART &<br>SULLIVAN LLP<br>201 West 5th Street<br>11th Floor<br>Austin, TX 77002Phone: (737) 667-6104<br>Fax: (737) 667-6110<br><br>*Counsel for Defendant NVIDIA Corp.* |
| | */s/ Patrick J. McCarthy*<br>Darryl Adams, State Bar No. 00796101<br>SLAYDEN GRUBERT BEARD PLLC<br>401 Congress Ave, Ste 1650<br>Austin, TX 78701<br>Telephone: 512-402-3562<br>dadams@sgbfirm.com<br><br>Neel Chatterjee (admitted pro hac vice)<br>GOODWIN PROCTER LLP<br>601 Marshall Street<br>Redwood City, CA 94063<br>Telephone: (650) 752-3100<br>Facsimile: (650) 853-1038<br>DG-RenesasDCt@goodwinlaw.com<br><br>Brett Schuman (admitted pro hac vice)<br>GOODWIN PROCTER LLP<br>Three Embarcadero Center<br>San Francisco, CA 94111-4003<br>Telephone: (415) 733-6000 |

Facsimile: (415) 677-9041
DG-RenesasDCt@goodwinlaw.com

Patrick J. McCarthy (admitted pro hac vice)
Kelly Grosshuesch (admitted pro hac vice)
Amanda E. Stephenson (admitted pro hac vice)
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
DG-RenesasDCt@goodwinlaw.com

Suhrid A. Wadekar (admitted pro hac vice)
Sarah J. Fischer (admitted pro hac vice)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1465
Facsimile: (617) 523-1231
DG-RenesasDCt@goodwinlaw.com

*Counsel for Defendants Renesas Electronics
Corporation and Renesas Electronics America,
Inc.*

*/s/ Bradley D. Coburn*
Barry K. Shelton
Texas Bar No. 24055029
Bradley D. Coburn
Texas Bar No. 24036377
**SHELTON COBURN LLP**
311 RR 620, Suite 205
Austin, TX 78734-4775
bshelton@sheltoncoburn.com
coburn@sheltoncoburn.com
(512) 589-9154 (Telephone)
(512) 263-2166 (Facsimile)

*Counsel for Defendant NXP USA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on October 6, 2021, all counsel of record who have appeared in the above-captioned cases are being served with a copy of the foregoing.


<u>*/s/ Eric C. Green*</u>
Eric C. Green