**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| Ocean Semiconductor LLC,<br><br>    Plaintiff<br><br> v.<br><br>MediaTek Inc. and MediaTek USA Inc. ("MediaTek"),<br><br>    Defendants. | Civil Action No.: 6:20-cv-1210-ADA<br><br>JURY TRIAL DEMANDED<br><br>PATENT CASE |
| Ocean Semiconductor LLC,<br><br>    Plaintiff<br><br> v.<br><br>NVIDIA Corporation,<br><br>    Defendant. | Civil Action No.: 6:20-cv-01211-ADA<br><br>JURY TRIAL DEMANDED<br><br>PATENT CASE |
| Ocean Semiconductor LLC,<br><br>    Plaintiff<br><br> v.<br><br>NXP USA, Inc.<br><br>    Defendants. | Civil Action No.: 6:20-cv-1212-ADA<br><br>JURY TRIAL DEMANDED<br><br>PATENT CASE |

Ocean Semiconductor LLC,

              Plaintiff

      v.

Renesas Electronics Corporation and Renesas
Electronics America, Inc.,

              Defendants.

Civil Action No.: 6:20-cv-1213-ADA

JURY TRIAL DEMANDED

PATENT CASE

---

Ocean Semiconductor LLC,

              Plaintiff

      v.

Silicon Laboratories Inc.,

              Defendant.

Civil Action No.: 6:20-cv-1214-ADA

JURY TRIAL DEMANDED

PATENT CASE

---

Ocean Semiconductor LLC,

              Plaintiff

      v.

STMicroelectronics, Inc.,

              Defendant.

Civil Action No.: 6:20-cv-1215-ADA

JURY TRIAL DEMANDED

PATENT CASE

Ocean Semiconductor LLC,

    Plaintiff

  v.

Western Digital Technologies, Inc.

    Defendant.

Civil Action No.: 6:20-cv-1216-ADA

JURY TRIAL DEMANDED

PATENT CASE

**PLAINTIFF OCEAN SEMICONDUCTOR LLC'S**
**RESPONSIVE CLAIM CONSTRUCTION BRIEF**

October 25, 2021:

Timothy Devlin
tdevlin@devlinlawfirm.com
Henrik D. Parker
hparker@devlinlawfirm.com
Alex Chan (State Bar No. 24108051)
achan@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

*Attorneys for Plaintiff*
*Ocean Semiconductor LLC*

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................. 1

II.   LEVEL OF ORDINARY SKILL IN THE ART .................................................. 1

III.  ARGUMENT ........................................................................................................ 2

   A.  "ultra thin resist layer[s]" ............................................................................ 2

      1.  The '097 Patent Consistently Defines "Ultra Thin Resist Layer" as a Layer Having a Thickness of Less Than 2500 Å ................................................................................ 2

      2.  Claim Differentiation Does Not Override the Clear Specification Teachings .............. 4

      3.  Consideration of Extrinsic Evidence Is Inappropriate Given the Clarity of the Specification's Teachings ...................................................................................... 6

      4.  Defendants' Expert's Opinion Is Not Credible ............................................................ 7

   B.  "pneumatic cylinder" .................................................................................... 7

      1.  Ocean's Construction Is Supported by the Intrinsic Evidence ..................................... 8

         a.  Pneumatic Cylinders Can Employ Pneumatic, Hydraulic, Electromagnetic, or Mechanical Mechanism ........................................................................................ 9

         b.  Defendants' Argument Stems from an Intentional Misreading of the Specification and Conflicts with the Intrinsic Record .............................................................. 12

      2.  Defendants' Construction Lacks Intrinsic and Extrinsic Support................................. 13

         a.  Defendants' Construction of "Cylindrical Device" Finds No Support in the Specification Because Pneumatic Cylinders Need Not Be Cylindrical............................ 13

         b.  Defendants' Construction of "Pressurized Air or Other Gas" Is Overly Narrow and Inconsistent with the Intrinsic Record ............................................................ 14

         c.  Defendants' Construction Requiring Movement of a Shaft in a Straight Line Ignores the Claimed Tilting and Is Inconsistent with Their Expert's Testimony and Cited Extrinsic Evidence ............................................................................................ 15

   C.  "said process chamber"................................................................................ 17

      1.  Ocean's Construction Is Amply Supported by the Intrinsic Record............................. 17

      2.  Defendants' Indefiniteness Argument Should Be Rejected Because It Ignores Claim Language and Focuses on Claim Elements in Isolation .................................................. 18

         a.  Defendants' Indefiniteness Argument Ignores the Surrounding Claim Language ... 18

   D.  "software scheduling agent" ....................................................................... 20

      1.  A Scheduling Agent Is Not Required to Initiate, Schedule and Execute..................... 20

         a.  An Embodiment "of Particular Interest to the Present Invention" Does Not Disavow Claim Scope ........................................................................................................ 21

         b.  A Scheduling Agent May Schedule Activities Without Initiating or Executing ...... 21

      2.  A Scheduling Agent May Schedule Activities for Multiple Manufacturing Domain Entities ...................................................................................................................... 23

a.    The Specification Discloses Scheduling of Multiple Entities.................................... 23

b.    The Portions of the Specification Cited by Defendants Are Non-Limiting.............. 25

c.    The Applicants Did Not Disavow Scheduling of Multiple Entities During Prosecution...................................................................................................................... 26

E.    "concurrently measuring" ................................................................................................. 28

1.    The Parties Agree that "Concurrently Measuring" Requires that Measurements Are Collected Simultaneously ..................................................................................................... 28

2.    No Limitation Within the '330 Patent Exists Requiring that "Concurrently Measuring" Happens Only Within a Single Tool ..................................................................................... 28

3.    Ocean Has Never Asserted, Including to the PTAB, that the Claims of the '330 Patent Are Limited to a Single Measuring Tool ............................................................................. 30

F.    The Disputed '538 Patent Terms Are Not Indefinite ..................................................... 31

1.    Dr. Spanos' Testimony as to Why the Term "Significant" is Allegedly Indefinite Contradicts His Own Use of That Same Term in His Own Publications ........................... 32

2.    "significant fault" (claim 5) ........................................................................................... 34

3.    "Determining in Said Computer Whether Said Parameter Is a Significant Factor" (claim 7) ................................................................................................................................. 35

IV.    CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
  707 F.3d 1318 (Fed. Cir. 2013) ............................................................................. 11

*Amhil Enter. Ltd. v. Wawa, Inc.*,
  81 F.3d 1554 (Fed. Cir. l996) ................................................................................. 9

*Andersen Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007) ............................................................................... 5

*ArcelorMittal France v. AK Steel Corp.*,
  700 F.3d 1314 (Fed. Cir. 2012) ............................................................................... 6

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ............................................................................. 35

*CardSoft (assignment for the Benefit of Creditors), LLC v. VeriFone, Inc.*,
  807 F.3d 1346 (Fed. Cir. 2015) ............................................................................... 5

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002) ............................................................................. 27

*Chamberlain Grp. Inc. v. Lear Corp.*,
  516 F.3d 1331 (Fed. Cir. 2008) ............................................................................. 11

*Comark Comm., Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998) ............................................................................... 5

*Forest Labs., LLC v. Sigmapharm Labs., LLC*
  918 F.3d 928 (Fed. Cir. 2019) ............................................................................... 21

*Geneva Harms. Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003) ............................................................................. 16

*Gummow v. Splined Tools Corp.*,
  No. 3-03-CV-1428-L,
  2004 U.S. Dist. LEXIS 31711 (N.D. Tex. Apr. 26, 2004) ...................................... 13

*Intex Rec. Corp. v. Team Worldwide Corp.*,
  42 F. Supp. 3d 80 (D.D.C. 2013) .......................................................................... 11

*Kraft Foods, Inc. v. International Trading Co.*,
  203 F.3d 1362 (Fed. Cir. 2000) .......................................................................... 4, 5

*Laitram Corp. v. Rexnord, Inc.*,
  939 F.2d 1533 (Fed. Cir. 1991) ............................................................................... 4

*Mallinckrodt, Inc. v. Masimo Corp.*,
  254 F. Supp. 2d 1140 (C.D. Cal. 2003) ..................................................... 31, 32, 35

*Marical Inc. v. Cooke Aquaculture Inc.*,
  C.A. No. 1:14-cv-00366-JDL,
  2016 U.S. Dist. LEXIS 118780 (D. Me. Sep. 2, 2016) ........................................... 35

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
  672 F.3d 1350 (Fed. Cir. 2012) ........................................................................ 4

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005) ........................................................................ 2

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998) ........................................................................ 5

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1327 (Fed. Cir. 2003) ...................................................................... 28

*Orion IP, LLC v. Staples, Inc.*,
  406 F. Supp. 2d 717 (E.D. Tex. 2005) ............................................................. 7

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
  778 F.3d 1021 (Fed. Cir. 2015) ...................................................................... 21

*Power-One, Inc. v. Artesyn Techs., Inc.*,
  599 F.3d 1343 (Fed. Cir. 2010) ........................................................... 2, 19, 33

*Prolitec, Inc. v. Scentair Techs., Inc.*,
  807 F.3d 1353 (Fed. Cir. 2015) ...................................................................... 14

*Retractable Techs. v. Becton*,
  653 F.3d 1296 (Fed. Cir. 2011) ................................................................... 4, 5

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
  324 F.3d 1346 (Fed. Cir. 2003) ........................................................................ 6

*SciMed Life Sys. v. Advanced Cardiavascular Sys.*,
  242 F.3d 1337 (Fed. Cir. 2001) ...................................................................... 21

*Seachange Int'l, Inc. v. C-Cor, Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005), ....................................................................... 4

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ........................................................................ 27

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ...................................................................... 26

*Triology Comms., Inc. v. Times Fiber Comms.*, Inc.,
  109 F.3d 739 (Fed. Cir.I997) ......................................................................... 10

*Trusted Knight Corp. v. Int'l Bus. Machines Corp.*
  681 F. App'x 898 (Fed. Cir. 2017) ................................................................. 20

*Unwired Planet L.L.C. v. Google, Inc.*,
  660 F. App'x 974 (Fed. Cir. 2016) ................................................................. 34

*V-Formation, Inc. v. Benetton Group SpA*,
  401 F.3d 1307 (Fed. Cir. 2005) ........................................................................ 2

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ........................................................................ 27

*WoodFold Mfg. Inc. v. EMI Porta Opco, LLC.*,
  No. 18-cv-3984-RMD (N.D. Ill. Nov. 30, 2020) ........................................... 13

*Wyers v. Master Lock Co.*,
  No. 06-cv-00619-LTB,
  2008 U.S. Dist. LEXIS 12974 (D. Colo. Feb. 11, 2008) ........................................ 14

*Wyeth LLC, et al. v. Alembic Pharmaceuticals, Ltd., et al.*,
  C.A. No. 16-1305-RGA (D. Del. Jun. 27, 2018) .................................................... 35

**Other Authorities**

American Heritage Dictionary, 3rd ed. (1992) ........................................................ 13

McGraw-Hill Encyclopedia of Science & Technology, Vol. 4 (7th ed. 1992) ............................ 13

Merriam-Webster's Collegiate Dictionary, 10th ed. (2000) ........................................... 13

Webster's II New College Dictionary (1995) ........................................................... 14

## I.      INTRODUCTION

Plaintiff Ocean Semiconductor LLC ("Ocean" or "Plaintiff") respectfully submits this Responsive Claim Construction Brief.  Defendants contend that three terms require special construction and that three other terms are indefinite.  Other than one term containing a drafting error, however, none of the terms needs construction as each is sufficiently clear and should be given its plain and ordinary meaning.  For each, applying the plain and ordinary meaning is consistent with the intrinsic (and extrinsic) evidence and avoids introducing extraneous or confusing limitations or alternate meanings.  Each term is fully consistent with the understanding of one of ordinary skill in the art.  In contrast, Defendants' proposed constructions/indefiniteness contentions violate well-settled principles of claim construction and should be rejected.

## II.     LEVEL OF ORDINARY SKILL IN THE ART

For U.S. Patent No. 6,420,097 (the "'097 patent") (as of around 2000) and U.S. Patent No. 6,660,651 (the "'651 patent") (as of around 2001), a POSITA was a person with: (i) a B.S. in Engineering, Materials Science or a related field with at least three years of experience in semiconductor manufacturing or (ii) at least an M.S. in Engineering or Materials Science. (Maltiel Decl. at ¶¶ 24-25.)  For U.S. Patent No. 8,676,538 (the "'538 patent") (as of around 2004), U.S. Patent Nos. 6,907,305 (the "'305 patent") and 6,968,248 (the "'248 patent") (as of around 2005), and U.S. Patent No. 7,080,330 (the "'330 patent") (as of around 2006), a POSITA was a person with (i) a B.S. in Engineering, Materials Science or a related field with at least three years of experience in either semiconductor manufacturing or advanced process control or (ii) at least an M.S. in Engineering or Materials Science.  (*Id.* at ¶ 26.)  Additional education or experience may serve as a substitute for these requirements.  (*Id.* at ¶¶ 24-26.)

## III.   ARGUMENT

### A.   "ultra thin resist layer[s]"

STMicro and NXP (the only Defendants against whom the '097 Patent is asserted) miss the mark when contending that the term "ultra thin resist layer" is indefinite (Dkt. 40 at 5-11).[1] The term would have been readily understood by a POSITA and it is wrong to rely on claim differentiation when doing so would ignore the clear import of the specification.

The boundaries of the term are easily discernible and nothing more is required.  *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1350 (Fed. Cir. 2010)).  This is not a case of "unresolvable ambiguity" as argued by STMicro/NXP.  (Dkt. 40 at 6.)  The term as used in the claims viewed in light of the specification and prosecution history informs a POSITA about the scope of the invention with reasonable certainty.

#### 1.   The '097 Patent Consistently Defines "Ultra Thin Resist Layer" as a Layer Having a Thickness of Less Than 2500 Å

The ordinary meaning of a term is not viewed in a vacuum.  Rather, the Court "must look at the ordinary meaning in the context of the written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *see also V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005).  Here, whenever the specification discusses an "ultra thin resist layer" (or "UTR layer"), it consistently refers to the layer as having a thickness that is less than 2500 Å.  (Maltiel Decl. at ¶ 44.)[2]

First, when discussing the problems of the prior art, the specification describes that "[a]s the wavelength of the radiation decreases, such classic image exposure techniques cannot be used to satisfactorily generate the pattern line widths ***in the photoresist of less than 0.25 μm***

---

[1] Unless otherwise noted, docket citations are to coordinated Defendant NXP's docket (*Ocean Semiconductor LLC v. NXP Semiconductors NV, et al.*, No. 6:20-cv-01212-ADA (W.D. Tex.)).

[2] Citations to "Maltiel Decl." are to the co-filed Declaration of Ron Maltiel in Support of Ocean Semiconductor's Responsive Claim Construction Brief.

*(2500 Å)*." ('097 patent, 1:29-32; Maltiel Decl. at ¶ 45.)[3]   It goes on to state that UTR coatings have been developed to overcome this drawback.  ('097 patent, 1:34-38; Maltiel Decl. at ¶ 45.) Then, after describing how the current state-of-the-art involves resist coatings of 5,000 Å for 248 nm lithography and 4,000 Å for 193 nm lithography, the specification explicitly sets out a definition of what constitutes an ultra thin resist: "a resist coating having an UTR thickness *is considered to be* resist films of less than 0.25 $\mu$m (2500 Å) in thickness."  ('097 patent, 1:38-45; Maltiel Decl. at ¶ 45.)  This language specifically establishes the limit or boundary of what qualifies as a thickness that of an "ultra thin resist" within the context of the '097 patent. (Maltiel Decl. at ¶ 47.)[4]  (Defendants' expert concedes that an ultra thin resist "coating" is the same thing as an ultra thin resist "layer."  (Ex. A at 98:6-12.)[5]

The specification is wholly consistent.  (Maltiel Decl. at ¶ 48.)  For example:

- the problem associated when the conventional lithographic process is applied to an ultra-thin resist thickness of less than 2500 Å will also be explained in connection with FIGS. 2(a) through 2(d)" ('097 patent, 2:58-61);

- "when the lithographic process described above. . . is applied to an UTR thickness of less than 2500 Å, there is created a Significant problem. . ." (*id.,* 3:33-37);

- "As can be seen in FIG. 2(a), an UTR layer 18a has a thickness of less than 2500 Å . . . ." (*id.,* 3:28-40); and

- "The UTR layer 120 has a thickness of less than 2500 Å" (*id.,* 4:12-13).

Notably, at no point does the specification describe an ultra thin layer resist as being any thicker than 2500 Å.  (Maltiel Decl. at ¶ 48; Ex. A at 102:21-103:4.)

---

[3] Unless otherwise indicated, emphasis in this Brief has been added.
[4] STMicro/NXP are wrong in contending that this "merely establishes that. . . thicknesses under 2500 Å qualify."  (Dkt. 40 at 8.)
[5] Citations to Exhibits in this Brief refer to the Exhibits attached to the co-filed Declaration of Alex Chan in Support of Plaintiff Ocean Semiconductor LLC's Responsive Claim Construction Brief.

Given these multiple references to a "thickness of less than 2500 Å," a POSITA would have had no difficulty understanding the meaning of the claim term "ultra thin resist layer" and what the upper thickness boundary of such a layer was intended to be.  (Maltiel Decl. at ¶ 50.)

### 2.        Claim Differentiation Does Not Override the Clear Specification Teachings

Despite the clarity of the specification, STMicro/NXP argue that the term is indefinite simply because claim 4 includes language making the thickness explicit: "[a] method of forming circuit structures as claimed in claim 1, wherein the ultra-thin resist layer has a thickness of less than 2500 Å."  In fact, STMicro/NXP entirely ignore all of the specification examples discussed above when erroneously contending that "the intrinsic evidence does not identify or suggest any upper boundary for thickness of the UTR layer recited in claims 1–3 and 10–17."  (Dkt. 40 at 7.)

Rather than give meaning to the stated scope of the actual invention as the Court and the parties should strive to do (*see Retractable Techs. v. Becton*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("we strive to capture the scope of the actual invention, rather than. . . allow the claim language to become divorced from what the specification conveys is the invention"), STMicro and NXP instead hitch their wagon to the doctrine of claim differentiation.  Claim differentiation, however, *is merely a rule of thumb* that raises a "presumption" that a dependent claim is narrower than the independent claim from which it depends and is not always applicable.

The Federal Circuit opinions holding that claim differentiation is *not* a hard and fast rule of claim construction and cannot broaden claims beyond their correct scope are legion.  *See, e.g., Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) (*en banc*) (citing *Seachange Int'l, Inc. v. C-Cor, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005), and *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991), and finding that the specification dictated a construction); *Kraft Foods, Inc. v. International Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000), citing *Comark Comm., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir.

4

1998); and *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998).[6]

Indeed, a patent's written description (and its prosecution history) can overcome any

presumption that may arise from the doctrine of claim differentiation.  *Andersen Corp. v. Fiber

Composites, LLC*, 474 F.3d 1361, 1368 (Fed. Cir. 2007), citing *Kraft Foods*, 203 F.3d at 1368;

*Multiform Desiccants*, 133 F.3d at 1480.  That is exactly what happened here.  While claim 4

does explicitly discuss the less than 2500 Å thickness of the "ultra thin resist layer," the

specification repeatedly makes it clear that claim 1—and all of the claims that depend from it—

are similarly limited.  (Maltiel Decl. at ¶¶ 51-52.)

The present situation is analogous to that in the Federal Circuit *Retractable Techs.*

decision.  There, the lower court determined that, because a dependent claim limited the "body"

term of the independent claim from which it depended to a one-piece structure, the independent

claim encompassed bodies composed of multiple pieces.  The Federal Circuit reversed.

> We agree with BD that the claimed "body" is limited to a one-piece structure in
> light of the specifications. . . .  [A] construction of "body" that limits the term to a
> one-piece body is required to tether the claims to what the specifications indicate
> the inventor actually invented. Accordingly, the district court erred when it
> construed "body" as encompassing bodies composed of multiple pieces.
>
> *Retractable Techs. v. Becton*, 653 F.3d at 1305; *see also CardSoft (assignment for the

Benefit of Creditors), LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1352 (Fed. Cir. 2015) (reversing

district court holding that differentiated the use of "virtual machine" in an independent claim

from dependent claims stating that instructions "do not require translation to the native software

code of the microprocessor," finding claim differentiation was merely a presumption or rule of

thumb and that "[b]ecause the ordinary meaning of 'virtual machine' is clear in light of the

specification and prosecution history, claim differentiation does not change its meaning").

---

[6] Even STMicro/NXP's cases (Dkt. 40 at 8) explicitly recognize that claim differentiation is not
absolute and that only a presumption arises.

A POSITA would readily understand from the specification that "ultra thin resist" is used to mean a resist that is less than 2500 Å thick and that an "ultra thin resist layer" in the '097 patent claims is a resist layer that is less than 2500 Å thick.  (Maltiel Decl. at ¶ 52.)  Far from "insolubly ambiguous," the term is readily definite.  In fact, STMicro, in as-yet-undecided IPR Petition, explicitly conceded the definiteness of the term, while citing to the specification: "The '097 patent describes a UTR layer *as having a thickness under 2500 Å.*  Ex. 1001, 1:43-45." (Ex. C (Petition For *Inter Partes* Review of U.S. Patent No. 6,420,097) at 24.)

### 3. Consideration of Extrinsic Evidence Is Inappropriate Given the Clarity of the Specification's Teachings

Because the intrinsic evidence is more than sufficient to discern the meaning and scope of "ultra thin resist layer," it is unnecessary, and indeed improper, to consider STMicro/NXP's cited extrinsic evidence—particularly to create manufactured ambiguity.  *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1358 (Fed. Cir. 2003).  Extrinsic evidence may not be used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.  *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1320 (Fed. Cir. 2012).

Consequently, STMicro/NXP's citation to, and discussion of, multiple unrelated patents (Dkt. 40 at 9-10) is a red herring.  Whether or not those patents contain their own specific definitions of "ultra thin resist layers" has no significant bearing on how a POSITA would interpret that term upon reading the '097 patent.  At best, that extrinsic evidence merely indicates that there was some variation as to what was considered to be ultra-thin—and that many of the instances are wholly consistent with the '097 Patent in setting the boundary at 2500 Å—thereby emphasizing the importance of looking to the '097 patent's specification to determine what upper boundary was to be used within the context of the claimed invention.  (Maltiel Decl. at ¶ 54.)  As the specification makes it very clear that the inventor considered resist layer thicknesses of less than 2500 Å to be "ultra thin," that is how the term should be construed.

### 4.    Defendants' Expert's Opinion Is Not Credible

Dr. Spanos' opinion suffers from critical flaws and inconsistencies and should not be credited.  First, contrary to the law, Dr. Spanos has admitted that his opinion is based on a belief that the doctrine of claim differentiation *always* has to be applied.  (Ex. A at 108:10-21.)

Second, even while contending that "ultra thin resist" is indefinite as used in the '097 patent, Dr. Spanos specifically points to another patent—U.S. Patent No. 6,326,319—as "identify[ing] an upper limit for UTR thickness of 2500 Å."  (Dkt. 40-1 at ¶ 57; *see also* Ex. A at 107:3-6.)  That patent, however, *uses the exact same language* as in the '097 patent to define the upper thickness limit as less than 2500 Å.  (*Compare* '097 patent, 1:39-45 to Dkt. 40-20 at 1:39-45.)  If the discussion in the '319 patent is sufficient to "identify an upper limit" than that same language must also be sufficient to identify the upper limit in the '097 patent.

### B.    "pneumatic cylinder"

While Defendants propose "plain and ordinary meaning" for this term, they slip in a specific construction that they hope to have the Court adopt for that meaning: "a cylindrical device that uses pressurized air or other gas to move a shaft of the device in a straight line." (Dkt. 40 at 17.)  The Court should not allow this backdoor construction.  There is no need to construe this term in view of the patent's intrinsic evidence.[7]

Moreover, Ocean objects to Defendants' *new* construction, as it was *never* presented during the parties' exchange of proposed claim construction or at any point during their meet and confer to narrow the terms in dispute.  (*See* Ex. B (Defendants' Disclosure of Preliminary Proposed Constructions) at 3.)  Withholding this new construction in an effort to reserve it for Defendants' opening brief is inconsistent with the spirit of this Court's Scheduling Order.

---

[7] The Federal Circuit "has repeatedly held that a district court is not obligated to construe terms with ordinary meanings."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F. 3d 1351, 1360 (Fed. Cir. 2008); *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005).

Defendants cannot now raise new construction and sandbag Ocean with new issues and evidence that should have been disclosed during the parties' claim construction exchanges.

### 1.    Ocean's Construction Is Supported by the Intrinsic Evidence

Should the Court find it necessary to construe this term, it is Ocean's alternative construction that comes from the specification: "the pneumatic cylinders 46 may be any type of pneumatic cylinders useful for performing the function of adjusting the surface 42 of the wafer stage 40," whose "*mechanism* useful in adjusting the position of the wafter stage 40 may be comprised of any of variety of devices, such as pneumatic, hydraulic, electromagnetic, or mechanical systems."  ('651 patent, 5:65-6:1 and 6:13-15.)

Defendants' primary contention that these four types of devices (i.e., pneumatic, hydraulic, electromagnetic, or mechanical) are "distinct" (Dkt. 40 at 18) seems to rely on a misreading that the claimed "pneumatic cylinders" are of "pneumatic" type to thereby exclude the other three mechanisms (i.e., hydraulic, electromagnetic, or mechanical).  But this is a false reading.  The specification explicitly describes that the mechanism "may be *comprised* of any of a variety of *devices*" and "systems"; in other words, the description is in the context of "mechanisms," *not* cylinders, making it clear that these four "types" are in reference to *mechanisms* that can be adopted by the pneumatic cylinders, as opposed to the type of cylinders themselves.  (Maltiel Decl. at ¶ 57.)  Defendants' own expert confirmed this on deposition.  (Ex. A at 36:22-37:14 ("Q: Is there anywhere in this specification that says a pneumatic cylinder cannot combine any of these [four] mechanisms for moving the wafer stage? . . . A: There is --- there is not a --- specific exclusion of that in this specification, if I recall correctly.").)

Plaintiff's alternative construction also does not limit the pneumatic cylinders to being only pneumatic (nor are they limited to a single mechanism), as the specification readily makes clear that a combination of the mechanisms is contemplated by the phrase "may be comprised

of." As such, Plaintiff's construction is proper and supported by the intrinsic record as it further defines those mechanisms or capabilities comprising pneumatic, hydraulic, electromagnetic, or mechanical mechanism, or a combination thereof, in adjusting the surface of the wafer stage.

### a. Pneumatic Cylinders Can Employ Pneumatic, Hydraulic, Electromagnetic, or Mechanical Mechanism

As is well-known, and as is amply supported by the intrinsic record, a pneumatic cylinder provides pneumatic, hydraulic, electromagnetic, mechanical capabilities, or a combination thereof. For example, the patent describes the pneumatic cylinder 46 as having mechanical parts, such as a shaft 49, that are often used in pneumatic, hydraulic, electro-magnetic, and mechanical applications, as Defendants' expert confirmed. ('651 patent, 6:21-25; Ex. A at 41:3-20.)

First, pneumatic cylinders as described in the specification can employ a pneumatic mechanism by using pressurized air or gas to generate the force necessary to adjust the wafer stage. But these pneumatic cylinders are not limited to the use of only a pneumatic mechanism. For example, the pneumatic cylinders can provide hydraulic functions. (Ex. A at 45:8-11 ("Q: Are you aware that there were hybrid cylinders that combined pneumatic and hydraulic functions at the time of the invention? A: Yes.").) Referring to the specification, the inventor describes "pneumatic cylinders" in ***both*** the drawings and the specification as "pneumatic cylinders 46." The inventor used that ***same*** numerical label to describe hydraulic cylinders:

> As another example, the ***pneumatic cylinder 46*** may be provided with sensors to detect the travel of the rod 49 of the cylinder 46. Initially, the controller 74 may position the surface 42 at an approximately horizontal position with the travel rack 82 and/or rod 49 of the ***hydraulic cylinders 46*** located at the approximate middle of their overall travel length.

('651 patent, 8:48-54.) The inventor used the reference label "46" for both "pneumatic cylinders" and "hydraulic cylinders." Thus, in this example, the inventor intended that both pneumatic and hydraulic cylinders to "mean essentially the same thing" and not to the exclusion of the other. *Amhil Enter. Ltd. v. Wawa, Inc.*, 81 F.3d 1554,1559 (Fed. Cir. l996); *accord,*

*Triology Comms., Inc. v. Times Fiber Comms.*, Inc., 109 F.3d 739, 743 (Fed. Cir.I997).  As such, the intrinsic record reinforces the inventor's intent that the pneumatic cylinders 46 can, though need not be, employ hydraulic mechanism, and by extension, the other mechanisms as well.

Using pneumatic cylinders to provide hydraulic capabilities is similarly recognized by Defendants in their invalidity contentions, which Defendants' expert failed to consider in forming his opinion.  (Ex. A at 45:12-19.)  For example, in their invalidity contentions, Defendants point to one of the prior art references' ("Wakui") "hydraulic actuator" as the claimed pneumatic cylinder.  (*See* Ex. D (Ex. A-02 of Defendants' Invalidity Contentions) ("A *hydraulic* actuator, an air pressure cylinder, an electric motor and a ball screw, a combination of an electric motor, a decelerator, and a ball screw, a linear motor, or the like can be used as the extendable actuator").  In doing so, Defendants admit that pneumatic cylinders are not limited to providing only pneumatic capabilities.

Defendants' misreading of the "pneumatic cylinders" to the exclusion of hydraulic, electromagnetic, and mechanical capabilities is further made apparent from the fact that their construction would categorize pneumatic cylinders as non-mechanical cylinders—a point that is both unsupported by the intrinsic evidence and contradicted by even Defendants' own expert and extrinsic evidence.  As discussed above, the specification describes the pneumatic cylinders as using mechanical components, such as rods, shafts, and valves, to adjust the wafer stage.  ('651 patent, 6:7-10 and 6:21-25; Ex. A at 40:22-41:2 ("Q: . . . Those mechanical parts are used by pneumatic cylinders; correct? A: Sure. Cylinders are made of parts and people could call those mechanical parts."); 41:22-42:3 ("In opining on the construction of the term 'pneumatic cylinder,' did you consider that hybrid pneumatic mechanical cylinders were readily available at the time of [the] invention? . . . THE WITNESS: Yes.").)  Defendants' construction, if adopted however, would ignore, in their entirety, the pneumatic cylinders' mechanical structure and

10

internal mechanical components that are described in various embodiments for adjusting the

wafer stage.  This is legally erroneous.  *See Chamberlain Grp. Inc. v. Lear Corp.*, 516 F.3d 1331,

1339 (Fed. Cir. 2008) (holding that the district court's construction of "binary code" was

erroneous because it was "internally inconsistent and contradictory to the rest of the patent").  A

construction that reads out these embodiments that are explicit in the specification "is rarely

correct."  *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013).

Also, the author of the "Pneumatic Systems" book ("PS Book") (Dkt. 40-24), cited by

Defendants as extrinsic evidence, recognizes "pneumatic cylinders" as "mechanical elements"

that include, for example, "piston 9," "piston rod 11," "tie rods 3," and "nuts 6" as shown in Fig.

5.1(b), which crystallizes the use of mechanical mechanism in connection with the pneumatic

cylinders.  (Dkt, 40-24 at 7; *see also* Maltiel Decl. at ¶ 63.)  Moreover, at least one court found

"pneumatic" to provide "***mechanical***" properties.  *See Intex Rec. Corp. v. Team Worldwide*

*Corp.*, 42 F. Supp. 3d 80, 87 n.6 (D.D.C. 2013) ("'The pertinent science at issue here is that of

'pneumatics,' i.e., 'a branch of ***mechanics*** that deals with the ***mechanical*** properties of gases (as

weight, pressure, elasticity).' Webster's Third New Int'l Dictionary 1746 (1993) . . . .").

Similarly, in connection with the electromagnetic mechanism, the specification describes

the use of electrodes and coils in conjunction with the adjustment of the wafer stage.  For

example, the inventor explained that "the wafer stage is actually an electrode that is used to

ground the wafer while a plasma is created above the wafer by other electrodes or coils in such

tools.  ('651 patent, 5:19-22.)  The inventor also explained that the "adjustable wafer stage 40 . . .

may be used to vary the distance between the target (upper electrode) and wafer stage (bottom

electrode) in such systems, thereby affecting the deposition rates of the material formed on a

wafer . . . .").  (*Id.* at 8:34-39.)  To that end, the specification contemplates that the pneumatic

cylinders, in some embodiments, employ electromagnetic mechanism (e.g., through electrodes and coils) for adjusting the surface of the wafer stage.

The use of electromagnetic mechanism in pneumatic cylinders was also well-known at the time of the invention.  (Maltiel Decl. at ¶ 66.)  For example, their electromagnetic properties can be realized through their valves that are "used in actuating the pneumatic cylinder 46 to control the position of the surface 42 of the wafer stage 40" ('651 patent, 6:7-11), as is well-known to those skilled in the art.  (Maltiel Decl. at ¶ 66.)

### b.   Defendants' Argument Stems from an Intentional Misreading of the Specification and Conflicts with the Intrinsic Record

Defendants contend that the patentee somehow disclaimed the other three mechanisms (namely, hydraulic, electromagnetic, and mechanical).  (Dkt. 40 at 19.)  But the patentee has ***not once*** described any other type of cylinders in any other context, which all but confirms that the "pneumatic, hydraulic, electromagnetic, or mechanical" function is in reference to the pneumatic cylinders' mechanisms used to adjust the wafer stage.  This makes sense because a pneumatic cylinder can, and does, provide pneumatic, hydraulic, electromagnetic, or mechanical functionality, or a combination thereof.  (Maltiel Decl. at ¶¶ 58 (hybrid), 59 (mechanical), 64 (hydraulic), 65-67 (electromagnetic).)  Nowhere does the specification limit the form of mechanism or device used by the pneumatic cylinders in adjusting the surface of the wafer stage.  This is especially true where these functionalities overlap in some ways with each other.

As a case in point, pneumatic cylinders deploy mechanical mechanisms through the use of mechanical components for adjusting the wafer stage.  (Maltiel Decl. at ¶ 59.)  In that sense, pneumatic cylinders are no different from "mechanical cylinders" being coined by Defendants.  Surely Defendants are not suggesting that the patentee has disclaimed the use of "mechanical mechanism" by virtue of claiming "pneumatic cylinders," as such a reading directly conflicts

with the specification, including the claims.  (*See, e.g.*, pneumatic cylinders that use "ball and socket connection" for coupling to the wafer stage, as recited in claims 5, 12, 24 and 30.)

As a last resort, Defendants point to other claims in support of their contention that "a pneumatic cylinder cannot be construed to encompass non-pneumatic devices."  (Dkt. 40 at 19-20.)  The dependent claims prove no such thing.  If anything, the fact that no other claims recite any cylinders other than pneumatic cylinders further demonstrates that the four mechanisms are in reference to the functions of the pneumatic cylinders, as opposed to cylinders themselves.

**2.      Defendants' Construction Lacks Intrinsic and Extrinsic Support**

**a.      Defendants' Construction of "Cylindrical Device" Finds No Support in the Specification Because Pneumatic Cylinders Need Not Be Cylindrical**

Defendants have not explained where the specification supports their construction that each "pneumatic cylinder" must be of "cylindrical" shape, appearing to base their construction on the use of the term "cylinder."  Setting aside that the specification does not limit the pneumatic cylinders to any particular shape, "cylinders" are not limited to being cylindrical, in the same way that ovals are not limited to being elliptical.  Courts in other districts have reached the same conclusion—a cylinder is not limited to a cylindrical shape.  *See Gummow v. Splined Tools Corp.*, No. 3-03-CV-1428-L, 2004 U.S. Dist. LEXIS 31711 at *13 (N.D. Tex. Apr. 26, 2004) (citing McGraw-Hill Encyclopedia of Science & Technology, Vol. 4 at 653 (7th ed. 1992)) (finding that "cylinders may be elliptical, parabolic, hyperbolic, or polygonal, as well as circular"); *see also WoodFold Mfg. Inc. v. EMI Porta Opco, LLC.*, No. 18-cv-3984-RMD, at *38 (N.D. Ill. Nov. 30, 2020) (*citing* American Heritage Dictionary, 3rd ed. (1992); Merriam-Webster's Collegiate Dictionary, 10th ed. (2000); and "Geometry A Modern Introduction" (publisher information not provided)) (finding the term "cylinder" to "not require a round cross-section but rather include cross-sections of any curved shape").  Other courts have construed a

13

cylinder to mean something other than a "cylindrical" shape, such as elliptical. *See, e.g.*, *Wyers v. Master Lock Co.*, No. 06-cv-00619-LTB, 2008 U.S. Dist. LEXIS 12974, at *19 (D. Colo. Feb. 11, 2008) (*citing* Webster's II New College Dictionary (1995)) ("'Cylinder' has a common definition meaning a tube shape with parallel sides and with flat ends of an elliptical shape.").

Additionally, a POSITA would understand that pneumatic cylinders are not necessarily cylindrical. (Maltiel Decl. at ¶ 68.) For example, an online search of "pneumatic cylinders" in the relevant timeframe also shows them in rectangular form. (*Id.*) As Defendants' construction of "cylindrical device" lacks factual and legal support, it should be rejected. In fact, Dr. Spanos admits that a pneumatic cylinder's housing need not be cylindrical, effectively admitting that a pneumatic cylinder need not be cylindrical. (Ex. A at 16:19:17:2; 18:24-19:11 ("Q: . . . So are the end covers not limited to cylindrical? I just want to make sure I understand. Because you mentioned other shapes. . . . THE WITNESS: Yes. . . . [T]hey do not have to be cylindrical.")

### b.   Defendants' Construction of "Pressurized Air or Other Gas" Is Overly Narrow and Inconsistent with the Intrinsic Record

Defendants point to the specification as allegedly limiting "pneumatic cylinder" to one supplied with "pressure" and "air or insert gas," but conveniently omit that the specification explicitly describes that embodiment as an "example." ("*For example*, the pneumatic cylinders may be dual-acting pneumatic cylinders. The stroke, size and supply pressure to such cylinders *may* vary depending upon the particular application. Air or an inert gas *may* be supplied to the cylinders 46 at the required pressure through flexible hoses . . . .). ('651 patent, 6:16-21.) Nothing in the specification confines the meaning of "pneumatic cylinders" to that example. *See Prolitec, Inc. v. Scentair Techs., Inc.*, 807 F.3d 1353, 1358 (Fed. Cir. 2015) ("[T]he use of 'may' signifies that the inventors did not intend to limit the patent.") (*rev'd on other grounds*).

In fact, the inventor was unequivocal in the sentence immediately preceding Defendants' cited example that "[t]he pneumatic cylinders 46 may be *any type* of pneumatic cylinders useful

for performing the function of adjusting the surface 42 of the wafer stage 40." ('651 patent, 6:14-16.)  This express language contemplates, and supports, other possible uses such as the use of fluid instead of air or gas.  Nothing in the specification, and certainly nothing in Defendants' referenced example, provides the sort of clear and unequivocal disavowal that would exclude other forms of use, or impose a strict requirement as to how such function should be performed.

> **c.   Defendants' Construction Requiring Movement of a Shaft in a Straight Line Ignores the Claimed Tilting and Is Inconsistent with Their Expert's Testimony and Cited Extrinsic Evidence**

Defendants' construction requiring movement of a shaft in a straight line is overly narrow and finds no support in the intrinsic record.  First, Defendants' construction of a "shaft" introduces extraneous material and confusion.  While the specification describes a shaft, nothing requires that "shaft" to be a part of the pneumatic cylinders.

Second, the specification describes the shaft in the form of a rod.  For example, the specification describes that "the pneumatic cylinder 46 may be provided with sensors to detect the travel of the rod 49 of the cylinder 46" where "the controller 74 may position the surface 42 at an approximately horizontal position with the travel rack 82 and/or rod 49 of the hydraulic cylinders 46." ('651 patent, 8:48-54.)  Defendants' construction finds no support to limit the pneumatic cylinders to moving *only* a shaft or requiring such cylinders to include *only* a shaft.  (*See* Maltiel Decl. at ¶ 69-70.)  The fact that Defendants' own expert also admits that "a rod is not always a shaft" further eviscerates Defendants' construction.  (Ex. A at 27:15-19.)

Also, both the claims and the specification are explicit that the pneumatic cylinders "are operatively coupled to said wafer stage to accomplish at least one of raising, lowering, and ***varying a tilt*** of said surface of said stage." (*See* claims 1 and 19; 6:66-7:1.)  While moving a shaft in a straight line, for example, facilitates raising or lowering of the wafer stage, Defendants' construction effectively reads out tilting and prevents the stage from varying its tilt angle.

(Maltiel Decl. at ¶ 70.)  Tellingly, Defendants never explain how moving in a straight line allows pneumatic cylinders to vary the tilt of the stage—it cannot since tilting necessarily requires the shaft to deviate from its axis (i.e., move in a non-straight line).  (Maltiel Decl. at ¶ 70.)

Defendants' construction would also make all claims reciting pneumatic cylinders indefinite as nothing in the specification supports the notion that moving a shaft in a straight line could facilitate tilting, or the varying of tilt, of the wafer stage.  (Maltiel Decl. at ¶ 70; *see also Geneva Harms. Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (refusing to adopt a proposed construction that would have rendered claims indefinite).  Defendants' expert also admits that "moving a shaft in a straight line" would not allow "a curvature on it at all," (Ex. A at 36:2-7), which all but confirms that indefiniteness would ensue if Defendants' construction is adopted because this construction would prevent the surface of the wafer stage to tilt in direct conflict with the express language of claim 19, which requires varying a tilt.

Defendants also cite to extrinsic evidence but it is unnecessary to consider this extrinsic evidence to vary or contradict the term's plain and ordinary meaning.  Even if Defendants' extrinsic evidence were to be considered, it fails for the same reason—it is overly narrow and actually contradictory.  First, ***none*** of the cited dictionaries (Dkts. 40-19, 40-20, and 40-21) define a pneumatic cylinder to "move a shaft of the device in a straight line."  Instead, Defendants concocted this definition from the "Pneumatic Systems" book ("PS Book").  (Dkt. 40-24.)  The PS Book, however, does not speak of a "shaft"; instead, it illustrates a piston rod. (*See, e.g.*, Dkt. 40-24, "Piston rod 11" in Fig. 5.1(b).)  The piston rod 11 as shown in Fig. 5.1(b) is not necessarily a shaft—a point confirmed by Defendants' expert—because it includes other integral sub-parts such as the piston 9.  (Ex. A at 27:15-19 ("Q: In your opinion, is a shaft the same as a rod? A: No. The two words do not mean the same. But a shaft is usually a rod, but a rod is not always a shaft.").)  Also, the piston rod described in the PS Book need not move in a

16

straight line because the piston is subject to "buckling and bending" (Dkt. 40-24 at 9.)  Whether the piston could move in a straight line is also an artifact of "a particular size of piston diameter, rod length, and stroke length."  (*Id.*)  At best, Defendants have shown that the piston could move in a straight line but otherwise have shown that it must do so.

###### C.   "said process chamber"

Ocean's construction should be adopted because it is consistent with the intrinsic record—the phrase "wafer stage in said process chamber" in the phrase ". . . processed wafer positioned on said wafer stage in said process chamber" as recited in claim 31 refers to the wafer stage in "said process tool" as is described throughout the specification.

###### 1.   Ocean's Construction Is Amply Supported by the Intrinsic Record

The specification is unequivocal that "the wafer stage 40 [is] ***in the process tool 72***." ('651 patent, 7:53-58.)  For example, the specification describes that "[t]he present invention is generally directed to a ***process tool comprised of an adjustable wafer stage***."  ('651 patent, 3:6-7; *see also* 3:9-13 ("the ***process tool is comprised of a process chamber***"); 3:23-30 ("a ***process chamber comprised of a wafer stage***"); 4:59-62 ("***a process tool comprised of an adjustable wafer stage***"); 10:7-8 ("***a process tool comprised of an adjustable wafer stage***."); 10:58-64 ("[A] ***process tool 72 [is] comprised of an adjustable wafer stage 40 . . . in the tool 72***").  The specification also describes the wafers as being "provided to the process tool 72 where a process operation will be performed on the wafer[s]," implying that the wafer stage on which the wafers are positioned is inside the "process tool 72."  (*Id.* at 7:21-25.; *see also* 7:50-53 ("[T]he wafers have been processed in the process tool 72.")

The intrinsic support for Ocean's construction is not limited to the specification; the claims also recite that the wafer stage is in the "process chamber."  For example, independent claim 44 recites "a ***process tool comprised of an adjustable wafer stage . . . in said tool***."  (*Id.* at

15:20-22.)  In the same fashion, independent claim 53 recites "an adjustable wafer stage that has a surface adapted to receive a wafer to be processed *in said tool*."  (*Id.* at 15:59-61.)

### 2. Defendants' Indefiniteness Argument Should Be Rejected Because It Ignores Claim Language and Focuses on Claim Elements in Isolation

Defendants' indefiniteness contention primarily focuses on differentiating between a process tool and a process chamber.  (Dkt. 40 at 21-22.)  Because they are two "different components," Defendants cast doubt on whether the term "said process chamber" actually means "said process tool."  (*Id.* at 22.)  Defendants attempt to take advantage of a harmless drafting error should be rejected.  As shown above, the error is not subject to reasonable debate in view of the claim language and specification, and the prosecution history does not suggest, and Defendants have cited none, that a different interpretation of "process chamber" should govern.

### a. Defendants' Indefiniteness Argument Ignores the Surrounding Claim Language

Defendants' indefiniteness argument also fails for one simple reason—they view the claim term "process chamber" in isolation without consulting the surrounding claim language, which provides useful guidance, and indeed powerful evidence, as to the meaning of this term.

Here, claim 31 recites four claim limitations.  In the first limitation, claim 31 recites in no unambiguous terms "performing a *process operation in a process tool* on each of a plurality of wafers."  In the second limitation, claim 31 references "across-wafer variations" resulting from "said *process operation performed in said process tool*."  After measuring across-wafer variations and adjusting the surface of the adjustable wafer stage using the across-wafer variations (third claim limitation), the claim then calls out "performing said process operation on at least one subsequently processed wafer on said wafer stage in said process chamber" (fourth claim limitation) after the wafer stage has been adjusted.  Between the first and fourth claim limitations, *nothing* modifies or changes the location of the process operation being performed

on the wafers—the process operation is still performed in the process tool as recited in the first claim limitation.  There is no uncertainty as to where the process operation is performed (i.e., in the process tool).  (Maltiel Decl. at ¶ 74.)

Thus, when the fourth claim limitation reiterates that the "said process operation" is being performed on subsequently processed wafers, it ***necessarily*** refers to that same process tool recited in the first claim limitation.  The fact that "said process operation" is referencing "the process tool" in the first and second claim limitations is not subject to any plausible debate, much less a reasonable one, because ***nothing*** in claim 31 recites performing the process operation anywhere else than in the process tool.  This is further reinforced by the fact that ***none of the dependent claims*** recite a process chamber or performing the process operation in places other than the process tool, further solidifying the sole meaning of "said process chamber" in claim 31 to mean "said process tool."  (Maltiel Decl. at ¶ 75.)

This reading also conforms to the specification and claims.  For example, the specification explicitly describes that the "wafer 28 is ***provided to the process tool 72 where a process operation will be performed*** on the wafer 28."  ('651 patent, 7:21-25; *see also* 10:39-49 ("[T]he method comprises performing a ***process operation in a process tool*** on each of a plurality of wafers . . . ."))  Moreover, dependent claim 32 further recites "***performing a process operation* . . . *in a process tool*** on each of a plurality of wafers."  The same is true for dependent claims 33-34—they both confirm that the process operation is performed in the process tool.

Defendants have committed the classic error of determining indefiniteness by only looking at the meaning of a process tool and a process chamber in isolation.  In doing so, they entirely omit the context of the surrounding claim language, specification and drawings as section 112(b) requires.  *Power-One*, 599 F.3d at 1350 ("To comport with § 112's definiteness requirement, the boundaries of the claim, as construed by the court, must be discernible to a

skilled artisan based on the language of the claim, the specification, and the prosecution history, as well as other knowledge of the relevant field of art.").  Tellingly, Defendants' expert, Dr. Spanos, *has not opined* otherwise—he offers no opinion as to this term.  Thus, Defendants have not demonstrated why the intrinsic record failed to inform with *reasonable certainty* those skilled in the art about the scope of claim 31.

*Trusted Knight* cited by Defendants is inapposite.  In *Trusted Knight*, which concerned a patent for an anti-malware computer program, the Federal Circuit concluded that it could not correct a claim which specified "a process of passing the encrypted data to a 3-ring level where a hook inserted by a hook-based key logger" to add the word "is" between "hook" and "inserted." 681 F. App'x 898, 904 (Fed. Cir. 2017).  Both the specification, and the patent, itself, emphasized that the software "passes encrypted data to the 3-ring level" regardless of whether the hook is inserted, so that the addition of the word "is" caused the claim to conflict with the rest of the patent and "would create a different claim scope than [the patentee's] proposed correction of adding [is]."  *Id.*  Because of this ambiguity, the Federal Circuit held that the error was not amenable to correction by the Court because it was "subject to reasonable debate."  *Id.*

No such facts exist here.  Construing "said process chamber" as "said process tool" does not create any conflict with the rest of claim 31.  Defendants have made it their key contention that these two components are "different" (despite their recognition that "many, if not all, of such tools have a process chamber"; Dkt. 40 at 22) but have otherwise failed to show why Ocean's construction would alter claim scope or create conflict with the surrounding claim language.

### D.   "software scheduling agent"

#### 1.   A Scheduling Agent Is Not Required to Initiate, Schedule *and* Execute

Based on a single citation to the specification that does not create such a requirement, Defendants' construction improperly narrows a scheduling agent to an agent that "initiates,

schedules **and** executes" on behalf of a particular manufacturing domain.  In fact, Defendants' proposed construction contradicts multiple portions of the intrinsic record and should be rejected.

### a.     An Embodiment "of Particular Interest to the Present Invention" Does Not Disavow Claim Scope

First, Defendants point to the language "[o]f particular interest to the present invention" as evidence that the agent "schedules, initiates, and executes activities . . . ."  (Dkt. 40 at 19.) While the Federal Circuit has made it clear that some statements on their own could provide a basis for finding disavowal or disclaimer, the statement that a specific combination is "of interest to the present invention" does not carry such a meaning.  *Cf. Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) ("We have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes . . .' or 'the present invention is . . .' or 'all embodiments of the present invention are. . . .'").  The alleged "definition" relied upon by Defendants does not use phrases such as "the present invention includes," "the present invention is," or "all embodiments of the present invention are."  Instead, it states "of particular interest."  Without more, this is ***not*** a clear and unmistakable statement that a software agent must perform all three specified functions.

*Forest Labs., LLC v. Sigmapharm Labs., LLC* is also inapposite because nothing in this alleged "definition" says that this is the sole embodiment.  918 F.3d 928, 933 (Fed. Cir. 2019). Similarly, the patent in *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, referred to "all embodiments of the present invention."  242 F.3d 1337, 1344 (Fed. Cir. 2001).

### b.     A Scheduling Agent May Schedule Activities Without Initiating or Executing

Both the '305 and '248 patents are permeated with language specifying that the software agents can perform ***any*** of these functions without requiring performance of ***all three functions***. For example, the '305 specification describes the software scheduling agents as performing

21

scheduling and initiating activities (i.e., without requiring execution; 7:7-8).  The specification describes several types of software scheduling agents, such as an LSA, MSA, PMSA, and RSA, that "schedule[] activities" on behalf of lots, process tools, PMs/Quals, and resources, respectively, but otherwise does not state that they must also initiate and execute such activities. (*Id.*, 7:18-29.)  As one example, where there is an "appoint state change" event (e.g., "Expand Lot Appointment"), "[t]he MSA initiates this change when the lot appointment is running low" and "[t]he LSA will react to this change by shifting all appointments to the right or later in time." (*Id.*, col. 21, Table 3, under "Expand Lot Appointment".)  Nothing requires MSA to also

[re-]schedule and execute any activity in connection with that event (at best, only "initiating" the change of appointment is described).  Similarly, a number of activities for MSAs are limited to cancelling or aborting a specific appointment.  (*Id.*, col. 18, Table 2, under "Downtime Detected" and "Lot Appointment Cancelled").

The same is true for an LSA—nothing requires the LSA to initiate and execute any activities for that event (at best, only "scheduling" by shifting appointments is described).  (*See id.*, col. 21, Table 3, under "Lot Appointment Cancelled.")  An LSA activity may also be limited to aborting an appointment.  (*See id.* at col. 21, Table 3, under "Make Unload Appointment Aborted.")  Many similar examples are described showing that one agent "initiates" while other agents "schedule" or "execute."  (*See*, *e.g.*, *id.*, Tables 4 and 5, each showing numerous events in which one agent (e.g., an MSA) "initiates th[e] change") while another agent (e.g., RSA schedules or shifts appointment in response to that initiation).)

Furthermore, requiring the software scheduling agent to perform all three functions irrespective of context contradicts the intrinsic record.  For example, where the processing equipment is in an "unready" state, which the specification defines as "the tentative appointment hav[ing] been booked, but is not ready for execution" ('305 patent, 12:46-47), it is illogical to

require the software scheduling agent to perform any function other than scheduling the

"tentative appointment."  Nor is it necessary to configure a software scheduling agent with

anything more than just scheduling capabilities as part of its representation of that equipment.

This is particularly true where not all events require all functions to be performed.  This makes

sense because, as the specification unequivocally states, "[t]he predetermined event and the

reactively scheduled action will be implementation specific."  (*Id.*, 8:6-7.)

Based on the foregoing countervailing examples, it is abundantly clear that the alleged

"definition" does not speak of the invention "as a whole," as is required to limit the scope of the

term "software scheduling agent."  Instead, it speaks only to the capabilities or functions of a

software agent.  The specification does not contain any, much less clear and unambiguous,

language sufficient to overcome the plain language so as to redefine the "software scheduling

agent" term to perform anything more than just the scheduling function.  While a software

scheduling agent may perform all three functions of scheduling, initiating, and executing

activities, the specification simply does not require that it does so.  Defendants have not cited any

embodiment demonstrating that all three functions must be performed by the same software

scheduling agent, further evidencing that the inventors had not disavowed, let alone clearly and

unambiguously, a software scheduling agent that performs less than all three such functions.

### 2.     A Scheduling Agent May Schedule Activities for Multiple Manufacturing Domain Entities

#### a.     The Specification Discloses Scheduling of Multiple Entities

Defendants' construction should also be rejected because it fails to account for the

patent's teachings of a scheduling agent that schedules for multiple domain entities or prompts

scheduling by a domain entity other than the one it represents.  A scheduling agent that

*represents* a manufacturing domain entity does not necessarily "schedule[], initiate[] and

execute[] activities" *exclusively* for a single manufacturing domain entity.

As Defendants acknowledge, a manufacturing domain entity in the '305/'248 patent is a single entity, "e.g., *a lot* 130, a process tool 115, a resource, a PM, or a Qual." (Dkt. 40 at 25.) And the intrinsic record discloses at least scheduling for *multiple lots* by a scheduling agent. For example, the specification teaches that "[w]henever the processing appointment 375 is booked, *the LSA 305 schedules move appointments for the lots 130* to the location of the newly booked processing appointment 375." ('305 patent, 11:65-12:2.) In another example, it teaches that "[*i*]*n furtherance of their proactive and reactive scheduling duties*, the software agents 265 maintain calendars, such as the calendar conceptually illustrated in FIG. 4, of scheduled appointments. *FIG. 4 conceptually illustrates a calendar containing information concerning appointments for, e.g., a process tool 115 for a number of lots 130*." (*Id.*, 11:29-34.) These disclosures run contrary Defendants' proposed construction.

Further, the proposed construction does not account for the fact that a scheduling agent that is assigned to a single manufacturing domain entity may still prompt or initiate scheduling by another agent for a different manufacturing domain entity. The specification accordingly emphasizes that the scheduling activities of software agents are undertaken "*collectively*." (*Id.*, 6:61-7:2; *see also* 16:58-60.) For example, "[c]hanges are instituted by a single software agent, *but a changed appointment may be booked on multiple calendars. The changes must* consequently be communicated to the other software agents so they can update their calendars respectively." (*Id.*, at 37:57-61.) Also "[*w*]*hen the software agents 265 react to appointment changes, they carefully manipulate the corresponding appointments*." (*Id.*, 10:62-64.) Specifically, "[i]n some cases, it would be inappropriate for two software agents 265 to manipulate their respective corresponding appointments at the same time." (*Id.*, 10:64-66.) Instead, "a single software agent 265 is responsible for manipulating its respective corresponding

appointment, ***which will then prompt the software agent 265 of the corresponding appointment to manipulate its respective corresponding appointment***." (*Id.*, 10:66-11:4.)

The specification further discloses that scheduling agents for one type of domain entity may influence scheduling, or initiation or execution of activities by another type of domain entity: "[f]or example, the [machine scheduling agent] may expand the scheduled duration of the appointment 375 on its calendar 370 due to the appointment 375 running late. The [lot scheduling agent] reacts to that change by expanding the corresponding appointment 375 on its calendar 385 to keep the appointments 375 synchronized across the two calendars 370, 385." (*Id.*, 13:42-59.)  Defendants' construction would improperly limit the scope of "software scheduling agent" to eliminate these features from the claims.

> **b.      The Portions of the Specification Cited by Defendants Are Non-Limiting**

There is no explicit language in the '305 or '248 patents that limits a scheduling agent to ***a single*** manufacturing domain entity.  In fact, Defendants' quoted language—"activities on behalf of a single manufacturing domain entity" (Dkt. 40 at 28; *see also id.* at 29)—***does not actually appear at the cited location or, indeed, anywhere in the '305/'248 patents***.

The other quoted specification portions are non-limiting.  That "software agents 265 reactively schedule, initiate, and execute activities on behalf of their respective manufacturing domain entities" ('305 patent, 6:61–64) in no way precludes software agents from directing the scheduling activities of other manufacturing domain entities.  Similarly, the specification's teaching that "some computing devices 110 may have multiple software agents 265 residing thereon while other computing devices 110 may not have any" (*id.*, 6:27-30) says nothing about whether a scheduling agent can schedule, initiate or execute activities on behalf of a single manufacturing domain entity.  Defendants' reasoning that "[i]f 'software scheduling agents' could represent multiple manufacturing domains, there would be no need for multiple agents on

one computing device" (Dkt. 40 at 29) is based on the unproven assumption that multiple

scheduling agents are undesirable and is untethered to the language of the '305 and '248 patents.

Again, for the reasons mentioned above, the "of interest to the present invention"

language does not evince a clear and unmistakable intent to limit the claims, nor is that portion of

the specification "identical to" Defendants' proposed construction (Dkt. 40 at 27), which limits a

scheduling agent's activities to a single manufacturing domain entity.  At most, that portion of

the specification teaches that a software scheduling agent "represents" a domain entity.  Thus, it

would be inappropriate to find an express limitation based on this citation.

### c.      The Applicants Did Not Disavow Scheduling of Multiple Entities During Prosecution

Apparently recognizing the inherent weaknesses of its argument that the specification

provides an express definition of the term "software scheduling agent" or a disavowal of

alternative meanings, Defendants try to save their position by reference to prosecution history

statements.  (Dkt. 40 at 25-27.)  However, these statements only repeat what is already stated in

the specification: that the scheduling agent is a software agent, and that it ***represents*** a

manufacturing domain entity.   Such statements do not disavow a scheduling agent that

schedules on behalf of multiple domain entities, as Defendants argue.

The prosecution arguments do not rise to the level of express definitions of "scheduling

agent" or disavowals of specific elements because they provide only partial descriptions of the

scheduling agent that recapitulate what the specification states.  Applicants' argument, cited by

Defendants (Dkt. 40 at 24), that "[t]he statement that *any* software entity that schedules

constitutes a software scheduling agent is clearly wrong" (Dkt. 40-29 at 4) (emphasis in original)

provides no indication as to what features a supposedly generic software scheduling entity might

possess.  *See Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012)

("To act as its own lexicographer, a patentee must ***clearly*** set forth a definition of the disputed

claim term other than its plain and ordinary meaning.")  The statements that "there is no support in Applicants' specification for the proposition that a scheduling agent ***represents*** more than one manufacturing domain entity at any given time," (Dkt. 40-27 at 10) and "there is no support for any definition of the term 'software scheduling agent' in which an entity represents, for instance, a whole subsystem comprising large numbers of manufacturing domain entities" (*id*. at 10) simply restate the specification's teaching that a scheduling agent ***represents*** one manufacturing domain entity.  *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (identifying the specification as "the single best guide to the meaning of a disputed term.")

Finally, the Summary of Invention in the Applicants' Appeal Brief repeats almost verbatim specification passages describing the scheduling agent and the manufacturing domain entities.  (*See* Dkt. 40-27 at 4; *cfr*. '305 patent, 6:38-41.)  Unlike the patentee in *Southwall Techs., Inc. v. Cardinal IG Co.*, the Applicants did not elect to amend the claims in a way that would limit their scope.  54 F.3d 1570, 1576 (Fed. Cir. 1995).  Unlike the claims in *CCS Fitness, Inc. v. Brunswick Corp.*, there is no lack of clarity in the claims reciting "software scheduling agent" that requires recourse to the intrinsic record.  288 F.3d 1359, 1367 (Fed. Cir. 2002).

Further, as illustrated above, the fact that a scheduling agent represents a manufacturing domain entity does not preclude it from scheduling activities for other entities or issuing scheduling instructions to other scheduling agents.  All of these features—all disclosed in the specification—would be written out of the claims under Defendants' construction.  In addition, the possibility that a given scheduling agent might ***represent different domain entities at different times***, contemplated by the Applicants' statements in prosecution, would be prohibited.  Thus, to the extent that the Court finds that any of these portions of the intrinsic record provide a definition of "software scheduling agent," they still do not support Defendants' proposed

construction. *See Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1327-28, 1314 (Fed. Cir. 2003) (rejecting a construction that exceeded the function disclaimed in prosecution).

### E.        "concurrently measuring"

Defendants' proposed construction—"simultaneously measuring with a single measuring tool"—errs by introducing a limitation found only in embodiments within the specification and is therefore overly narrow.  The '330 patent on the whole never requires that concurrent measurements be performed with a single tool.  "Concurrently measuring" is not a term of art, and thus carries no specialized meaning.  Moreover, nothing in the intrinsic record supports Defendants' proposed construction.

#### 1.        The Parties Agree that "Concurrently Measuring" Requires that Measurements Are Collected Simultaneously

There is no dispute that the temporal element of "concurrently measuring" requires that critical dimension ("CD") and overlay measurements be collected at the same point in time—that is the plain and ordinary meaning of the term.  (Dkt. 40 at 26-27.)  There is no need, however, to consider any extrinsic evidence to interpret this term.  Defendants mistakenly rely on multiple dictionary definitions (*id.* at 26) when the intrinsic record is already clear.  (*See* '330 patent, 7:19-28 (comparing CD and overlay measurements "at a first point in time").)  Because the specification is already clear that "concurrently measuring" CD and overlay occurs at the same time, the Court need not consider extrinsic evidence for this term.

#### 2.        No Limitation Within the '330 Patent Exists Requiring that "Concurrently Measuring" Happens Only Within a Single Tool

Defendants seek to introduce a new limitation: that the measuring of CD and overlay occur "with a single tool."  (Dkt. 40 at 27-28.)  First and foremost, the claims of the '330 patent do ***not*** limit concurrent measurements to a single tool.  (*See* '330 patent, claims 1-25.)  In fact, the claims require that "***a measurement system*** . . . concurrently measures one or more critical

dimensions and overlay . . . ."  (*Id*. at claim 1.)  The '330 patent repeatedly states that a "measurement system" collects measurements from *one or more* detecting components or detectors throughout the manufacturing process.  (*See, e.g.,* 9:28-31 ("***One or more light detecting components*** 720 collect the reflected light 716 and transmit the collected light . . . to the measurement system 718"); 9:65-10:1 ("Reflected light 814 is collected by ***one or more light detecting components*** 816, and processed by a measurement system 818 for a concurrent determination of critical dimensions and overlay"); and 13:7-11 ("When the electron beam 1014 strikes the structure 1004, electrons and X-rays . . . are ***detected by one or more detectors 1028 and are provided to the measurement system 1018 for a concurrent determination of critical dimensions and overlay***").)  These definitions of "a measurement system" alone overcome any notion that "concurrently measuring" occurs within a single tool.

Defendants' primary support for their overly-narrowing limitation consists of citations to certain embodiments within the specification.  (*Id.*)  For example, Defendants cite to 9:9-13 and 11:46-50, but each of these citations is immediately preceded by the term "[t]he structure ***allows*** these measurements [CD and overlay] to be taken concurrently with a single measuring tool . . . ."  ('330 patent, 9:9-10; 11:46-48.)  In other words, a single tool is contemplated, but not introduced as a claim limitation.  Defendants further cite to 7:48-50 ("Measuring critical dimensions and overlay in a single operation with a single tool (e.g., by scatterometry) mitigates fabrication duration and spacing requirements"), but this citation presents nothing but a factual statement that using a single measuring tool saves space.  None of the citations provide an alternate ***definition*** for the term used in the claims, "a measurement system," as discussed above.

Defendants then assert, without citation to the '330 patent claims, that the limitation of "grating structures" in "command[s]" that measurements occur in a single tool.  (Dkt. 40 at 27.) Defendants cite to a portion of the specification stating that the use of grating structures "***allows***

these measurements to be taken concurrently with a single measuring tool . . . ."  (Dkt. 40 at 27; '330 patent, 9:9-10.)  Certainly, "allows" and "commands" are ***not*** interchangeable words.

Defendants continue to go too far when asserting that "[a]ll disclosed embodiments concurrently measure CD and overlay with the same tool."  (Dkt. 40 at 28.)  This is just not true.  For example, the specification states that "Scatterometry or scanning electron microscope (SEM) techniques can be employed in accordance with one or more aspects of the present invention to concurrently measure critical dimensions and overlay ***at different points in an IC [integrated circuit] fabrication process*** . . . ."  As discussed above, the '330 patent claims a "measurement system" that collects measurements from one or more components or detectors throughout the manufacturing process.  Defendants' citation to a few examples within the specification where a single measuring tool is contemplated is insufficient to support their argument.

### 3. Ocean Has Never Asserted, Including to the PTAB, that the Claims of the '330 Patent Are Limited to a Single Measuring Tool

Defendants' misdirection citation to Ocean's statements in co-pending IPR proceedings as allegedly conceding a single measurement tool is a red herring.  First, Defendants quote Ocean as saying, "[a]n engineer who was working with a CD-SEM or scatterometry tool in 2003 would simply ***not*** have contemplated using such a typical CD tool to also get overlay measurements that were three orders of magnitude larger."  (Dkt. 40 at 49, *Western Digital Technologies, Inc. v. Ocean Semiconductor LLC*, IPR2021-00929, Paper 6, 55-56 (P.T.A.B. Aug. 26, 2021) (emphasis original).)  In that IPR proceeding, petitioner Western Digital Technologies, Inc. ("WDT") asserts that a prior art reference, *Wong*, in combination with other references, renders the '330 patent obvious.  (*See Western Digital Technologies, Inc. v. Ocean Semiconductor LLC*, IPR2021-00929, Paper 1 (P.T.A.B. May 18, 2021.)  At the portion of the Patent Owner's Preliminary Response ("POPR") cited by Defendants, Ocean distinguishes *Wong* from the disclosures of the '330 patent because **Wong *contemplates a single metrology tool***.

(*See* U.S. Patent Application 10/083,877 ("Wong") at Abstract ("The optical metrology target is illuminated with *a light source* . . . ."); ¶ 0019 ("A scatterometer is a tool typically used in optical critical dimension metrology.  *The scatterometer* collects the optical signal . . . .").) Thus, the sentence quoted by Defendants identifies where Ocean distinguished the single metrology tool in *Wong* from the inventions of the '330 patent claims.  In other words, Defendants are attempting to import a limitation from *Wong* into the '330 patent claims.

Defendants then quote Ocean stating "[a]nalyzing for CDs and overlays use very different features. How would a POSITA know to combine the different features and use one of the *Levy* tools to do so?"  (Dkt. 40 at 29; IPR2021-00929, Paper 6 at 51-52.)  Again, in this part of the POPR, Ocean distinguished the disclosures of *Levy* (U.S. Patent No. 6,891,627) from the inventions of the '330 patent and, once again, **Levy *contemplates a single metrology tool***.  (*See Levy* at 3:5-8 ("The System may also include *a measurement device* coupled to the Stage.  *The measurement device* may include an illumination System . . . .").)  Thus, once again, Defendants are improperly attempting to import a limitation from *Levy* into the '330 patent claims.

### F.    The Disputed '538 Patent Terms Are Not Indefinite

Defendants incorrectly assert that a patent claim term using the word "significant" is indefinite simply because the word "is a subjective term of degree."  (Dkt. 40 at 30.)  Notably, Defendants do not cite a single case where a court finds a term including the word "significant" indefinite because *no court has ever so found*.  *See, e.g., Mallinckrodt, Inc. v. Masimo Corp.*, 254 F. Supp. 2d 1140, 1151 (C.D. Cal. 2003) ("The mere fact that a term cannot be quantified into an absolute value, even when taken in conjunction with the fact that the specifications do not provide examples of what is or is not *significant*, cannot be said to rise to the level of meeting the 'clear and convincing standard to show that one of ordinary skill would not understand' what is included in claim 19.")  Defendants indefiniteness arguments should be rejected.

1.     **Dr. Spanos' Testimony as to Why the Term "Significant" is Allegedly Indefinite Contradicts His Own Use of That Same Term in His Own Publications**

Defendants rely on Dr. Spanos' opinion that "a POSITA would not understand the bounds of the claims because the word 'significant' is a subjective word of degree and it does not indicate any specific amount, range, or parameter to [him]."  (Dkt. 40-1 at ¶ 30.)  A term need not be "quantified to an exact amount," however, to be definite.  *Mallinckrodt*, 254 F. Supp. 2d at 1151.  Yet, this is exactly what Dr. Spanos requires in his opinion.  In a contradictory fashion, Dr. Spanos uses the term "significant" to describe his related experiments in two of his authored publications, and in one of them, he explicitly quantified it, stating "when we say a predictor was insignificant in predicting a response, we use conventional definitions of ***5 percent significant*** in a frequent ordinary lease square (OLD) framework."  (Ex. A at 59:21-60:11.)  When prompted to address why the term "significant" as used in his publications is definite, Dr. Spanos explained that his use of the term "significant" is in the statistical context, and as such, is not indefinite. (*Id.* at 59: 16-19 ("A: I'm not saying the term significance is quantifiable. I am saying the term statistical significance is quantifiable.").)  Dr. Spanos, however, does not address why the term "significant" as used in the '538 patent is indefinite when the '538 patent is explicit that it is used in the same context.  ('538 patent, 10:37-43 ("[A]fter the fault condition is identified, the PCA weight calculation module 630 receives information from the fault data analysis module 610 and/or the fault data input interface 620 as to whether the fault was an actual fault and/or whether any parameters associated with the abnormality or the fault contributed significantly to that fault or abnormality" where "the abnormal conditions detected by the PCA may be statistically different from the data that may have been used to build the fault detection or the PCA model ; *see also id.* at 2:52-55.)

Dr. Spanos admitted that he used the term "significant," "significantly," and "insignificant" more than 18 times in at least one of his two publications, even at places where the discussion was completely devoid any of any statistical relevance.  (Ex. A at 62:13-17 and 65:19-67:20.)  In his biased view, whether the term "significant" is definite also depends on "inferences" and the audience for which his publications are presented.  (*Id.* at 62:22-63:7 ("A: . . . So it was very reasonable for the readers to infer that I'm using the term in its formal sense, in its formal, quantifiable sense and the audience is [sic] went for that. The forum where the paper was presented was meant for that. So no, I think the term is very clear.")

The '538 patent uses "significant" in the context of describing that ***the product being manufactured is not impacted by an insignificant (i.e., not important) fault***.  (*Id.,* 5:35-42, Maltiel Decl. at ¶ 79.)  By identifying that the product being manufactured is not negatively impacted by the insignificant fault, the patented method decreases the weight accorded to that type of fault.  ('538 patent, 5:51-56, Maltiel Decl. at ¶ 79.)  By decreasing the weight of the insignificant fault in the fault detection analysis, the invention promotes efficiency and eliminates at least one type of ultimately unnecessary alteration to the manufacturing process. This is a substantial advantage over the art, which required a certain amount of "guess work" to determine the faults that have a negative impact (i.e., that are "significant") versus the faults that are harmless.  ('538 patent, 2:64-67, 3:14-16; Maltiel Decl. at ¶ 80.)

Defendants' citation to caselaw requiring "objective boundaries" for the word "significant" is nonsensical.  A patentee is not required to strictly define every possible fault in a semiconductor manufacturing process and whether that type of fault would negatively impact the end result.  See *Power-One*, 599 F.3d at 1350 ("To comport with § 112's definiteness requirement, the boundaries of the claim . . .  must be discernible to a skilled artisan based on the language of the claim, the specification, and the prosecution history, as well as other knowledge

of the relevant field of art").  Rather, the inventors of the '538 patent understood that a POSITA would inherently know that some faults do not impact the end result of the semiconductor manufacturing process and proceeded based on that understanding.  (Maltiel Decl. at ¶ 81.)

Even Defendants' expert recognizes the impossibility of such quantification in view of the technology of the '538 patent.  (*See* Ex. A at 50:5-13 ("Q: So is it your opinion that the term 'significant' must be quantified to some amount in order to be definite? . . . THE WITNESS: It is not.").)  As discussed above, Dr. Spanos regularly uses the word "significant" in his own publications.  (*See* Ex. A at 55:19-21 ("Q: Have you ever used the word significant in any context in any of your publications? A: Many times.").)  Because a POSITA would understand "significant" in the context of the '538 patent to have a specific meaning, it is not indefinite.

### 2.      "significant fault" (claim 5)

The '538 patent provides a clear context as to what a "significant fault" is: "The system 300 analyzes the fault data resulting from the fault data analysis and/or the PCA, in order to determine whether any particular parameters associated with any faults or abnormalities detected that are associated with the processing of semiconductor wafers 105 is actually a significant fault . . . In other words, the system 300 determines whether the abnormality or fault indication relates to an actual fault." ('538 patent, 11:12-19.)  When asked whether a POSITA would readily ascertain what an actual fault it, Dr. Spanos agreed.  (Ex. A at 84:12-19 ("Q: . . . My question is, for a skilled engineer, will there be any issue in terming of identifying whether there's an actual fault or a false positive? A: In a very narrow context with enough information known, I think skilled engineers could do that.").

Cases cited by Defendants are inapposite because they do not involve the term "significant."  *Unwired Planet L.L.C. v. Google, Inc.*, 660 F. App'x 974 (Fed. Cir. 2016) (construing the term "much larger"); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363–64 (Fed. Cir.

2018) (construing the term "minimal redundancy").  And contrary to these cases, several courts have found the term "indefinite."  *See, e.g., Mallinckrodt*, 254 F. Supp. 2d at 1151 (construing "significant"); *Wyeth LLC, et al. v. Alembic Pharmaceuticals, Ltd., et al.*, C.A. No. 16-1305-RGA (D. Del. Jun. 27, 2018) (finding "significant" not indefinite and not requiring construction); *Marical Inc. v. Cooke Aquaculture Inc.*, C.A. No. 1:14-cv-00366-JDL, 2016 U.S. Dist. LEXIS 118780, at *7 (D. Me. Sep. 2, 2016) (construing "significantly increased level").

Based on the intrinsic record, the term "significant" is not indefinite.

### 3.  "Determining in Said Computer Whether Said Parameter Is a Significant Factor" (claim 7)

For the foregoing reasons equally applicable to this term, the '538 patent considers whether a product undergoing a manufacturing process is negatively impacted by a parameter (i.e., the factor is significant) or not (i.e., the factor is harmless).  ('538 patent, 5:51-59, Maltiel Decl. at ¶ 87.)  As such, the specification similarly supports the definiteness of "significant factor" (e.g., determining whether the parameter "provides a significant contribution to the fault.")  ('538 patent, 5:51-56, Maltiel Decl. at ¶ 87.)  This term thus requires no construction, or in the alternative, means "a parameter that provides a significant contribution to the fault."

## IV.  CONCLUSION

For all the foregoing reasons, this Court should adopt Ocean's proposed constructions and reject Defendants' proposed constructions, including any indefiniteness arguments.

Dated: October 25, 2021

*/s/ Alex Chan*
Timothy Devlin
tdevlin@devlinlawfirm.com
Henrik D. Parker
hparker@devlinlawfirm.com
Alex Chan (State Bar No. 24108051)
achan@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

*Attorneys for Plaintiff*
*Ocean Semiconductor LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

*/s/ Alex Chan*
Alex Chan