## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| **OCEAN SEMICONDUCTOR LLC,** <br> *Plaintiff,* <br> **vs.** <br> **MEDIATEK INC., ET AL.,** <br> *Defendant.* | **NO. 6:20-cv-01210-ADA** |
| **OCEAN SEMICONDUCTOR LLC,** <br> *Plaintiff,* <br> **vs.** <br> **NVIDIA CORPORATION**, <br> *Defendant.* | **NO. 6:20-cv-01211-ADA** |
| **OCEAN SEMICONDUCTOR LLC,** <br> *Plaintiff,* <br> **vs.** <br> **NXP SEMICONDUCTORS NV, ET AL.,** <br> *Defendant.* | **NO. 6:20-cv-01212-ADA** |
| **OCEAN SEMICONDUCTOR LLC,** <br> *Plaintiff,* <br> **vs.** <br> **RENESAS ELECTRONICS CORPORATION, ET AL.,** <br> *Defendant.* | **NO. 6:20-cv-01213-ADA** |
| **OCEAN SEMICONDUCTOR LLC,** <br> *Plaintiff,* <br> **vs.** <br> **SILICON LABORATORIES INC.,** <br> *Defendant.* | **NO. 6:20-cv-01214-ADA** |
| **OCEAN SEMICONDUCTOR LLC,** <br> *Plaintiff,* <br> **vs.** <br> **STMICROELECTRONICS INC.,** <br> *Defendant.* | **NO. 6:20-cv-01215-ADA** |
| **OCEAN SEMICONDUCTOR LLC,** <br> *Plaintiff,* <br> **vs.** <br> **WESTERN DIGITAL TECHNOLOGIES, INC.,** <br> *Defendant.* | **NO. 6:20-cv-01216-ADA** |

## DEFENDANTS' REPLY CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

**Page**

A.  '097 PATENT (ST Inc. and NXP Only) .................................................................. 1

B.  '651 PATENT ....................................................................................................... 4

    1.  The plain and ordinary meaning of "pneumatic cylinder" requires a pneumatic force ............................................................................................... 4

        a.  Ocean's construction is inconsistent with the record evidence and improperly rewrites the claim term. ........................... 4

        b.  Whether pneumatic cylinders can employ non-pneumatic components is irrelevant. ................................................. 5

        c.  Ocean's challenges to Defendants' plain-and-ordinary-meaning are misguided. ................................................. 6

    2.  Ocean's rewrite of "said process chamber" should be rejected. ................... 7

C.  '305 AND '248 PATENTS ..................................................................................... 9

    1.  The inventors specified one "particular interest" of their invention and those words must be given weight. ...................................................... 9

        a.  Ocean arbitrarily limits the application of specification claim scope disavowal to certain magic words. ..................... 9

        b.  The specification repeatedly says which aspects of the invention are limiting and which are not. ..................... 10

    2.  Applicant repeatedly disclaimed the scope of "software scheduling agent" during prosecution. ...................................................................... 11

D.  '330 PATENT ..................................................................................................... 12

E.  '538 PATENT ..................................................................................................... 14

    1.  Ocean cannot provide any objective boundaries for these terms. ............... 14

    2.  "[A] significant fault" (claim 5) is indefinite. ............................................ 16

    3.  "Determining in said computer whether said parameter is a significant factor" (claim 7) is indefinite. ...................................... 17

# TABLE OF AUTHORITIES

**Page**

## Cases

*Forest Labs., LLC v. Sigmapharm Labs.,*
   918 F.3d 928 (Fed. Cir. 2019) ................................................................. 10

*GE Lighting Sols., LLC v. AgiLight, Inc.,*
   750 F.3d 1304 (Fed. Cir. 2014) ................................................................. 1

*Interval Licensing LLC v. AOL, Inc.,*
   766 F.3d 1364 (Fed. Cir. 2014) ............................................................... 16

*Marical Inc. v. Cooke Aquaculture Inc.,*
   No. 1:14-cv-00366-JDL, 2016 U.S. Dist. LEXIS 118780 (D. Me. Sep. 2, 2016).................... 17

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
   572 U.S. 898 (2014)................................................................................ 1

*Pacing Techs., LLC v. Garmin Int'l, Inc.,*
   778 F.3d 1021 (Fed. Cir. 2015) ........................................................... 10, 11

*Retractable Techs., Inc. v. Becton, Dickinson & Co.,*
   653 F.3d 1296 (Fed. Cir. 2011) ................................................................. 2

*SciMed Life Sys. v. Advanced Cardiovascular,*
   242 F.3d 1337 (Fed. Cir. 2001) ............................................................... 10

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
   789 F.3d 1335 (Fed. Cir. 2015) ............................................................... 15

*Trusted Knight v. Int'l Bus. Machines Corp.,*
   681 F. App'x 898 (Fed. Cir. 2017) ............................................................. 9

*Vitrionics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996) ................................................................. 11

*Wyeth LLC, et al. v. Alembic Pharm., Ltd., et al.,*
   C.A. No. 16-1305-RGA, Dkt. 98 (D. Del. Jun. 27, 2018)........................................ 17

Ocean's Response solidifies that its claim construction positions are influenced by factors outside a proper claim construction analysis. Emblematic of this problem are Ocean's misguided arguments on "pneumatic cylinder" in the '651 patent. The '651 patent clearly delineates distinct types of actuators: pneumatic, hydraulic, electromagnetic, and mechanical. Yet, Ocean asserts that claims directed to only one of the group (pneumatic) somehow cover all of them. This defies both the plain meaning of "pneumatic" and the controlling tenets of claim construction. Ocean's other proposed constructions are similarly flawed. Defendants' proposed constructions should be adopted as they give weight to the relevant evidence and a clear reading of the specifications.

## A.     '097 PATENT (ST Inc. and NXP Only)

The claims, the specification, and extrinsic evidence all establish that the scope of the term "ultra-thin resist layer" ("UTR" layer) in claims 1-3 and 10-17 of the '097 patent is not reasonably certain, and thus indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).[1] First, while independent claim 1 does not provide any thickness for the claimed "ultra-thin resist layer," dependent claim 4 specifies a thickness of "less than 2500 Å," suggesting some undefined, broader scope for claim 1. *E.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014) (limitations from dependent claims do not limit independent claims); Def. Br. at 7-8. The specification is also ambiguous. While the patent identifies an example UTR with a thickness of less than 2500 Å,[2] it is silent about whether other disclosed thicknesses are ultra-thin. Def. Br. at 8-9. Extrinsic evidence confirms the uncertainty, recognizing many different thicknesses of resist as ultra-thin. *Id.* at 13-15.

---

[1] Ocean applies the superseded "insolubly ambiguous" standard for indefiniteness. Resp. at 6.

[2] Ocean alleges that ST Inc. conceded the definiteness of the term "ultra-thin resist layer" in its IPR petition. Resp. at 6. But ST Inc. simply recognized the example provided in the patent.

Ocean does not contest that the claims and extrinsic evidence are ambiguous but argues that the specification settles the issue. Not so. The specification describes "standard" resist thicknesses of more than 5000 Å and 4000 Å for 248 nm and 193 nm lithography processes, respectively. Ex. 1, 1:39-45.[3] Next, the specification states that one example of a UTR thickness "is considered to be" layers of less than 2500 Å. *Id.* at 1:43-45. As Ocean's expert, Mr. Maltiel recognized, the patent leaves unaddressed the range of thicknesses between the "standard" thicknesses and its single example. Resp. at 6-7; Ex. 31, 179:24-180:6, 183:19-184:3. The specification's use of the phrase "is considered to be" compounds the uncertainty. The '097 patent does not simply state that a UTR thickness *is* less than 2500 Å. And Mr. Maltiel could not divine what the extra language means, noting it could be what skilled persons would have "considered to be" ultra-thin. Ex. 31, 170:8-171:4, 174:3-12.[4] Further, if the specification defined UTR layers to have a thickness of less than 2500 Å, neither the specification nor claim 4 would need to consistently repeat that range, as they do.

Ocean goes on to argue that claim differentiation should not apply in this case, citing *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011). Resp. at 4-6. That case does not determine the outcome here. As Ocean recognized, the court in *Retractable Techs.* relied on the description in the specification. *Id.* at 5. As described above, the specification here—like the claims and extrinsic evidence—is ambiguous as to the scope of the claimed UTR layers. That difference renders *Retractable Techs.* and Ocean's related argument irrelevant.

Ocean next contends that the Court should not consider extrinsic evidence. *Id.* at 6. But that assertion is based on the false premise that the specification is clear. There is no dispute that

---

[3] Exhibits 1-30 are attached to Stephanie Sivinski's declaration filed with Defendants' Opening Brief. Exhibits 31-38 are attached to Stephanie Sivinski's declaration filed with this Reply Brief.

[4] At times, Mr. Maltiel also claimed the specification was clear, making the record even murkier. Ex. 31, 191:17-192:5.

extrinsic evidence should be considered if the specification is ambiguous. Ex. 31, 137:11-138:3. And as Mr.Maltiel also acknowledged, the extrinsic evidence here reveals that skilled persons, including the inventors themselves, considered resist layers having various thicknesses, such as 3000Å or 5000Å, to be ultra-thin. Def. Br. at 9-11; Resp. Maltiel Decl. ¶ 54. Indeed, a contemporaneous patent acknowledges that a resist with a thickness between 3700 Å and 3900 Å for a 193 nm lithography process is "ultra-thin." *E.g.*, Ex. 14, 11:38-42. That thickness falls within the range of thicknesses for 193 nm lithography that the '097 patent fails to address, showing that the patent's silence would have confused a skilled person about the scope of UTR layers.

Ocean also attacks Defendants' expert, Dr. Spanos, by contorting his testimony. Ocean asserts Dr. Spanos stated that the law always requires applying the doctrine of claim differentiation. Resp. at 7. That is incorrect. When asked whether claim differentiation should always be applied, Dr. Spanos testified he did not know the legal answer to that question but considered the doctrine to be common sense. Resp. Ex. A, 108:16-19. Ocean also argues that the term UTR layer in the '097 patent claims is definite because Dr. Spanos noted that an extrinsic patent with some similarities to the '097 patent "identif[ies] an upper limit for UTR thickness of 2500 Å." Resp. at 7. Dr. Spanos focused on a single sentence from the extrinsic patent. That sentence provides an example where a resist thickness of exactly 2500Å is described as ultra-thin, which differs from the example in the '097 patent of a UTR with a thickness of "less than" 2500 Å. Spanos Decl. ¶ 57. Dr. Spanos did not state whether the term UTR layer was definite in the extrinsic patent, and his testimony does not resolve the issue for the '097 patent. The statement cited by Dr. Spanos merely confirms the wide variation in what skilled artisans considered to be a UTR layer at the time of the alleged invention. *E.g.*, *id.* ¶¶ 55-56, 58.

**B.    '651 PATENT**

**1.    The plain and ordinary meaning of "pneumatic cylinder" requires a
pneumatic force.**

While both parties contend that "pneumatic cylinders" should be given its "plain and
ordinary meaning," Ocean's construction and response brief confirm that a fundamental dispute
exists necessitating the Court's intervention.[5] Defendants contend that the plain and ordinary
meaning should apply. Ocean's construction, by contrast, would read out both "pneumatic" and
"cylinder" instead allowing *any one* of the following devices to be a "pneumatic cylinder":
pneumatic, hydraulic, electromagnetic, mechanical, or any combination thereof, regardless of
whether that device employs any pneumatic force.

**a.    Ocean's construction is inconsistent with the record evidence
and improperly rewrites the claim term.**

Ocean's construction is premised on a misleading and inaccurate revision of the
specification. The specification is clear that (1) certain "mechanisms," including pneumatic
cylinders, may be used to adjust the wafer stage and (2) for embodiments with pneumatic cylinders,
any type of pneumatic cylinders may be used:

> *A mechanism* useful in adjusting the position of the wafer stage 40 may be
> comprised of any of a variety of devices, such as pneumatic, hydraulic,
> electromagnetic or mechanical systems. ***In the disclosed embodiment, each of
> three pneumatic cylinders 46*** . . . are operatively coupled to the bottom
> surface 43 of the wafer stage 40 via a ball and socket connection 48. . . . The
> pneumatic cylinders 46 ***may be any type of pneumatic cylinders*** useful for
> performing the function of adjusting the surface 42 of the wafer stage 40.

Ex. 2, 5:65–6:15 (5:65–6:1 (red) and 6:13–15 (blue); emphasis added). Ocean's argument relies
on improperly reversing the order of the specification's two points to argue that the "pneumatic

---

[5] Ocean contends that Defendants' construction is "new." Resp. at 7–8. This is incorrect.
Defendants proposed (and continue to propose) the plain and ordinary meaning of "pneumatic
cylinder." In order to explain why Ocean's construction was incorrect, Defendants were required
to explain the plain and ordinary meaning of pneumatic cylinder.

cylinders 46" "may be comprised of any of [a] variety of devices, such as pneumatic, hydraulic, electromagnetic or mechanical systems." Resp. at 8. ***That is not what the specification discloses***.

The asserted claims are consistent with the specification—they claim only pneumatic cylinders. Other unasserted claims require different actuator types, *e.g.*, rack and pinion combinations. Ex. 2, 13:20–31, 17:41–45. As a red herring, Ocean argues that it did not "somehow disclaim[] the other three mechanisms." Resp. at 12. Whether or not Ocean "disclaimed" anything is beside the point. Ocean never *claimed* the other three mechanisms, and cannot now read out the limitations "pneumatic" and "cylinder" completely.

Ocean's proposed construction would also render meaningless any difference between the claimed pneumatic cylinder in claim 75 and the claimed (mechanical) rack-and-pinion combination in otherwise identical claim 76. Ex. 2, 17:36–40 (claim 75), 17:41–45 (claim 76); *see also* Def. Br. at 15–16. Ocean's response does not address that its construction would create two claims with the ***same scope***, in direct contrast to the specification's teachings that they are separate structures disclosed in separate embodiments. Ex. 2, 6:66–7:3; 6:1–29, FIGs. 2–5.

### b.   Whether pneumatic cylinders can employ non-pneumatic components is irrelevant.

Ocean's argument that pneumatic cylinders can include non-pneumatic components (such as mechanical components) is distracting and misses the point. Resp. at 9–12. There is no dispute that "pneumatic cylinders" include mechanical components like a shaft or rod that are actuated by a pneumatic force (consistent with both the intrinsic record and Dr. Spanos' testimony). Ex. 2, 6:14–26; Spanos Decl. ¶¶40–43; Ex. 36, 15:12–16:17; Def. Br. at 14.[6]

---

[6] Ocean's reliance on the specification's disclosure of electrodes, coils, and valves in support of its argument that a pneumatic cylinder can include electromagnetic parts is similarly a distraction. First, Defendants do not dispute that pneumatic cylinders may include other non-pneumatic components. Second, the electrodes, coils, and valves referenced in the specification are not even part of the pneumatic cylinder or other actuator used to adjust the stage. *Compare* Resp. at 11–12 *with* Ex. 2, 5:19–22, 6:7–26, 8:34–39; FIG. 2; *see also* Ex. 31, 61:7–62:14, 63:8–16.

Ocean's citations to Defendants' invalidity contentions to support its argument that a hydraulic actuator can satisfy the "pneumatic cylinder" claim limitation are similarly misleading. Resp. at 10. Defendants never said that a hydraulic actuator can satisfy the claimed pneumatic cylinder limitation. Defendants cited a single quote referencing *multiple* actuators, including an "air pressure cylinder" (*i.e.*, the claimed "pneumatic cylinder") and a hydraulic actuator. A "hydraulic cylinder" is ***not*** the same as a "pneumatic cylinder." Ocean's expert admits this. Ex. 31, 47:7–23; *see also id.*, 52:23–53:9; Spanos Decl. ¶¶ 40–43; Ex. 36, 44:15–21.

### c.   Ocean's challenges to Defendants' plain-and-ordinary-meaning are misguided.

Ocean argues that "limiting 'pneumatic cylinder' to one supplied with 'pressure' and 'air or insert [sic] gas'" is improper because the specification describes those as examples. Resp. at 14. But that is the meaning of pneumatic—a point Ocean does not dispute. The specification confirms that "pneumatic cylinder" uses "air or other inert gas . . . at the required pressure." Ex. 2, 6:16–21. Although the specification contemplates the use of "any type of pneumatic cylinders," (*id.*, 6:14–16), they must be pneumatic. This is consistent with Defendants' understanding of this term.

Ocean's focus on the details of the pneumatic cylinder (its movement and shape, and the difference between a rod and shaft) is a red herring. Ocean's construction does not require any pneumatic force, and therefore must be rejected.

Regarding linear motion, Ocean argues that the claimed "varying a tilt" necessarily means that a pneumatic cylinder is not limited to a straight-line movement. Resp. at 15–16. According to Ocean, "tilting necessarily requires the shaft to deviate from its axis (i.e., move in a non-straight line)" and a linear motion of a pneumatic cylinder can only raise or lower a stage. *Id.* at 16. Not so. The claims require "a ***plurality*** of pneumatic cylinders." Ex. 2, 12:62–66. Moving a single cylinder in a linear path causes stage tilt, whereas moving all cylinders together results in stage

raising or lowering. Ocean's expert confirms this. Ex. 31, 57:14–59:13, 60:6–61:6.[7]

Similarly, Ocean's shaft/rod distinction is irrelevant to the dispute. Ocean ignores that Dr. Spanos testified—in his declaration and deposition—that "a pneumatic cylinder [is] a cylindrical device that uses pressurized air or other gas to move a ***shaft (or rod)*** of the device to along a linear path (that is, in a straight line)." Spanos Decl. ¶ 41 (emphasis added); Ex. 36, 15:12–16:17; *see also* Def. Br. at 14.[8] There is no dispute here.

Last, as to "cylinder," Ocean does not dispute that it wants to replace "cylinder" with a generic "mechanism" or "device." Resp. at 13–14. Ocean relies on a handful of cases that construed the term in isolation, but ***none*** construed "pneumatic cylinder."[9] Ocean also mischaracterizes Dr. Spanos' testimony when arguing that he "effectively admit[ed] that a pneumatic cylinder need not be cylindrical." Resp. at 14 (citing Ex. A to Resp. at 16:19–17:2, 18:24–19:11[10]). That discussion focused on end caps that prevent gas leakage, not the cylindrical core of the device itself. Ex. 36, 17:19–22:7.

### 2.   Ocean's rewrite of "said process chamber" should be rejected.

Ocean's response and its expert's testimony confirm that claim 31 is indefinite. Ocean does not dispute that it is seeking a judicial correction of what it calls a "harmless drafting error." *See* Resp. at 18, 20. But judicial correction is improper because there are three possible meanings. It is unclear where the subsequent process operation happens; whether it need only be within the tool

---

[7]  Ocean further argues that the Pneumatic Systems book describes non-linear motion ("buckling and bending"). Resp. at 16–17 (citing Ex. 22, 89). Stroke length is a consideration to ***avoid*** buckling and bending, (Ex. 22, 89), so the cylinder moves in a straight line, (*id.*, 85).

[8] Defendants' point is simply that a component extends/contracts to adjust the stage. Ocean does not dispute that a pneumatic cylinder includes such a component, whether called a "shaft" or "rod."

[9] In fact, Ocean's cases support Defendants' position because particular shapes are required.

[10] These citations correspond to the final transcript, Ex. 36, 21:6–13, 23:6–16.

(as Ocean proposes), or if it is further limited to a specific part of the tool—the process chamber.

Ocean argues that the "specification is unequivocal" that the wafer stage is located in the process tool, and therefore claim 31's reference to "chamber" should be "tool." *Id.* at 17. But this ignores that the specification also repeatedly describes that (i) the stage is located *within* a process chamber (which is a component of the tool)[11] and (ii) the "process operation" is performed on a wafer on the stage *within* the tool's process chamber. *See, e.g.*, Ex. 2, 3:23–31, 3:44–47, 5:15–19, 6:45–57, 10:46–49; *see also* Def. Br. at 18. In fact, the specification twice tracks claim 31 in full: "[T]he method comprises . . . *performing the process operation on at least one subsequently processed wafer positioned on the wafer stage 40 in the process* __*chamber*__ after the plane 44 of the wafer stage 40 has been adjusted." Ex. 2, 10:39–49 (emphasis added);[12] *see also* 3:37–46. That is, because the specification teaches that the wafer stage could be in either the tool or chamber, there is a reasonable debate. On top of this ambiguity, Ocean's expert contends that all process operations in the '651 patent "have to occur within the process chamber." Ex. 31, 84:11–17.

Ocean argues that the claim language supports its request for judicial correction because "said process operation" in the subsequent "performing" step necessarily means that the operation occurs generally in the process tool, not within a (narrower) process chamber. *See* Resp. at 19. But, there are at least three competing interpretations of the claim. It is unclear if (i) "a process tool" in the first claimed step could be "a process chamber" (and all references to "tool" should be "chamber"); (ii) "in said process chamber" in the fourth step could be "in said process tool"; or (iii) "in said process chamber" in the fourth step should be "in a process chamber." Moreover, the initial claimed step of "performing a process operation . . ." does not mention a wafer stage at all.

---

[11] Ocean does not dispute that a "process chamber" and a "process tool" are different, as confirmed by the claims and specification. *See also* Def. Br. at 18 (explaining same).

[12] Although Ocean cites to this part of the specification, it fails to acknowledge or address that the process operation on the subsequently processed wafer occurs in the process chamber. Resp. at 19.

Ex. 2, 13:51–52. It is not until the third step ("adjusting") that a "wafer stage" is introduced. *Id.*, 13:56–58. Then, in the subsequent "performing" step, the claim requires "performing said process operation on at least one subsequently processed wafer" (*i.e.*, a ***different*** wafer than the initial "performing" step) "positioned on said wafer stage in said process chamber . . . ." *Id.*, 13:59–62. Although claim 31 requires the same "process operation" in both "performing" steps, it is unclear ***where*** the subsequent process operation happens, *e.g.*, whether it need only be within the tool.[13]

Ocean cannot distinguish *Trusted Knight v. Int'l Bus. Machines Corp.*, 681 F. App'x 898, 904 (Fed. Cir. 2017) because, as in *Trusted Knight,* Ocean's proposed rewrite (i) is subject to reasonable debate, (ii) ignores the competing disclosure in the specification, and (iii) would significantly alter the claim scope. Instead, "said process chamber" is indefinite.

## C.     '305 AND '248 PATENTS

Defendants' construction that a "software scheduling agent" (SSA) is "a software agent that schedules, initiates, and executes activities on behalf of a single manufacturing domain entity" reflects the "invention" described by the specification and file history. Taken in its entirety, the specification calls out one feature of "particular interest" to define the invention as a whole amidst a sea of optional aspects. During prosecution, Applicants repeatedly emphasized another aspect to define the invention vis a vis the prior art. Both of these disclaimers are clear and yet given no consideration in Ocean's proposal.

### 1.     The inventors specified one "particular interest" of their invention and those words must be given weight.

#### a.     Ocean arbitrarily limits the application of specification claim scope disavowal to certain magic words.

Ocean searches the specification for magic words and argues that their absence is

---

[13] None of the dependent claims (32–37) relate to the claimed "performing said process operation on at least one subsequently processed wafer . . . in said process chamber. . . ." They only serve to limit earlier steps in claim 31, and thus, do not shed light on "in said process chamber."

conclusive. Specifically, Ocean argues that there is no disavowal without a phrase reflecting that "the present invention includes," "the present invention is," or "all embodiments of the present invention are." Resp. at 21 (*citing Pacing Techs., LLC v. Garmin Int'l, Inc.,* 778 F.3d 1021, 1024 (Fed. Cir. 2015)). However, the Federal Circuit does not apply a test for disavowal based on magic words, it analyzes the specification as a whole and determines whether "[i]n the context of [the] patent, [the inventors] clearly and unmistakably limits" the claims. *Pacing Techs.,* 778 F.3d at 1025; *see also Forest Labs., LLC v. Sigmapharm Labs.,* 918 F.3d 928, 933 (Fed. Cir. 2019) ("when a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention"); *SciMed Life Sys. v. Advanced Cardiovascular,* 242 F.3d 1337, 1344 (Fed. Cir. 2001) (describing that certain words may be examples of the kind of "broad and unequivocal" disclaimer regarding a "present invention" that results is disavowal).

### b.   The specification repeatedly says which aspects of the invention are limiting and which are not.

Although Ocean's selected magic words are not found verbatim in the specification, the written description comes remarkably close. The specification identifies particular aspects of a SSA that are "[o]f particular interest to the present invention." Ex. 9 at 6:63-66. This is a description of "the features of the 'present invention' as a whole" that should be understood to "limit[] the scope of the invention." *See Forest Labs.*, 918 F.3d at 933. First, the specification describes aspects of a SSA that are "not material to the practice of the invention," such as where the SSA resides and how many SSAs are present on a single computer. Ex. 9 at 6:24-39. Then, it describes unique aspects of SSAs, like that they "each represent some 'manufacturing domain entity.'" *Id.* at 6:40-62. It then identifies one feature "[o]f particular interest to the present invention." *Id.* at 6:63-66. The phrase "of particular interest" is never again used. The inventors meant something different for this phrase than other generic language; it was meant to define the

present invention as a whole. Notably, the inventors said when they used the term "invention" in a non-limiting manner. *See, e.g., id.* at 6:28-29 ("The situs of the software agent 265 is ***not material to the practice of the invention***"); *see also* 12:18-22; 6:21-23; 6:7-9. But the inventors never qualified their statement about this "particular interest." The inventors' statement about the only feature described as a "particular interest to the present invention" should be understood as "clearly and unmistakably limit[ing]" the claims. *Pacing Techs.,* 778 F.3d at 1025.

### 2. Applicant repeatedly disclaimed the scope of "software scheduling agent" during prosecution.

Ignoring the Applicant's disclaimer during prosecution, Ocean argues that the specification is "the single best guide to the meaning of a disputed term." Resp. at 27 (*citing Vitrionics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)). However, the specification is only the "single best guide" in the absence of other intrinsic evidence. *Vitrionics* recognized that "the record before the [PTO] is often of critical significance in determining the meaning of the claims." 90 F.3d at 1582-83. Indeed, "the prior art cited in the file wrapper gives clues as to what the claims do not cover." *Id.* at 1583. Here, the prosecution history contains a clear disclaimer.

During prosecution, the Examiner rejected the issued claim as anticipated by U.S. Patent No. 5,369,570 to Parad. Ex. 32 at 3. Parad discloses "scheduling, monitoring, and control of … resources [including] those required for the manufacture of goods" that "may be implemented in any combination of software, firmware, or hardware." Ex. 33 at 1:6-9, 7:53-54. The Examiner stated that a SSA is "[an] inherent property of Parad['s] invention." *Id.* at 3. The Applicant argued that "[t]he existence of a 'software scheduling agent' does not necessarily flow from Parad's disclosure." Ex. 34 at 5. The Examiner disagreed because "Applicant's definition of the term 'software scheduling agent' is very broad." Ex. 35 at 4. Afterward, the Applicant repeatedly defined a "software scheduling agent" as representing not "***more than one***

manufacturing domain entity at any given time" (Ex. 27 at 3-4 (emphasis added); *see also* Ex. 26 at 4-5; Ex. 25 at 9) and noted that not "*any* software entity that schedules constitutes a software scheduling agent" (Ex. 27 at 4 (emphasis original)). Applicant disclaimed an agent representing "more than one" entity to overcome the prior art, and Applicant's disclaimer must be given weight.

### D.   '330 PATENT

Ocean concedes that the term "concurrently measuring" requires measuring CD and overlay "simultaneously," consistent with Defendants' proposed construction.[14] Resp. at 28. Therefore, only the "with a single measuring tool" portion of Defendants' proposed construction is disputed. Ocean fails to explain how the claimed method—simultaneously measuring CD and overlay on "a wafer"—could be performed with more than one measuring tool, tacitly admitting that the specification does not describe how to do so. Ex 3, Claim 19. Even if it were possible to concurrently measure a single wafer with multiple measuring tools, Ocean does not explain how doing so achieves the patent's stated benefits: combining two operations to reduce space and time. *Id.*, 4:18–21; *see also id.*, Abstract; 1:63–2:5; 7:48–50; 9:9–13; 11:46–50. Measuring "with a single measuring tool," is required by the claim language and the intrinsic record.

The claimed method of the '330 patent includes "concurrently measuring critical dimensions and overlay in *a wafer* undergoing the fabrication process." *Id.*, Claim 19 (emphasis added). In other words, the claim requires taking two different measurements, on the same wafer, at the same time. Neither the patent nor Ocean explains how to simultaneously take two different measurements "at submicron levels," on the same wafer, using more than one tool. *Id.*, 1:19. But the patent *does* explain how to measure CD and overlay simultaneously using a single tool: the

---

[14] Ocean also describes "concurrently measuring" as requiring measurements be taken "at the same time." Resp. at 28. Defendants assume the terms "simultaneously" and "at the same time" have the same meaning. If not, the specification and the extrinsic evidence support including the term "simultaneously" in the construction instead of "at the same time." Def. Br. at 26-27.

"top grating structures are used for CD measurements and the combination of the underlying and overlying grating structures are used for the overlay." Ex. 30 at 42 (internal citations omitted).

Ocean argues that because the '330 patent mentions a "measurement system" with multiple light detectors, the claimed method cannot be limited to a single measuring tool. First, the asserted claims do not recite a "measurement system." Ex. 3, Claims 19–21. Second, the '330 patent teaches that a single tool can include multiple light detectors. For example, the measuring system in Figure 7 includes the claimed grating structure that "allows these measurements to be taken concurrently with a single measuring tool." *Id.*, 9:9–13. But the system in Figure 7 also includes "[o]ne or more light detecting components 720" that collect the light reflected off the gratings and then analyze it to measure CD and overlay. *Id.*, 9:28–31; 9:41–51.

Even if it were possible to simultaneously measure CD and overlay on a single wafer using multiple tools, doing so would not achieve the patent's stated benefit of combining operations. Further, every embodiment in the patent concurrently measures CD and overlay with a single measuring tool. The fact that the concurrent CD and overlay measurements can be made at different points in the fabrication process—which, as the patent teaches, can help determine the impact of various process steps on CD and overlay—has nothing to do with how many tools are used to take the measurements. *Id.*, 7:4–31. Ocean's argument to the contrary is wrong.

In Ocean's own statements to the PTAB, which are part of the intrinsic record, Ocean argued that WDT's cited art did not sufficiently m otivate a POSITA to form a single tool to concurrently measure CD and overlay. Ex. 30 at 42, 49, 51–52, 55–57. In other words, Ocean said the '330 patent requires simultaneously measuring with a single tool and therefore the prior art must teach such a single tool. These statements support Defendants' construction, so Ocean now wants to avoid them. To do so, Ocean mischaracterizes its own POPR. Ocean now argues its POPR

statements were meant to distinguish prior art references *because they were limited to* a single measuring tool. That is, Ocean now implies that the '330 patent *requires multiple* measuring tools. Ocean's change of course is inconsistent with the specification and the claim language described above. As Ocean knew when it filed its POPR, the claim language and the intrinsic record require that "concurrently measuring" CD and overlay be done with a "single measuring tool."

### E.   '538 PATENT

#### 1.   Ocean cannot provide any objective boundaries for these terms.

Neither the claims nor the specification provide any boundaries, parameters, or metrics that objectively inform a POSITA when a fault is "significant" or not. There are no high or low boundaries, no ranges, and no other information disclosed in the patent about what "significant" means in the context of the patent. The term is thus both one of degree and subjective, as the intrinsic evidence and expert testimony shows, rendering the claims indefinite.

Ocean fails to identify any objective boundaries (as the law requires), effectively conceding indefiniteness. For instance, Ocean contends that the '538 patent offers a "substantial advantage over the art" because it purportedly eliminates the guess work and unnecessary alteration to the manufacturing process by giving less weight to "insignificant" faults.[15] Resp. at 33, *see also* Maltiel Decl. at ¶¶ 78-80. In support, Ocean relies on the patent's disclosure that "weighting of the model parameters may be *modified to increase the sensitivity of parameters that have been found to have contributed significantly* to fault conditions." Ex. 4, 5:64-68 (emphasis added). But nothing in this section of the specification defines or gives meaning to what "significant" means (or "insignificant"), let alone does it describe how one might determine that a parameter "contributed significantly." The specification also does not identify any "parameters," how

---

[15] Whatever the patentees' aspirations were for their purported invention, that does not excuse their statutory obligation to clearly and distinctly claim it, which they have not done here.

sensitive they need to be, or how much they need to contribute to be considered "significant."' Spanos Decl. at ¶¶ 30, 35. A POSITA thus has no clue what is or is not "significant."

Ocean also argues that Dr. Spanos' use of the word "significant" in the context of his own publications means that these terms of degree provide objective boundaries for the claims 5 and 7 of the '538 Patent. Resp. at 32-33. That argument is equally flawed. To determine whether the subject matter is distinctly claimed, courts "look to the ***patent record***—the claims, specification, and prosecution history—to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed." *Teva Pharms. USA, Inc. v. Sandoz, Inc*., 789 F.3d 1335, 1341 (Fed. Cir. 2015). References to a POSITA's unrelated publications are irrelevant. And as Dr. Spanos himself explained, a term of degree like "significant" may be understood in a certain context but that meaning is not transferable to a different context. *See* Resp. Ex. A, . 60:24-61:25, 67:11-20, 68:3-7. The patentee must provide clarity in the patent at issue—how some third party might use a term in an unrelated context is irrelevant.

Further, Dr. Spanos's articles are completely irrelevant, and Ocean's claim that they "are in the same context" as the '538 patent misrepresents them. Resp. at 32. The '538 patent "relates generally to semiconductor manufacturing, and, more particularly, to a method, system, and apparatus for performing a process to improve fault detection reliability through feedback" (*see* '538 patent at 1:9-12). In stark contrast, one of the publications Ocean cites describes visualizations of consumer energy use. *See* Ex. 37, at Abstract. The second publication proposes a gamification framework as a form of smart infrastructure. *See* Ex. 38, at Abstract. Neither has anything to do with semiconductor manufacturing or the '538 patent. Ocean's contention to the contrary is disingenuous.

Finally, Ocean misapplies the law. Ocean argues that the claims of the '538 patent are not indefinite because no court has ever found the word "significant" to be indefinite. Resp. at 31. But the standard for indefiniteness of terms of degree is not whether a court previously found these exact terms indefinite in the context of some *other patents*, but whether, "[t]he claims, when read *in light of the specification and the prosecution history [of the asserted patent] provide objective boundaries* for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (emphasis added). Here, the disputed terms of the '538 patent are indefinite because they lack these objective boundaries. Resp. at 30-33.

### 2.    "[A] significant fault" (claim 5) is indefinite.

The purported "clear context" from the specification Ocean relies on to argue that "a significant fault" from claim 5 is not indefinite, is nothing of the sort. Resp. at 34 (citing to Ex. 4, 11:12-19). The specification does not explain how to determine a fault's significance, leaving a POSITA to guess. Dr. Spanos explained that the specification "tells you that some system determines whether the abnormality or fault indicated relates to an actual fault" which "implies that somewhere out there is a definition of what an actual fault is ... but that definition is missing." Resp. Ex. 3, 83:14-21; *see also id.*, 84:7-10.

Mr. Maltiel's testimony further shows that Ocean cannot identify the bounds of "significant," and instead improperly reads the term out of the claim entirely. Mr. Maltiel admitted that when a wafer is produced according to specified requirements, POSITAs do not consider a fault to have occurred. Ex. 31, at 97:25-98:9 ("Q.· Understood, so if the wafer hasn't failed and it's within the specifications, there would be no reason to believe any fault has occurred in the tool, correct? ·A.· Yes, only when the wafer doesn't meet specification, you can then try to pinpoint . . . the fault that caused it."), 95:17-23, 95:24-96:4. However, Mr. Maltiel admitted he considers any fault producing a wafer outside the specified requirements to be "significant." Ex. 31, 110:7-18

("Q.· So . . . a significant fault is any fault that causes the wafer to be out of specification from what is described in the data sheet?  A.· Yes."). In other words, Mr. Maltiel finds no fault if the wafer is manufactured within specification, but a "significant fault" anytime the wafer is manufactured outside of specification. By Mr. Maltiel's own testimony, he is equating a "fault" and a "substantial fault." This interpretation removes "substantial" from the claim in an attempt to avoid its ambiguity because even Ocean's expert cannot derive any meaning from the term.[16]

### 3.   "Determining in said computer whether said parameter is a significant factor" (claim 7) is indefinite.

Ocean also fails to provide a boundary for "significant factor" in claim 7. Resp. at 35. Ocean's alternative construction replaces the indefinite "a significant factor" with the indefinite "a significant contribution." The word "significant" is unresolvably ambiguous. Mr. Maltiel confirmed at his deposition that Ocean's interpretation removes "significant" from the claim, admitting "[i]f one factor is out of range and the device fails, then that factor is a significant fault." *See* Ex. 31 at 125:24-126:6. In other words, any factor that results in an out-of-specification wafer is a "significant factor" in the fault. Mr. Maltiel already admitted that a fault only occurs when the wafer is out of specification, so therefore Mr. Maltiel's position is that any factor leading to any fault is "significant." Given the claim language, that cannot be true.

---

[16] Ocean's cited cases are inapplicable. For example, in *Marical Inc. v. Cooke Aquaculture Inc.*, the court construed "significantly increased level" based on defendants' request and to avoid indefiniteness. No. 1:14-cv-00366-JDL, 2016 U.S. Dist. LEXIS 118780, at *8-9 (D. Me. Sep. 2, 2016). Here, Ocean fails to identify any standard for the term "significant," nor do Defendants know of one that could avoid indefiniteness. Similarly, *Wyeth LLC, et al. v. Alembic Pharm., Ltd., et al.*, C.A. No. 16-1305-RGA, Dkt. 98 (D. Del. Jun. 27, 2018) is not persuasive because it does not give any reasoning for its construction. And those patents claim pharmaceuticals, a very different context than semiconductor manufacturing. *Id.* at Dkt. 91, at 48 (May 31, 2018).

Dated: November 8, 2021                    Respectfully submitted,

|  | |
|---|---|
| | */s/ Tyler R. Bowen*<br>Janice L. Ta, Texas 24075138<br>JTa@perkinscoie.com<br>Perkins Coie LLP<br>500 West Second St., Suite 1900<br>Austin, TX 78701<br><br>Chad S. Campbell (*admitted pro hac vice*)<br>CSCampbell@perkinscoie.com<br>Tyler R. Bowen (*admitted pro hac vice*)<br>TBowen@perkinscoie.com<br>Perkins Coie LLP<br>2901 North Central Avenue, Suite 2000<br>Phoenix, AZ 85012<br><br>Philip A. Morin (*admitted pro hac vice*)<br>PMorin@perkinscoie.com<br>Yudong Kim (*admitted pro hac vice*)<br>YKim@perkinscoie.com<br>Perkins Coie LLP<br>11452 El Camino Real, Suite 300<br>San Diego, CA 92130-2020<br><br>*Counsel for Defendant STMicroelectronics, Inc.* |
| | */s/ L. Kieran Kieckhefer*<br>L. Kieran Kieckhefer (*pro hac vice*)<br>Shearman & Sterling LLP<br>535 Mission Street, 25th Floor<br>San Francisco, CA 94105<br>Telephone: 415.616.1124<br>Facsimile: 415.616.1199<br>Kieran.Kieckhefer@Shearman.com<br><br>David P. Whittlesey<br>Shearman & Sterling LLP<br>300 West 6th Street, 22nd Floor<br>Austin, TX 78701<br>Telephone: 512.647.1907<br>Facsimile: 512.857.6602<br>David.Whittlesey@Shearman.com<br><br>Matthew G. Berkowitz (*pro hac vice*) |

|  | Patrick Colsher (*pro hac vice*) |
|  | Yue (Joy) Wang (*pro hac vice*) |
|  | Shearman & Sterling LLP |
|  | 1460 El Camino Real, 2nd Floor |
|  | Menlo Park, CA 94025 |
|  | Telephone: 650.838.3737 |
|  | Facsimile: 650.838.5141 |
|  | Matt.Berkowitz@Shearman.com |
|  | Patrick.Colsher@Shearman.com |
|  | Joy.Wang@Shearman.com |
|  |  |
|  | Ahmed ElDessouki (*pro hac vice*) |
|  | Shearman & Sterling LLP |
|  | 599 Lexington Avenue |
|  | New York, NY 10022 |
|  | Telephone: 212.848.4908 |
|  | Ahmed.ElDessouki@Shearman.com |
|  |  |
|  | *Counsel for Defendant Western Digital Techs., Inc.* |
|  | /s/ Stephanie N. Sivinski |
|  | David H. Harper |
|  | Texas Bar No. 09025540 |
|  | david.harper@haynesboone.com |
|  | David L. McCombs |
|  | Texas Bar No. 13438700 |
|  | david.mccombs@haynesboone.com |
|  | Stephanie N. Sivinski |
|  | Texas Bar No. 24075080 |
|  | stephanie.sivinski@haynesboone.com |
|  | HAYNES AND BOONE, LLP |
|  | 2323 Victory Avenue, Suite 700 |
|  | Dallas, Texas 75219 |
|  | (214) 651-5000 (telephone) |
|  | (214) 200-0615 (fax) |
|  |  |
|  | *Counsel for Defendants MediaTek Inc. and MediaTek USA Inc.* |
|  | /s/ Marc B. Collier |
|  | Marc B. Collier (SBN 00792418) |
|  | marc.collier@nortonrosefulbright.com |
|  | Eric C. Green (SBN 24069824) |
|  | eric.green@nortonrosefulbright.com |
|  | Catherine Garza (SBN 24073318) |

|  | cat.garza@nortonrosefulbright.com<br>NORTON ROSE FULBRIGHT US LLP<br>98 San Jacinto Boulevard, Suite 1100<br>Austin, Texas 78701<br>Tel:  (512) 474-5201<br>Fax:  (512) 536-4598<br><br>Richard S. Zembek (SBN 00797726)<br>richard.zembek@nortonrosefulbright.com<br>Darren Smith (SBN 24088433)<br>darren.smith@nortonrosefulbright.com<br>NORTON ROSE FULBRIGHT US LLP<br>1301 McKinney, Suite 5100<br>Houston, Texas 77010-3095<br>Tel: (713) 651-5151<br>Fax: (713) 651-5246<br><br>*Counsel for Defendant Silicon Laboratories Inc.* |
|---|---|
|  | */s/ Andrew M. Holmes*<br>Sean S. Pak<br>seanpak@quinnemanuel.com<br>*admitted pro hac vice*<br>California Bar No. 219032<br>Andrew M. Holmes<br>drewholmes@quinnemanuel.com<br>*admitted pro hac vice*<br>California Bar No. 260475<br>QUINN EMANUEL URQUHART &<br>SULLIVAN LLP<br>50 California Street<br>22nd Floor<br>San Francisco, CA 94111<br>Phone: (415) 875-6600<br>Fax: (415) 875-6700<br><br>Scott L. Cole<br>scottcole@quinnemanuel.com<br>Texas Bar No. 00790481<br>QUINN EMANUEL URQUHART &<br>SULLIVAN LLP<br>201 West 5th Street<br>11th Floor<br>Austin, TX 77002Phone: (737) 667-6104<br>Fax: (737) 667-6110 |

|  | *Counsel for Defendant NVIDIA Corp.* |
|--|--|
|  | */s/ Patrick J. McCarthy*<br>Darryl Adams, State Bar No. 00796101<br>SLAYDEN GRUBERT BEARD PLLC<br>401 Congress Ave, Ste 1650<br>Austin, TX 78701<br>Telephone: 512-402-3562<br>dadams@sgbfirm.com<br><br>Neel Chatterjee (admitted pro hac vice)<br>GOODWIN PROCTER LLP<br>601 Marshall Street<br>Redwood City, CA 94063<br>Telephone: (650) 752-3100<br>Facsimile: (650) 853-1038<br>DG-RenesasDCt@goodwinlaw.com<br><br>Brett Schuman (admitted pro hac vice)<br>GOODWIN PROCTER LLP<br>Three Embarcadero Center<br>San Francisco, CA 94111-4003<br>Telephone: (415) 733-6000<br>Facsimile: (415) 677-9041<br>DG-RenesasDCt@goodwinlaw.com<br><br>Patrick J. McCarthy (admitted pro hac vice)<br>Kelly Grosshuesch (admitted pro hac vice)<br>Amanda E. Stephenson (admitted pro hac vice)<br>GOODWIN PROCTER LLP<br>1900 N Street, N.W.<br>Washington, D.C. 20036<br>Telephone: (202) 346-4000<br>Facsimile: (202) 346-4444<br>DG-RenesasDCt@goodwinlaw.com<br><br>Suhrid A. Wadekar (admitted pro hac vice)<br>Sarah J. Fischer (admitted pro hac vice)<br>GOODWIN PROCTER LLP<br>100 Northern Avenue<br>Boston, MA 02210<br>Telephone: (617) 570-1465<br>Facsimile: (617) 523-1231<br>DG-RenesasDCt@goodwinlaw.com |

| | |
|---|---|
| | *Counsel for Defendants Renesas Electronics Corporation and Renesas Electronics America, Inc.* |
| | */s/ Bradley D. Coburn*<br>Barry K. Shelton<br>Texas Bar No. 24055029<br>Bradley D. Coburn<br>Texas Bar No. 24036377<br>**SHELTON COBURN LLP**<br>311 RR 620, Suite 205<br>Austin, TX 78734-4775<br>bshelton@sheltoncoburn.com<br>coburn@sheltoncoburn.com<br>(512) 589-9154 (Telephone)<br>(512) 263-2166 (Facsimile)<br><br>*Counsel for Defendant NXP USA, Inc.* |

## **CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on November 8, 2021, all counsel of record who have appeared in the above-captioned cases are being served with a copy of the foregoing.


*/s/ Darren Smith*
Darren Smith