Exhibit 31

ROUGH DRAFT

```
 1                         ROUGH

 2     REALTIME AND INTERACTIVE REALTIME TRANSCRIPT
                 ROUGH DRAFT DISCLAIMER
 3   ---------------------------------------
     IMPORTANT NOTICE:   AGREEMENT OF PARTIES
 4   We, the party working with realtime and rough
        draft transcripts, understand that if we
 5      choose to use the realtime rough draft
        screen or the printout, that we are doing
 6      so with the understanding that the rough
        draft is a noncertified copy.
 7
     We further agree not to share, give, copy,
 8      scan, fax or in any way distribute this
        realtime rough draft in any form (written
 9      or computerized) to any party.  However,
        our own experts, cocounsel and staff may
10      have limited internal use of same with the
        understanding that we agree to destroy our
11      realtime rough draft and/or any
        computerized form, if any, and replace it
12      with the final transcript upon its
        completion.
13
     Case: Ocean Semiconductor v. Mediatek Inc.
14   Date: 11/2/21

15                   REPORTER'S NOTE:

16   Since this deposition has been realtimed and
        is in rough draft form, please be aware
17      that there may be a discrepancy regarding
        page and line number when comparing the
18      realtime screen, the rough draft disk, and
        the final transcript.
19
     Also please be aware that the realtime screen
20      and the noncertified rough draft transcript
        may contain untranslated steno, reporter's
21      notes in parentheses, misspelled proper
        names, incorrect or missing Q/A symbols or
22      punctuation, and/or nonsensical English
        word combinations.  All such entries will
23      be correct on the final, certified
        transcript.
24

25   Court Reporter Name:  Mary F. Bowman
```

ROUGH DRAFT

```
 1                         ROUGH

 2   BY MS. KIECKEFER:

 3        Q.    Good afternoon, morning good

 4   morning.  Afternoon where, you are.  My

 5   name is Kieran Kieckefer and I represent

 6   western digital.

 7        A.    How do you do.

 8        Q.    Turning to paragraph 29 of your

 9   declaration, the western district of Texas

10   declaration of Exhibit 1 --

11        A.    It's Exhibit 1, which paragraph?

12        Q.    29.

13        A.    OK.

14        Q.    You note in paragraph 29 that a

15   claim may be given a meaning that differs

16   from the ordinary and customary meaning and

17   then you have two different scenarios.  Is

18   that correct or is that a typo.  Did you

19   mean a claim or did you mean a claim term?

20        A.    A claim term.  I guess.

21        Q.    And then you note that one can

22   depart from the plain and ordinary meaning

23   of a claim term only in two scenarios and

24   those are the ones described in paragraph

25   29.  Correct?
```

ROUGH DRAFT

```
 1                         ROUGH
 2   a pneumatic cylinder?
 3       A.    It is OK because it's part of the
 4   way he described in the specification, he
 5   said it's -- he is looking at in in the he
 6   is looking at it in a a broader way.
 7       Q.    Is it your opinion that the
 8   inventor of the 651 patent intended the
 9   terms pneumatic cylinder and hydraulic
10   cylinder to mean essentially the same
11   thing?
12       A.    He didn't mean the same thing.
13   He just said in a specification, that
14   sometimes you lose hydraulic system,
15   sometimes you use mechanical system,
16   sometimes you use a hybrid system.  So he
17   really -- he created a stage that could be
18   operated by using these various means.  And
19   he specifically felt that he should mention
20   them because if he didn't feel you could
21   use hydraulic, mechanical and so on, he
22   wouldn't have mentioned.  He specifically
23   mentioned more than once.
24       Q.    When you talk about -- excuse me,
25   strike that.
```

ROUGH DRAFT

1                              ROUGH

2      Q.    So we have 1078 claims that refer

3  to pneumatic cylinders and some claims that

4  refer to rack and pinion combinations and

5  my question is whether it is your opinion

6  that these terms are interchangeable with

7  each other.

8            REPORTER'S NOTE: relationship

9      A.    Well, I believe they be

10  interchangeable because you can have

11  pneumatic cylinder without rack and pinion

12  and on the other scenario, you can have

13  rack and pinion situations.  So it's not --

14  they are not the same terms.

15      Q.    And you have a same opinion with

16  respect to pneumatic cylinders and

17  hydraulic cylinders that those are not the

18  same terms, correct?

19      A.    They are related.  You can have a

20  system be a combination or hybrid to be

21  able to move and adjust the angle of the

22  stage and so on.

23      Q.    I guess, I don't think that

24  answered my question.  My question is

25  whether pneumatic cylinders and hydraulic

ROUGH DRAFT

```
 1                         ROUGH
 2   cylinders are not the same term, is that
 3   correct?
 4        A.     They are not the same term.  But
 5   again, they are not the same term as far as
 6   what is the meaning but as far as what the
 7   patent said that you can use to move the
 8   stage, you can use either hybrid or
 9   hydraulic or pneumatic cylinder.
10        Q.     Is it your contention, just one
11   follow up point, you say that in paragraph
12   59 of your declaration -- and I can wait
13   for you to go there.  Eke.
14        Q.     You said that pneumatic cylinder
15   is a mechanical device used to generate a
16   force.  Do you see that?
17        A.     Yes.
18        Q.     Is it your opinion a pneumatic
19   cylinder is a subset of the mechanical
20   device category?
21        A.     Not really.  Because you can see
22   that you can use mechanical force to
23   operate a pneumatic cylinder but you can
24   you can have a component like for example
25   that after you move it 234 one direction,
```

ROUGH DRAFT

1                        ROUGH

2    word in it, which is a mechanism useful in

3    adjusting the position of the wafer stage

4    40 may be comprised of any one of of a

5    variety of devices your opinion would

6    remain the same, that any one of the

7    pneumatic mechanical hydraulic,

8    electromagnetic or some combination thereof

9    could be used.  Is that correct?

10        A.    Yes because if you look at figure

11   2, you can see that part of it could be

12   pneumatic and part of it could be

13   mechanical.  For example.

14        Q.    Turning to claim 19, which begins

15   in column 12,?

16        A.    Yeah, I have it.

17        Q.    Claim 19 requires a plurality of

18   pneumatic cylinders that are operatively

19   coupled to the wafer stage, correct?

20        A.    The plurality of pneumatic

21   cylinder, yes.

22        Q.    So in order to meet that claim

23   limitation, you need at least two pneumatic

24   cylinders that are connected to the stage,

25   correct?

ROUGH DRAFT

1                      ROUGH

2         A.    Yes.

3         Q.    And then if you have multiple

4    pneumatic cylinders connected to the stage,

5    where would they be positioned relative to

6    the stage?

7         A.    They are shown in figure 5, I

8    think.  Let me go back there.  It's not

9    5 -- I guess it is figure, figure 3 show

10   one potential combination.  It's a guess

11   what you call a -- 49 -- well, yes, in

12   figure 3, you have a big cylinder and

13   inside it, you have three rectangle.  And

14   each of the rectangle would be one, it's a

15   top view and each of the rectangle would be

16   connected to a pneumatic cylinder.

17              So this is just one way to

18   adjust, to put them.

19        Q.    I think it's actually the bottom

20   view is what the patent says?

21        A.    Yeah, OK, the bottom view.  But

22   yeah, but it shows where the three connect

23   to the stage.

24        Q.    Yup.  And then so let's just use

25   this figure 3 as an example where you have

ROUGH DRAFT

Page 59

1                         ROUGH

2    the three pneumatic cylinders, if you

3    extend the shaft of only one of them and

4    the other two remain in place, isn't it

5    correct that the stage would tilt?

6         A.      Yes, I mean yeah, assuming --

7    they have to adjust it or make it so it

8    would be possible for it to tilt.

9         Q.    But it is possible that the stage

10   would tilt if you are extending the shaft

11   of only one and keeping the other two

12   roughly in place, is that correct?

13        A.    Yeah.

14        Q.    And the only way to raise the

15   stage using that same example, the only way

16   to raise the stage is if all of the shafts

17   of each cylinder move together and remain

18   it at the same height, is that correct?

19             MR. PARKER:  Objection, vague.

20        A.    So can you repeat the question.

21        Q.    Sure.

22             The only way to raise the stage

23   is if all of the shafts of each cylinder

24   move together and remain at the same

25   height.  Correct?

ROUGH DRAFT

1                           ROUGH

2          MR. PARKER:  Same objection.

3     A.    This is assuming that there is no

4  other way to move the stage in a vertical

5  direction or perpendicular to the page.

6     Q.    Sure, let me revise the question

7  slightly.

8          Is one way to raise the stage the

9  scenario when all of the shafts of each

10 cylinder move together and remain at the

11 same height?  Would you agree with that?

12    A.    That means I have to move higher

13 to the starting position but the same

14 amount or the of the three shafts for it to

15 be raised by the amount to go higher by the

16 amount -- by the mount -- so can you repeat

17 the part that you have recorded. -- in the

18 beginning it should be to move from the

19 starting position because I'm not sure if

20 you are saying form.

21          So if you repeat if you change it

22 now from the starting position.

23          (Record read)

24    A.    Well, they don't have necessarily

25 even to move together but all of them has

ROUGH DRAFT

```
 1                         ROUGH
 2   to -- between the starting position, before
 3   you start moving the shaft until you finish
 4   moving all of them, all of them is to move
 5   by the same amount from the starting
 6   position to the end position.
 7        Q.    At paragraph 65 of your
 8   declaration, you reference electrodes, do
 9   you see that? let me know when you're
10   there?
11        A.    OK, I have it.
12        Q.    So that's then if you turn to the
13   patent if you look at column 5 and line 20.
14        A.    Give me a minute.
15        Q.    Sure.
16        A.    OK.
17        Q.    At line 20 it says in many tools
18   the wafer stage is actually an electrode
19   that is used to ground the wafer while a
20   plasma is created above the wafer by other
21   electrodes or coils in such tools.
22              Do you see that?
23        A.    Yes.
24        Q.    So you would agree that according
25   to the specification in this scenario, it
```

ROUGH DRAFT

```
 1                      ROUGH
 2   says that the stage is an electrode,
 3   correct?
 4        A.    Yes.
 5        Q.    And it does not say that the
 6   electrode adjusts the stage, correct?
 7        A.    The this sentence just defined
 8   what the stage.  It doesn't talk about
 9   movement.
10        Q.    Correct.  And that's my question.
11   It does not say that the electrode adjusts
12   the stage.  Correct?
13        A.    This specific sentence does not
14   say it.
15        Q.    If you could turn to claim 19,
16   which is in column 12.
17        A.    OK.
18        Q.    And claim 19 requires that the
19   pneumatic cylinders be separate components
20   from the stage, correct?
21        A.    It says are coupled to the stage.
22        Q.    Yes, I see that.  Would you agree
23   that that means that the pneumatic
24   cylinders are separate from the stage?
25        A.    Well, I mean --
```

ROUGH DRAFT

1                    ROUGH

2        MR. PARKER:  Objection, vague.

3    A.   The question what you mean by

4 separated.  Coupled means it is connected

5 to the stage.  So they are not apart of the

6 whole big system, I mean.  It doesn't say

7 that they are not connected to it.

8    Q.   Yeah, let me rephrase.

9        With respect to claim 19, they're

10 talking about the stage and the cylinder

11 that are connected.  And my question is --

12 I agree and I see that they're connected

13 but you will agree that they are separate

14 components that are connected, correct?

15   A.   They are separate elements that

16 are attached one another by being coupled.

17   Q.   Right.

18        In paragraph 68 of your

19 declaration?

20   A.   OK.

21   Q.   Does that mean you're there?

22   A.   Yes.

23   Q.   Great.  You state that pneumatic

24 cylinders can be but need not be

25 cylindrical, do you see that?

ROUGH DRAFT

1                      ROUGH

2   you talk about what are the potential areas

3   it could be used for.

4        Q.    I'm sorry, are you looking in the

5   patent?

6        A.    Yes, sorry that you cannot see,

7   I'm looking --

8        Q.    That's what I thought?

9        A.    I'm looking at the column 1 and 2

10  and then starting so repeat the question.

11       Q.    Is it your opinion that all of

12  the process operations that are taught by

13  the 651 patent have to occur within the

14  process chamber?

15       A.    The one that.

16       A.    Yes, they have to occur within

17  the process chamber.

18       Q.    OK.

19            MS. KIECKEFER:  That concludes my

20       questioning, I'm going to pass the

21       torch to I believe it is Mr. Lynch.

22       Examination by thank you, Mr. Maltiel.

23       Lynne good evening, Mr. Maltiel, I'm

24       going to go ahead for a little bit

25       since we just took a break if that's

ROUGH DRAFT

```
 1                         ROUGH

 2      Q.    Again, I just want to talk about

 3 situations in which the wafer -- ex- cubes

 4 me, strike that.

 5      Q.    If faults are only defected when

 6 the wafer does not meet the data sheet

 7 specification, then if the data sheet -- if

 8 the wafer is within the specs of the data

 9 sheet, no fault would be detected, correct?

10      A.    I mean it's not accurate -- or

11 maybe I didn't explain it enough.  This

12 equipment is all the time the equipment

13 that process the wafer is all the time

14 monitored.  So you will have a situation

15 that you see the temperature fluctuate or

16 gas pressure was too high or too will he

17 and you use this information correlated

18 with how the wafer come out at the end of

19 the production line to try to see which of

20 this fault that happened in the equipment

21 caused problems that caused the wafer to

22 fail, not to meet the data sheet.

23           So it is sort of an interactive

24 process.

25      Q.    Understood, so if the wafer
```

ROUGH DRAFT

Page 98

1                    ROUGH

2    hasn't failed and it's within the

3    specifications, there would be no reason to

4    believe any fault has occurred in the tool,

5    correct?

6        A.    Yes, only when the wafer doesn't

7    meet specification, you can then try to

8    pinpoint what caused -- what was the fault

9    that caused it.

10       Q.    So I want to now turn your

11   attention to what's been marked --

12       A.    Let me elaborate though so that

13   you -- like for example, you also on test

14   wafer during lesses say deposition as a

15   process and you see that the gate come too

16   thick, the thickness is too high or too low

17   so you don't need to wait for the end of

18   the processing to see if it conform to the

19   data sheet because you know it's going to

20   be defective, so you know as the end.  So

21   it is as a way to monitor, it's not only at

22   the end of the line.

23       Q.    Understood.  But in that

24   situation that you just gave, even in the

25   middle of the process, it would already be

ROUGH DRAFT

1                            ROUGH

2   to an actual fault do you understand that

3   the construction is referring to a fault

4   that has caused the wafer to be outside of

5   the specification in the data sheet?

6        A.    Yes.

7        Q.    So the -- another way to describe

8   the construction of a significant fault

9   proposed by plaintiffs and agreed to by you

10  is that a significant fault is any fault

11  that causes the wafer to be out of

12  specification from what is described in the

13  data sheet?

14       A.    Yes.  It's not necessarily the

15  full wafer but some dyes on the wafer.

16       Q.    Right, some part of the wafer is

17  out of specification?

18       A.    Yes.

19       Q.    Isn't that -- that is simply the

20  same definition as a fault?

21       A.    No, because you see that you have

22  a fault, the -- what happened to the

23  equipment, like a fault like the way we

24  said temperature is too high, the pressure

25  is out of range and this is the fault at

1                    ROUGH

2  temperature fault to be significant and not

3  the pressure fault given that even if

4  pressure was in range, the wafer would

5  still be unacceptable?

6       A.    If the wafer was range for the

7  pressure but out of range for the

8  temperature, you consider the temperature

9  to be the fault.

10      Q.    In my example both temperature

11  and pressure are out of rake but the

12  temperature is so out of range it alone

13  would cause an issue by itself.  Does that

14  make sense to you?

15      A.    Well, in such case the

16  temperature by itself would be a

17  significant fault but even if in a case

18  where the temperature wouldn't be so

19  extreme but would be slightly out of range

20  and if it is slightly out of range and the

21  pressure is out of range and it falls on

22  each -- then the combination is also a

23  significant fault.

24      Q.    If one factor alone is enough

25  that would be the significant fault?

ROUGH DRAFT

```
 1                         ROUGH
 2            MR. PARKER:  Objection.
 3       Misstates.
 4       A.    If one factor is out of range and
 5  the device fails, then that factor is a
 6  significant fault.
 7       Q.    I'm going to turn your attention
 8  to paragraph 84 and the chart below
 9  paragraph 84 of your declaration.
10       A.    OK.
11       Q.    This is a proposed construction
12  for the term in claim 7 so the term is
13  determining in said computer whether said
14  program is a significant factor.
15            And plaintiffs proposed
16  alternative is the parameter that provides
17  a significant contribution to the fault.
18            Do you see that?
19       A.    Yes.
20       Q.    Do you agree with that
21  alternative construction?
22       A.    Yes.
23       Q.    What is a parameter that provides
24  a significant contribution to the fault?
25       A.    It's like we discussed, if the
```

ROUGH DRAFT

```
 1                        ROUGH
 2  to try to interpret something that is vague
 3  in the claim.
 4      Q.    Is any part of the intrinsic
 5  evidence more important than another part?
 6      A.    I'm not sure.  I think the
 7  specification are -- I mean the claim are
 8  of course the most important but the
 9  specification I think are the highest
10  priority after the claims themself.
11      Q.    Is it your opinion, Mr. Maltiel,
12  that if the intrinsic evidence is
13  unambiguous, it's appropriate to consider
14  ex- continue sick evidence?
15      A.    When you say unambiguous, you
16  don't need to consider anything, I wouldn't
17  considered ex- extrinsic -- I wouldn't
18  consider extrinsic if intrinsic is fairly
19  clear and not ambiguous at all.
20      Q.    Accident your opinion that the
21  intrick sick evidence of the 097 patent
22  defines the race ultra-thin resist?
23      A.    Yes.
24      Q.    Is it your opinion that the
25  specification of the 097 patent is
```

ROUGH DRAFT

1                         ROUGH

2     unambiguous?  On that point?

3          A.    Yes.

4          Q.    If the court disagrees and finds

5     that the specification ambiguous, should

6     the court consider extrinsic evidence?

7          A.    I don't know, I'm not an

8     attorney.

9               MR. PARKER:  Calls for a legal

10         conclusion.

11         A.    I cannot say to a legal

12    conclusion.

13         Q.    Let's talk for a few minutes on

14    the doctrine of claim differentiation are

15    you familiar with those words?

16         A.    In general, again, I'm not an

17    attorney.

18         Q.    What is your you hadding of what

19    claim differentiation?

20         A.    That to try to decide what level

21    the claim is to be different to stand on

22    their own.

23         Q.    I'm sorry, madam court reporter

24    could you read back that answer.

25               (Record read)

ROUGH DRAFT

```
 1                        ROUGH

 2  ultra-thin resist is less than 2500

 3  angstroms, did they?

 4      A.    Maybe this is why he put claim 4.

 5  I mean I don't know the mind of the

 6  inventor like if I say I didn't met him, I

 7  didn't know him.  I didn't interview him.

 8      Q.    Mr. Maltiel, let's turn back to

 9  column 1, lines 43 through what,?

10      A.    OK.

11      Q.    Do you see the phrase there is

12  considered to be?

13      A.    Yes.

14      Q.    What do the words considered to

15  be mean to you as a person of ordinary

16  skill in the art?

17      A.    In his experience people would

18  recognize it to be this thickness, but at

19  the same time, you want to be sure that

20  they know what he means.

21      Q.    A person of ordinary skill in the

22  art at the time of the alleged invention,

23  where would you go to look for what other

24  people of skill in the art recognized as an

25  ultra-thin resist?
```

ROUGH DRAFT

1                              ROUGH

2        A.    I'll ask them.  I'm basically ask

3    the people or try to find a record of what

4    is it considered to be.

5        Q.    Would that include publications

6    like in IEEE or SPIE?

7        A.    I wouldn't need to if I am

8    reading this patent it mention things like

9    3 or 4 times what it is, there are at least

10   twice in the figure they mention it.  So it

11   would be clear enough that what the

12   inventor, when he is talking about

13   ultra-thin resist, what he need an means.

14       Q.    So did you consider the fact that

15   the inventor didn't use the word is by

16   itself but used the phrase is considered to

17   be?

18       A.    I mean it's possible that he just

19   was talking here that potentially that

20   maybe other people call ultra-thin resist

21   different thicknesses but he want for

22   people to be clear that when he is talking

23   in this patent of full ultra-thin resist,

24   it has to be less 2500 angstroms.

25       Q.    Wouldn't it have been clearer he

ROUGH DRAFT

1                           ROUGH

2    don't know why he didn't include.

3        Q.    Is there any difference in your

4    view between using the phrase is considered

5    to be as opposed to just the word is?  In

6    lines 43 through 45 of column 1 of the 097

7    patent?

8        A.    There is a difference but

9    different people use different words in

10   different circumstance.  So I cannot

11   speculate what was his reasoning to include

12   the word considered.

13       Q.    So I want to run back to a

14   question I asked you before, which was as a

15   person of ordinary skill in the art if you

16   wanted to know what other people of

17   ordinary skill in the art recognized as

18   ultra-thin resist, where would you go look?

19   Do you remember that question?

20       A.    Yes.

21       Q.    And I believe you said that you

22   would talk to the ear people, talk to other

23   people of the skill in the art, is that

24   correct?

25       A.    Yes.

ROUGH DRAFT

1                          ROUGH

2    that for the 248, you need 5,000 angstrom

3    and for the 193 nanometer, you need 4,000

4    angstrom.

5         Q.    So my question is a little

6    different.  The next sentence that talks

7    about the UTR thickness?

8         A.    Um-hm.

9         Q.    Does that apply for both 248

10   nanometer lithography and 193 nanometer

11   lithography?

12        A.    He doesn't -- he doesn't explain

13   there, he doesn't define it.

14        Q.    Let's take the case for example

15   of 248 nanometer lithography to begin with.

16   Am I right that the patent describes that

17   the standard thickness is 5,000 angstroms?

18        A.    OK.

19        Q.    And then the -- there is a

20   sentence at 43 lines 43 through 45, states

21   that under 2500 angstroms is an ultra-thin

22   resist.  Correct?

23        A.    OK.  Yeah that's in 44, 45, yeah.

24        Q.    How does the patent describe a

25   resist with a thickness between 2500

ROUGH DRAFT

1                    ROUGH

2    angstroms and 5,000 angstroms for 248

3    nanometer lithography?

4        A.    He is not talking about it.   He

5    is talking about a case where you use

6    ultra-thin resist.

7        Q.    So it's accurate to say that the

8    patent doesn't tell you how to describe a

9    resist that has a thickness of 2500

10   angstroms to too 5,000 angstroms with 248

11   nanometer lithography?

12       A.    No, no, he is talking about

13   different situation when you need to use

14   ultra-thin resist and you describe your

15   process that you can use it to create the

16   small dimension of lines.

17       Q.    Is my question is different.   I

18   think we have established that the patent

19   describes a resist with the thickness of

20   under 2500 angstroms as ultra-thin and then

21   the patent also describes for 248 nanometer

22   lithography that a resist of 5,000

23   angstroms is known as standard in terms of

24   its thickness, what about a resist of 4,000

25   angstroms for 248 nanometer lithography,

ROUGH DRAFT

```
 1                      ROUGH

 2   patent, is that photo resist standard

 3   thickness, ultra-thin thickness or some

 4   other thickness?

 5        A.    He doesn't give it a name,

 6   standard or whatever.  He is just shall

 7   did-this is just a background if you want

 8   to make features.5 micron are.4..5 is

 9   standard photo he is resist,.4 he doesn't

10   gave it a name.  But for my case when Iing

11   want to make smaller features than either.5

12   or.4, you should use the ultra UTR with the

13   resist thickness of 2500 and depose this

14   with the hard mask and so and and you will

15   be able to produce the small dimension.

16   Even claim 1 it starts by saying to a -- it

17   is someplace else that you make a small,

18   small as in the photo resist dimensions.

19        Q.    So I want you to focus

20   Mr. Maltiel on 193 nanometer lithography

21   for a moment.  Based on the teaching of

22   this patent limb using 193 nanometer

23   lithography and a resist as thickness of

24   3,000 angstroms, does that resist have a

25   standard thickness, an ultra-thin thickness
```

ROUGH DRAFT

1                           ROUGH

2   or some other thickness?

3       A.    He doesn't define it.

4       Q.    Mr. Maltiel, did you look, in

5   preparing your reports and opinions did you

6   look for any evidence as to what the patent

7   applicant considered a resist with the

8   thickness between 2500 angstroms and 5,000

9   angstroms to be an ultra-thin resist for

10  248 nanometer lithography?

11              MR. PARKER:  Objection, vague.

12      A.    I mean I looked to see what the

13  patent use and see what was defined clearly

14  in the patent and if it makes sense in the

15  device works and consider it a workable

16  device.

17      Q.    Did you look at anything outside

18  the patent?

19      A.    I looked at the as I said of

20  other patent and I'm familiar with the

21  industry, I develop on many technology of

22  this nature, so I'm familiar with the area

23  so I blocked at some of the aspect.

24      Q.    For 248 nanometer lithography,

25  did you find any instances where a person

ROUGH DRAFT

1                    ROUGH

2   either 4,000 or 5,000 angstroms of the

3   sentence before.  Do you remember those

4   questions?

5        A.    Yes, I do.

6        Q.    For the purposes of the invention

7   described in the 097 patent and in

8   particular the claims, does it matter what

9   those thicknesses are called, the

10  thicknesses between the 2500 angstrom and

11  the 4 or 5,000 angstrom?

12       A.    No, not at all.  It's just a

13  background of the invention.  They

14  described clearly just what the UTR

15  thickness and this is what the invention is

16  all about.

17       Q.    And Mr. Bowen asked you a bunch

18  of questions about the final sentence lines

19  43 to 45 and focused and various times on

20  specific words or groups of words but when

21  you read that sentence in the context of

22  one of ordinary skill in the art, was the

23  sentence clear to you as to what the patent

24  was intending to convey to one of ordinary

25  skill in the art?

ROUGH DRAFT

1                    ROUGH

2      A.    Yes.  Yeah, it was clear.  It was

3  clear talking about UTR thickness to be

4  ultra-thin risks Syms it is less than 2500

5  angstrom in thickness.

6      Q.    And then if you if you could turn

7  to column 3, Mr. Bowen asked you some

8  questions about the first sentence on the

9  top of column 4, do you recall those

10  questions?

11      A.    Yes.

12      Q.    And particularly the use of the

13  term UTR layer there and whether or not it

14  should -- well, that it it doesn't

15  specifically mention less than 2500

16  angstroms, do you recall that?

17      A.    Yes.

18      Q.    Now if you look at column 3,

19  starting at line 58, there is a sentence,

20  it starts the present invention.

21      A.    Yes.  I see.

22      Q.    In that sentence -- well, the

23  sentence says the present invention will

24  now be described with respect to the

25  process flow of figure 3 and the